Ralph M. HACKLEY, Appellant,

v.

Richard L. ROUDEBUSH, Administrator of Veterans Affairs, et al., Appellees,

No. 73–2072.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1975.

Decided Sept. 29, 1975.

David J. Saylor, Washington, D. C., for appellant.

Edward D. Ross, Jr., Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry and Ellen Lee Park, Asst. U. S. Attys., were on the brief, for appellees. Harold H. Titus, Jr., U. S. Atty. at the time the record was filed, also entered an appearance for appellees.

Charles Stephen Ralston, New York City, with whom James M. Nabrit, III, New York City, and David Cashdan, Washington, D. C., were on the brief, for NAACP Legal Defense and Educational Fund, Inc. as amicus curiae.

Before WRIGHT and LEVENTHAL, Circuit Judges, and DAVIS,* Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge:

■ Plaintiff-appellant Ralph Hackley, a black employee of the Federal Government, brought suit in the District Court alleging racial discrimination in the employment practices of the Veterans Administration's Investigation and Security Service Division.[1] Having exhausted his administrative remedies without satisfaction, appellant contended that the Equal Employment Opportunity Act of 1972, Section 11, 42 U.S.C. § 2000e–16 (Supp. III 1973), which

* Of the United States Court of Claims, sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

1. *See Hackley v. Johnson,* 360 F.Supp. 1247 (D.D.C.1973).

amended Title VII of the Civil Rights Act of 1964 to encompass federal employees and to accord them the right to file a "civil action" after final agency action, entitled him to a trial *de novo* on his discrimination claims in the District Court.[2] In response, appellees sought summary judgment on the basis of their assertion that, as a legal matter, the role of the District Judge in such civil actions was limited to review of the administrative record to ensure the existence of a rational basis for the agency's[3] decision and that, as a factual matter, the administrative record clearly indicated that there was a rational basis for the agency's finding that there was an absence of discrimination against appellant.[4] Judge Gesell granted appellees' summary judgment motion[5] since his analysis of the language and legislative history of the 1972 amendments to Title VII, and his perception of the policies implicated by the question of *de novo* proceedings, convinced him that Title VII did not accord an aggrieved federal employee the right to a trial *de novo*; however, he held that the administrative record must be scrutinized under the more demanding preponderance of the evidence standard of review.[6] Although we believe there may be some merit to the concerns

2. Appellant sought injunctive relief, retroactive promotion, retroactive pay, and a declaration of his rights to be free from employment discrimination under, *inter alia,* Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Fifth Amendment to the Constitution, and Executive Orders 11246 and 11478. Jurisdiction was invoked under, *inter alia,* the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1970), the Civil Rights Act, 28 U.S.C. § 1343 (1970), and the Tucker Act, 28 U.S.C. § 1346 (1970), as well as the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (Supp. III 1973). In light of our disposition of the Title VII claim, we need not reach the question whether a trial *de novo* (or some variant thereof) might be appropriate under the other asserted jurisdictional bases. *See, e. g., Bowers v. Campbell,* 505 F.2d 1155 (9th Cir. 1974); note 172 *infra.*

3. The agency whose decision was under review in the District Court was the Civil Service Commission's Board of Appeals and Review, which had itself reviewed the final decision of the VA. 171 U.S.App.D.C. pp. ———, ———, 520 F.2d pp. 114–115, 116 & n. 72 *infra.*

4. Appellees also sought dismissal of appellant's claims on the ground that this was an unconsented suit against the sovereign, *see, e. g., Gnotta v. United States,* 415 F.2d 1271 (8th Cir. 1969), *cert. denied,* 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970), since the Equal Employment Opportunity Act of 1972 purportedly did not retroactively extend jurisdiction to cases where the alleged discrimination occurred prior to the Act's passage. Judge Gesell denied appellees' motion without stating any rationale, *see Hackley v. Johnson,* 360 F.Supp. 1247 (order of Mar. 14, 1973), and later specifically reaffirmed that ruling upon the ground that the 1972 amendments were retroactive as to discrimination complaints administratively pending at the time they went into effect. *See Hackley v. Johnson,* 360 F.Supp. 1247, 1249 n. 1 (D.D.C.1973). We concur in this determination of the scope of Title VII's coverage. *See, e. g., Grubbs v. Butz,* 169 U.S.App.D.C. 82, 514 F.2d 1323 (1975); *Womack v. Lynn,* 164 U.S.App.D.C. 198, 504 F.2d 267, 269 & nn. 4, 6 (1974). *See also, e. g., Sperling v. United States,* 515 F.2d 465, 474–475 (3d Cir. 1975); *Koger v. Ball,* 497 F.2d 702 (4th Cir. 1974).

5. *Hackley v. Johnson,* 360 F.Supp. 1247 (D.D.C.1973).

6. It is not totally clear, however, how Judge Gesell considered the burden of proof was to be allocated. He stated:

The District Court is required by the Act to examine the administrative record with utmost care. If it determines that an absence of discrimination is affirmatively established by the clear weight of the evidence in the record, no new trial is required. * * * * * * Those who feel aggrieved, once having brought forward any proof suggestive of discrimination, are entitled to require those most cognizable [*sic*] of the relevant employment practices to come forward and disprove the accusation by the clear weight of the evidence.

*Id.* at 1252–1253. This approach may be inconsistent with that enunciated by the Supreme Court in other Title VII contexts. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 157 *infra.* Moreover, although Judge Gesell held that the lack of discrimination must be proved by the "clear weight of the evidence," 360 F.Supp. at 1252, he actually affirmed the finding of no discrimination because it was "supported by a preponderance of the evidence." *Id.* at 1255. The potential vagaries of the standard of review if the federal employee is not accorded a trial *de novo* with the same standard and allocation of the burden of proof as govern private sector employee civil actions are considerable. *See, e. g.,* note 152 *infra.*

which motivated Judge Gesell's holding, we are of the opinion that Congress intended to bestow on federal employees the same rights in District Court—including the right to a trial *de novo* —which it had previously mandated for private sector employees, and that the Federal Rules of Civil Procedure are flexible enough to enable trial judges to prevent such *de novo* trials from unduly burdening the courts or substantially duplicating agency proceedings.[7] Accordingly, we reverse the grant of the motion for summary judgment and remand the case to the District Court for further proceedings consistent with this opinion.[8]

## I

On June 29, 1967 appellant Hackley transferred from a GS–7 position with the District of Columbia Department of Public Welfare to a GS–7 position as a General Investigator in the Investigation and Security Service Division (I&S) of the Veterans Administration (VA). Before appellant was hired at the insistence of Mr. Holland, I&S' then recently appointed black Director, I&S had never had a black investigator.

During Mr. Holland's tenure as Director of I&S, appellant progressed from GS–7 to GS–12, reaching the latter rating in November 1969.[9] Shortly thereafter, Mr. Holland was succeeded by Mr. Maiers, a white Director. In February 1971 appellant complained that Mr. Maiers and his assistant, Mr. Rettew, had denied him a promotion to the level of

GS–13 solely because of racial discrimination. An informal investigation of the allegation was conducted by an Equal Employment Opportunity counselor, who interviewed five of appellant's past and present supervisors; the counselor recommended that appellant be promoted because, *inter alia,* there were no written job standards at I&S, thus leaving the question of promotions "to the personal likes and dislikes of the supervisors,"[10] who ostensibly considered appellant lacking in experience and deficient in the areas of field investigation and report writing necessary for such a promotion.[11]

When the EEO counselor informed appellant that VA management had rejected this recommendation, he lodged a formal complaint of racial discrimination with the VA on March 22, 1971, asserting that Messrs. Rettew, Maiers, and Turner (Assistant Administrator of the VA for Management and Evaluation) were responsible for the allegedly discriminatory acts. A formal investigation of this complaint was conducted during April 1971 by Mrs. Kinnebrew, a VA employee. In her final written report, she concluded that appellant's work assignments and a lack of communication with management had "placed him in a cycle of discriminatory circumstances."[12] She perceived a "vast difference" in the assignments given appellant (predominantly assistance to white investigators on cases concerning blacks, with accountability to numerous supervisors) and those given Mr. Sandleman, a white GS–12 in-

---

7. *See generally* 171 U.S.App.D.C. pp. ——— ——, ——————, 520 F.2d pp. 118–122, 142–159 *infra.*

8. Since this remand will probably result in the introduction of further evidence in this case, we do not address appellant's alternative claim that even under the standard of review applied in the District Court, summary judgment was improper because an absence of discrimination was not shown by a preponderance of the evidence already available.

9. In September 1967 appellant was promoted to the GS–9 level and in November 1968 he was promoted to GS–11. These rapid advances were partially due to the fact appellant had been hired at a lower salary level than the

GS-11 which is normal for his position, since he was recruited for the position even though he possessed less experience than is ordinarily required for I&S investigators.

10. Brief and appendix for appellant at App. 39 (Initial Review of EEO counselor Bumbary, Feb. 8, 1971).

11. *Id.* Both Mr. Maiers and Mr. Rettew considered the charges unfair since they believed they had treated appellant no differently than other investigators; the EEO counselor, in recommending appellant's promotion, made no finding of racial discrimination on their part.

12. Brief and appendix for appellant at App. 34 (Report of EEO Investigation, June 4, 1971).

vestigator hired after appellant (predominantly assigned his own cases concerning whites, with accountability to a single supervisor).[13] Although she recommended that actions be taken to avoid such a cycle of discriminatory circumstances in the future, and that job standards be reduced to writing and the length of the training program spelled out,[14] these remedial actions were not taken by appellant's superiors and his dispute remained unresolved.

After being informed by Mr. Turner that no promotion would be forthcoming and that he had the option of requesting a decision by the VA's General Counsel either without or after a hearing on his complaint, appellant demanded a hearing. A Civil Service Commission (CSC) employee, Mr. Knazik, was designated the complaints examiner for the purpose of holding the formal hearing. Although no prehearing depositions were taken or other discovery allowed, appellant was represented by counsel at the hearing and was permitted to present and cross-examine available[15] witnesses. The hearing spanned seven days and was comprised of testimony from 19 persons, including appellant; upon its completion, Mr. Knazik filed a report to the VA stating various findings and concluding that there was no evidence to support a claim of racial discrimination in the failure to promote appellant.[16]

■ In a letter to appellant, the Assistant General Counsel of the VA adopted Mr. Knazik's findings and recommended decision as the final VA position and notified appellant of his right to appeal the decision to the CSC's Board of Appeals and Review (BAR). Appellant filed such an appeal and the BAR requested the VA to supplement the hearing record by providing additional data concerning the races of certain I&S personnel as well as their promotion records. This information, supplied to the BAR in an unsworn memorandum by

13. *Id.* Mrs. Kinnebrew also reported her inability on six different occasions to obtain a statement from Mr. Holland, who had "promised to write a statement that would point up why Mr. Hackley could not expect to ever become a member of the Investigation and Security Division 'Family.'" *Id. See also* 171 U.S.App.D.C. pp. ———, ———, 520 F.2d pp. 150–151, 158–159 *infra.*

14. No promotion recommendation was made because Mrs. Kinnebrew believed that "[w]hether or not Mr. Hackley is capable of doing the work assignment of a GS–13 Investigator is the decision of Management." However, she noted that this discretion "does not in any way overshadow the differences Management has made in the work assigned two GS–12 Investigators—one white and the other black." Brief and appendix for appellant at App. 34.

15. Some potential witnesses, such as Mr. Holland and Mr. Haycraft (a white former investigator who had submitted an affidavit to Mrs. Kinnebrew stating, *inter alia,* that Mr. Maiers referred to blacks derogatorily as "burr heads") were not available, since they were no longer in VA employ and there was no mechanism for compelling their presence at the agency hearing. *See, e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 140 & note 131 *infra.*

16. Without delving into the merits of the case, which must be analyzed on remand, we note that the issue of the racial climate at I&S was dealt with only cursorily by the complaints examiner, even though Congress has cautioned that CSC investigations have too often focused on overt discrimination by malicious individuals rather than on systemic discrimination. *See* note 129 *infra.* The examiner concluded that "enough of the testimony does reflect a climate of exclusion of minorities prior to July 1966." Brief and Appendix for Appellant at App. 28. Nevertheless, without specifying the basis on which he reached his finding, and without comparing the relative treatment of various I&S employees, the examiner simply asserted that "I feel that the old attitudes have changed. I believe that Mr. Maiers could no longer exclude any group arbitrarily. Under Mr. Blake Turner, the Internal Audit Service has brought in minority group members. It now must be felt that since the old pattern of exclusion is broken that Mr. Turner will insure that the Services under his supervision will continue their positive recruitment efforts to attract minorities." *Id.* Of course, even if hiring is not discriminatory, promotion policies—especially where there are no written promotional criteria—may be. Indeed, Congress expressed particular concern that although minorities were fairly well represented at some levels of federal employ, discrimination was acute at the higher GS levels. *See, e. g.,* sources cited at notes 63, 76 *infra.*

Mr. Turner, one of the officials accused by appellant of racial discrimination, was not subject to rebuttal by appellant, although it was discussed in the BAR's decision reviewing his complaint. On May 22, 1972 the BAR affirmed the VA decision and advised appellant that there were no further administrative remedies available. Appellant subsequently instituted the current suit against the Administrator of the VA, Messrs. Maiers, Rettew, and Turner, and the three members of the CSC, all in their official capacities.[17]

## II

Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 253 *et seq.* (codified at 42 U.S.C. § 2000e *et seq.*), which generally prohibits[18] employment discrimination[19] based on an individual's race, color, religion, sex, or national origin, originally was inapplicable to federal employees. Although Congress did declare it to be "the policy of the United States to insure equal employment opportunities for [federal] employees without discrimination because of race, color, religion, sex, or national origin,"[20] and although several Executive Orders reiterated that policy and charged the CSC with its enforcement,[21] specific implementing legislation was not enacted until the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103 *et seq.*, extended the protections of Title VII so as to embrace federal employees.[22] Notwithstanding the constitutional right to be free from such discrimination,[23] federal employees attempting to enforce that right before 1972 had been faced with virtually insuperable obstacles to judicial rulings on the merits of their claims.[24] This anomalous situation was dramatically altered by the promulgation, as Section 11 of the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (Supp. III

**17.** The only proper defendant in a Title VII suit, however, is the "head of the department, agency, or unit" in which the allegedly discriminatory acts transpired. *See, e. g.*, 171 U.S.App.D.C. pp. —— – ——, 520 F.2d pp. 115–117 *infra*.

**18.** *See generally* 42 U.S.C. §§ 2000e, e–1 (1970), *as amended* (Supp. III 1973) (defining those individuals and organizations which fall within the Act's coverage).

**19.** *See generally* 42 U.S.C. §§ 2000e–2 to –3 (1970), *as amended* (Supp. III 1973) (defining the employment practices outlawed by the Act).

**20.** 5 U.S.C. § 7151 (1970).

**21.** *See* Executive Order 11478, 3 C.F.R. § 207 (1974) (superseding Executive Order 11246, 3 C.F.R. § 567 (1965)). *See also* Executive Order 9980, 3 C.F.R. § 720 (1948); Executive Order 10590, 3 C.F.R. § 237 (1955). In addition to restating the Government's non-discrimination policy, Executive Order 11478 requires under section 2 that each executive department and agency establish an affirmative program of equal employment opportunity. Section 3 of Executive Order 11478 directs the Civil Service Commission to review and evaluate these programs, while sections 4 and 5 elaborate the CSC's powers: the CSC is to "provide for the prompt, fair, and impartial consideration of all complaints of [federal employment] discrimination," including informal counseling at the agency level and appeal to the CSC, and to issue regulations and orders as necessary to carry out the presidential directive. No remedial powers, however, were specified, which prompted much of the 1972 reform with respect to the Commission. *See, e. g.*, 171 U.S.App.D.C. pp. ——, ——, —— – ——, ——, 520 F.2d 128–129, 132, 133–134 notes 66, 77 *infra*.

**22.** Coverage was also extended so as to embrace employees of state and local governments, governmental agencies, and political subdivisions (except for local officials, their personal assistants and immediate advisors, unless they are subject to civil service laws); District of Columbia departments and agencies; and private sector employers with 15 or more full-time employees and labor organizations with 15 or more members. Moreover, a prior exemption for educational institutions was eliminated and that for religious organizations was expanded. *See* H.R.Rep.No.899, 92d Cong., 2d Sess. 15–16 (1972), U.S.Code Cong. & Admin.News 1972, p. 2137 (conference report on 1972 Amendments). For a fuller description of the various changes effected by the 1972 amendments, *see generally id.* at 15–21.

**23.** *See, e. g., Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**24.** *See, e. g.*, 171 U.S.App.D.C. pp. ——, ——, —— – ——, ——, —— 520 F.2d pp. 128–129, 132, 133–136 & note 67 *infra*.

1973), of Section 717 of the Civil Rights Act of 1964.

Subsection 717(a) of Title VII, 42 U.S.C. § 2000e–16(a), specifies that "[a]ll personnel actions affecting employees or applicants for employment * * * in executive agencies [of the United States] * * * shall be made free from any discrimination based on race, color, religion, sex, or national origin," while subsection 717(b) of Title VII, 42 U.S.C. § 2000e–16(b), authorizes the CSC to enforce subsection (a) through dispensation of appropriate remedies and issuance of necessary rules and regulations.[25] The crux of the instant case involves the meaning of subsections 717(c), (d) of Title VII, 42 U.S.C. §§ 2000e–16(c), (d), which explicitly provide that a federal employee aggrieved by the administrative disposition of his complaint or the failure of administrative action within certain time limits may file a "civil action" in the District Court:

> (c) Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant.

Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 [26] or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, *may file a civil action as provided in section 2000e–5* [27] of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

> (d) Section 2000e–5(f) through (k) of this title applicable to civil actions.

*The provisions of section 2000e–5(f) through (k) of this title, as applicable, shall govern civil actions brought hereunder.*

(Emphasis added.)

■ We must determine the proper contours of the "civil action" which federal employees may institute under these provisions. In particular, we must reassess Judge Gesell's conclusion that subsections 717(c) and (d) do not accord those federal employees who have received an administrative hearing on their complaint [28] the right to a trial *de novo* in federal court on their allegations of employment discrimination. Judge Gesell had determined that:

> The grant of jurisdiction to the Federal Courts [by subsection 717(c)] leaves open how that jurisdiction should be exercised. * * *
>
> * * * * * *
>
> The Federal Courts are free to act in whatever manner may be appropri-

---

**25.** *See generally* 171 U.S.App.D.C. pp. ——— ———, 520 F.2d pp. 136–142 *infra.*

**26.** *See* note 21 *supra.*

**27.** 42 U.S.C. § 2000e–5 (1970), *as amended* (Supp. III 1973) (§ 706 of the Civil Rights Act of 1964), contains the enforcement provisions of Title VII and includes the jurisdictional and procedural rules applicable to private sector employee actions. *See, e. g.,* 171 U.S.App.

D.C. pp. ——— ———, 520 F.2d pp. 118–119 *infra.*

**28.** Those federal employees who, because of failure of agency action for 180 days, file a civil action without prior compilation of an administrative hearing record, are concededly entitled to a trial *de novo* on their discrimination claims in the District Court. *See Grubbs v. Butz,* 169 U.S.App.D.C. 82, 514 F.2d 1323 (1975); brief for appellees at 27, 40, 59–60.

ate, case by case, consistent with experience and precedent. Precious rights of individuals are involved and these must not be obfusticated [*sic*] by procrustean adherence to standards of review that are more semantic than substantial. There is a need to establish an especially high standard of review in government employment cases involving aspects of discrimination prohibited by the Civil Rights Act of 1972, but an interpretation that embraces an automatic requirement of trial *de novo* in all instances with all its inherent uncertainties and substantial delays will defeat rather than advance the Act's objectives.

The trial *de novo* is not required in all cases. The District Court is required by the Act to examine the administrative record with utmost care. If it determines that an absence of discrimination is affirmatively established by the clear weight of the evidence in the record, no new trial is required. If this exacting standard is not met, the Court shall, in its discretion, as appropriate, remand, take testimony to supplement the administrative record, or grant the plaintiff relief on the administrative record.[29]
This hybrid approach—limiting the District Judge to a review of the administrative record but requiring him to reassess the evidence to decide where the preponderance lies—may appear to strike a nice compromise between the opposing parties' contentions in this case, and between those courts which have found a right to a trial *de novo* and those which have merely reviewed the administrative record under a substantial evidence standard, but we find no basis for this holding in the language or legislative history of the 1972 amendments. Rather, we believe that Congress did intend to provide federal employees the right to a trial *de novo*, and that the preponderance test is to be applied as a normal concomitant of any civil action which involves such a trial *de novo*.[30]

---

**29.** 360 F.Supp. at 1250, 1252 (footnote omitted). *But see also* note 6 *supra*.

**30.** *See generally,* 171 U.S.App.D.C. pp. ——-——, —— - ——, 520 F.2d pp. 118–122, 142–148 *infra*. The District Courts appear to be hopelessly divided on the question whether federal employees have the right to a trial *de novo* on their Title VII claims. *Compare, e. g., Baca v. Butz,* 376 F.Supp. 1005 (D.N.M.1974), *Thompson v. U. S. Dept. of Justice, Bureau of Narcotics & Dangerous Drugs,* 372 F.Supp. 762 (N.D.Cal.1974), *Spencer v. Schlesinger,* 374 F.Supp. 840 (D.D.C.1974), *Tomlin v. U. S. Air Force Medical Center,* 369 F.Supp. 353 (S.D.Ohio 1974), *Handy v. Gayler,* 364 F.Supp. 676 (D.Md.1973), *Abrams v. Ohio,* 383 F.Supp. 450 (N.D.Ohio 1974), *Guilday v. U. S. Department of Justice,* 385 F.Supp. 1096 (D.Del.1974) (denying trial *de novo*), *with, e. g., Jackson v. U. S. Civil Service Commission,* 379 F.Supp. 589 (S.D.Tex.1973), *Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Tex.1973), *Henderson v. Defense Contract Administrative Services Region, N.Y.,* 370 F.Supp. 180 (S.D.N.Y.1973), *Griffin v. U. S. Postal Service,* 385 F.Supp. 274 (M.D.Fla.1973), *Robinson v. Klossen,* 9 EPD ¶ 9954 (E.D.Ark., Oct. 3, 1974), *Sylvester v. U. S. Postal Service,* 393 F.Supp. 1334 (S.D.Tex.1975), *summarized in* 43 U.S.L.Week 2468 (May 20, 1975) (absolute right to trial *de novo*). *See also, e. g., Correathers v. Alexan-*

*der,* 9 EPD ¶ 9858 (D.Colo., Dec. 11, 1974); *McLaughlin v. Callaway,* 382 F.Supp. 885 (S.D. Ala.1974) (trial *de novo* ordered as exercise of court's discretion); *Robinson v. Warner,* 8 EPD ¶ 9452 (D.D.C., June 24, 1974) (plaintiff granted summary judgment on basis of administrative record supplemented by discovery). And those courts which deny the right to a trial *de novo* are severely divided as to the standard of review that should be applied to the administrative record. *See* note 172 *infra*.

The trial *de novo* question is now reaching the Courts of Appeals, which are also divided as to the proper answer. *Compare Salone v. United States,* 511 F.2d 902, 904 (10th Cir. 1975) (denying trial *de novo* "for the reasons stated by the court in Hackley"), and *Chandler v. Johnson,* 515 F.2d 251 (9th Cir. 1975) (no abuse of discretion in trial court's denial of request for trial *de novo*), *with Sperling v. United States,* 515 F.2d 465 (3d Cir. 1975), *summarized in* 43 U.S.L.Week 2448 (May 6, 1975) (absolute right to trial *de novo*) and *Caro v. Schultz,* No. 74–1728 (7th Cir., Sept. 3, 1975) (absolute right to trial *de novo*).

Commentators have also reached apparently conflicting conclusions concerning the issue. *Compare* Sape & Hart, *Title VII Reconsidered: The Equal Employment Opportunity Act of 1972,* 40 Geo.Wash.L.Rev. 824, 853–857 (1972) ("Unlike review of agency action pursuant to

## A.

To be sure, Section 717 of Title VII does not explicitly declare that the "civil action" instituted by an aggrieved federal employee [31] is to be a trial *de novo*. However, even without the support of the legislative history of the 1972 amendments [32] it would appear on closer scrutiny that the structure of Title VII indicates that such a *de novo* proceeding was intended by Congress.

Subsection 717(c) of Title VII permits an aggrieved federal employee to "file a civil action as provided in section 2000e–5 of this title [42 of the U.S. Code, Section 706 of Title VII]," and subsection 717(d) specifies that the "provisions of section 2000e–5(f) through (k) of this title [42 of the . U.S. Code, subsections 706(f)–(k) of Title VII], as applicable, *shall govern* civil actions brought hereunder." (Emphasis added.) Section 706 contains the enforcement provisions of Title VII, and subsections 706(f)–(k) specify the parameters of the "civil ac-

tions" which may be brought to remedy private sector discrimination. Subsection 706(f) provides, *inter alia*,[33] for jurisdiction and specific venue requirements in the United States District Courts,[34] for an expedited "hearing" of the case,[35] for discretionary appointment of a master if the judge "has not scheduled the case *for trial* within one hundred and twenty days after issue has been joined," [36] and for court appointment of counsel and waiver of fees and court costs in appropriate circumstances.[37] Subsection 706(g) grants the courts broad remedial powers, while subsection 706(j) renders the civil action appealable under 28 U.S.C. §§ 1291, 1292 (1970). Finally, subsection 706(k) specifies that the court may award the prevailing party a reasonable attorney's fee as part of the costs of the action, and subjects the United States to the same liability as private litigants.[38]

The provisions of Section 706 have been interpreted by the Supreme Court

---

section 10 of the [Administrative] Procedure Act whereby the court merely determines whether an agency's action is supported by substantial evidence, an action by an aggrieved federal employee under the 1972 Act requires a trial *de novo*."), and Comment, *Federal Employment Discrimination and the Equal Employment Opportunity Act of 1972: Review on the Administrative Record or Trial De Novo?* 20 *S.Dak.L.Rev.* 181 (1975) (same), with Comment, *Hackley v. Johnson: The Federal Employee's Right to Trial De Novo Review of Civil Service Discrimination Determinations,* 123 *U.Pa.L.Rev.* 206 (1974) (discretionary trial *de novo*).

**31.** In referring to federal employees, we will also be including applicants for federal employment, since § 717 accords them the same rights to equal employment opportunity as are possessed by individuals already within the federal employ. *See* 171 U.S.App.D.C. p. —, 520 F.2d p. 116 *supra.*

**32.** *See* 171 U.S.App.D.C. pp. — — —, — — —, 520 F.2d pp. 122–136, 142–148 *infra.*

**33.** Subsection 706(f)(1) initially authorizes the EEOC, if it finds "reasonable cause to believe" the discrimination complaint is meritorious, *see* § 706(b), to file a "civil action" against any private sector respondent (other than a state or local government, governmental agency, or

political subdivision) if the EEOC does not secure a satisfactory conciliation agreement within specified time limits. With respect to state or local government employees, the "civil action" may only be brought by the Attorney General. In either case, the aggrieved party has the right to intervene in the civil action. If, on the other hand, the charge is dismissed by the EEOC or if the Commission or the Attorney General has not filed the civil action which is authorized, the aggrieved person may himself file a "civil action" against the respondent named in the discrimination charge.

**34.** Subsection 706(f)(3), 42 U.S.C. § 2000e–5(f)(3) (Supp. III 1973).

**35.** *Id.* § 706(f)(5).

**36.** *Id.* (emphasis added).

**37.** *Id.* § 706(f)(1).

**38.** Subsection 706(f)(2) allows the EEOC, after a preliminary investigation of a charge, to bring an action seeking temporary relief in accordance with Rule 65 of the Federal Rules of Civil Procedure if the EEOC concludes that prompt judicial relief is necessary. Subsection 706(h) exempts all civil actions brought under § 706 from the strictures of 29 U.S.C. §§ 101–115 (1970) (Norris-LaGuardia Act), and subsection 706(i) authorizes the EEOC to commence proceedings to compel compliance if any respondent fails to obey a court order issued in a civil action brought under § 706.

to grant an aggrieved private sector litigant the right to a trial *de novo* on his or her employment discrimination claim, *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (private sector employee's right to trial *de novo* under Title VII is not foreclosed by prior submission of claim to final arbitration under nondiscrimination clause of collective bargaining agreement) [39]; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798–799, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (EEOC finding of "no reasonable cause" to believe Title VII was violated does not bar trial *de novo* of private sector employee's Title VII claims), and before the 1972 amendments, the essentially identical [40] provisions governing private sector suits were held to be *de novo* proceedings which were not interdicted by an EEOC finding of "no reasonable cause." [41] *See, e. g., Robinson v. Lorillard Corp.,* 444 F.2d 791, 800 (4th Cir. 1971); *Beverly v. Lone Star Lead Construction Corp.,* 437 F.2d 1136 (5th Cir. 1971); *Flowers v. Local No. 6, Laborers International Union of North America,* 431 F.2d 205 (7th Cir. 1970); *Fekete v. U. S. Steel Corp.,* 424 F.2d 331 (3d Cir. 1970). *See also Alexander v. Gardner-Denver Co., supra,* 415 U.S. at 45–46 n. 5, 94 S.Ct. at 1018. Thus, since subsection 717(d) merely provides that the statutory subsections relating to private sector civil actions shall also govern the federal employee civil actions, it would appear that the latter should also be conducted as *de novo* proceedings.

Nevertheless, appellees and the District Court rely on the fact that subsection 717(d) only directs that federal employee civil actions be governed by private sector employee provisions "as applicable" to support their position that Congress did not intend to accord federal employees the same right to a *de novo* trial possessed by private sector employees. [42] More particularly, appellees note that subsection 717(c) allows an aggrieved federal employee to file a civil action when the final agency or CSC determination is adverse or when the agency or CSC has delayed adjudicating the claim for over 180 days; they insist that Section 706 procedures that are appropriate when the claimant enters federal court without an administrative record because of agency inaction should not be "applicable" once such a record has been compiled. [43]

■■ However, a closer look at the language and structure of subsection 717(d) and Section 706 would tend to discredit any notion that the "as applicable" language was intended by Congress to constitute a vehicle according the District Judge discretion to, in Judge Gesell's terms, "act in whatever manner may be appropriate" [44] in the judge's view of the case and to choose from among the provisions of Section 706. Rather, it seems most logical that the "as applicable" language expresses a congressional recognition that the referenced subsections of Section 706 also pertain to "civil actions" instituted by the EEOC and the Attorney General, [45]

**39.** *See also* 171 U.S.App.D.C. pp. ———, 520 F.2d pp. 155–157 & notes 136, 195 *infra.*

**40.** Before 1972, § 706 did not provide for court action by the EEOC, did not provide for temporary relief, and, most important, had no reference to an expedited "hearing" or setting the case for "trial." Nevertheless, even when the EEOC's investigation convinced it that there was no "reasonable cause to believe the [discrimination] charge [was] true," 42 U.S.C. § 2000e–5 (1970), the District Court was to engage in a *de novo* proceeding to determine the merits of the complaint if a civil action was filed by the aggrieved employee.

**41.** *See* note 57 *infra.*

**42.** 360 F.Supp. at 1252 n. 9; brief for appellees at 13 n. 10, 60–62.

**43.** Brief for appellees at 27, 40, 58–62.

**44.** *See* 171 U.S.App.D.C. p. ———, 520 F.2d p. 116 *supra.*

**45.** *See, e. g.,* 171 U.S.App.D.C. pp. ———, 520 F.2d pp. 118–119 & note 33 *supra. See also* note 38 *supra.* The rights accorded state and local government employees under the 1972 amendments, *see* note 22 *supra,* also tend to discredit any reading of the "as applicable" language which would deny federal employees the right to a trial *de novo.* State and local government employees file discrimination complaints with the EEOC in the same manner

and that language in subsections 706(f) through (k) relating to such suits, as opposed to suits brought personally by private sector litigants, is clearly not "applicable" to federal employee civil actions.

Surely Congress, in stating that the provisions of subsections 706(f)–(k) "shall govern" federal employee civil actions, did not intend to allow District Judges to escape that requirement by determining that various provisions are not "applicable" to such litigation. And surely Congress, had it considered the disparity in the posture of cases coming to District Court after agency inaction and final agency action to be so substantial as to merit the considerably different treatments of trial de novo and mere review of the administrative record, would have

specified that distinction with particularity rather than rely on the amorphous "as applicable" device.[46] This is particularly plausible when it is observed that of the four points in the administrative process at which a federal employee may bring a "civil action," only one would entail the absence of an administrative record.[47] If almost all federal employee suits would be review proceedings rather than de novo proceedings, we believe Congress would have affirmatively indicated that in some manner, rather than having the unrestricted provisions of Section 706, which unequivocally accord private ·sector litigants the right to a trial de novo and which "shall govern" federal employee civil actions, obliquely limited through the "as applicable" language of Section 717(d). Moreover, if

---

as do private sector employees. However, before filing a complaint with the EEOC such employees must first commence any available proceedings under state anti-discrimination laws. See 42 U.S.C. § 2000e–5(c) (Supp. III 1973). In making its determination as to whether there is reasonable cause to believe the discrimination charge is true, the EEOC is to "accord substantial weight to final findings and orders made by State or local authorities" in those proceedings. 42 U.S.C. § 2000e–5(b) (Supp. III 1973). If the EEOC nevertheless determines reasonable cause exists but is unable to secure an acceptable conciliation agreement, the EEOC is to refer the case to the Attorney General, "who may bring a civil action against such [governmental] respondent in the appropriate United States district court." 42 U.S.C. § 2000e–5(f)(1) (Supp. III 1973). Since these civil actions are explicitly covered by the various provisions of § 2000e–5(f)–(k) (subsections 706(f)–(k) of Title VII), these civil actions are clearly trials de novo. See also 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 129–130 & notes 82, 85 infra. Yet the state or local government employee may have been accorded a full evidentiary hearing, replete with all procedural rights including the opportunity to conduct discovery and compel attendance of witnesses, in the processing of his complaint at the state or local level. Indeed, since all private sector employees must first exhaust available state remedies, see 42 U.S.C. § 2000e–5(c) (Supp. III 1973); cf. Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), and yet have an uncontested right to a trial de novo under subsections 706(f) through (k), this argument applies with equal force to all non-federal em-

ployees. Thus, since the presence vel non of such an administrative hearing is of no consequence with respect to the right of private sector and state and local government employees to have a trial de novo in the federal courts, there is no reason to assume that Congress intended the existence of an administrative record (particularly when compiled without substantial procedural safeguards, see 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 136–142 & notes 117–137 infra) to bar the federal employee's right to such a trial de novo; at a minimum, it cautions against trying to read such a significant distinction into the words "as applicable," particularly when those words can be explained much more logically, as we do in text, as a recognition of the variety of suits authorized under § 706, and the language in that Section referring to the EEOC and the Attorney General.

**46.** Indeed, Congress adopted the term "civil action," the same term which characterizes the unrestricted suits that the EEOC, the Attorney General, or individual private sector employees may bring against private sector employers or state and local governments under § 706, to describe federal employee actions; it could readily have referred to "petitions for review" or similar nomenclature had a different type of proceeding been intended. See, e. g., 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 145–146 & notes 58, 71 infra.

**47.** See, e. g., 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 116–117 & note 28 supra; 171 U.S.App.D.C. p. ——, 520 F.2d p. 126 & note 72 infra.

Congress had intended that a federal employee "civil action" commenced after compilation of an administrative record would be a review of the agency action rather than a trial *de novo,* it is most probable that it would have clarified the standard under which such review would proceed.[48] And if review of the administrative record was intended, we doubt that Congress would have placed jurisdiction in the District Courts rather than in the Courts of Appeals.[49]

Finally, the incongruity of the District Court's approach in interpreting the "as applicable" language of Section 717 so as to allow it to choose which of the provisions of Section 706 apply not only to private sector employee "civil actions," but also to federal employee "civil actions," may be seen from the distortion it would require in the language of Section 706. It would, in effect, result in holding that sentences should be parsed so that they would be partially "applicable" and partially not "applicable." For example, subsection 706(f)(5) directs the District Judge assigned to a Title VII case "to assign the case *for hearing* at the earliest practicable date *and to cause the case to be in every way expedited."* (Emphasis added.) We doubt that anyone would contend that private sector employee "civil actions" are to be expedited under this congressional command but that federal employee "civil actions" are not to be so expedited.[50] Yet this command is part and parcel of a sentence requiring a "hearing" of the action, which would not occur if the District Judge could merely decide the case on the administrative record. Similarly,

subsection 706(f)(5) provides that "[i]f [the district] judge has not scheduled the case *for trial* within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure." (Emphasis added.) Yet the District Court in this case suggested that the master provision of the Act would apply to federal employee actions at the same time that it held that there is no requirement of a trial in such cases; indeed, it used the possibility of appointment of a master as an affirmative reason for holding that there is no requirement of a trial *de novo.*[51]

█ In short, we believe that the language of Section 717 fits better with the *de novo* trial interpretation. Subsection 717(c) authorizes federal employees to file "civil actions" in the same manner as Section 706 authorizes private sector employees to file "civil actions," and subsection 717(d) directs federal courts to apply the same procedures in federal and private sector "civil actions." It is well established that the latter are trials *de novo,* and the congressional directive of equal procedures thus requires the former to also be trials *de novo.* We can only view the purportedly qualifying phrase of subsection 717(d)—"as applicable"—as nothing more than a recognition that the referenced provisions of Section 706 cover EEOC and Attorney General "civil actions" as well as individual private sector employee "civil actions," and that the latter are the relevant provisions to analyze in determining what procedures govern federal employee ac-

---

**48.** For example, Congress was especially careful to specify the standard of review which would have prevailed if private sector employees had been limited to court of appeals review of proposed EEOC cease and desist orders. *See, e. g.,* 171 U.S.App.D.C. pp. ——— ———, 520 F.2d pp. 145–146 *infra.*

**49.** *See, e. g.,* 171 U.S.App.D.C. p. ———, 520 F.2d p. 144 & note 177 *infra; cf., e. g., Polcover v. Secretary of the Treasury,* 155 U.S.App. D.C. 338, 340–343, 477 F.2d 1223, 1225–1228, cert. denied 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973) (noting the "[d]uplication,

delay, expense and despair for the employee-litigant [which is] inherent in such a [double reviewing court] system"; interposition of District Court serves "no viable purpose").

**50.** Even appellees agree that expeditious treatment of Title VII cases is one of the "general matters" of § 706 which they consider are made "applicable" to federal employee civil actions. Brief for appellees at 61–62.

**51.** *See* 360 F.Supp. at 1252 & n. 10; note 181 *infra.*

tions.[52] In any event, to the extent the "as applicable" language creates ambiguity as to congressional intent, we believe the legislative history of and the policies underlying Section 717 dictate resolution of any possible statutory ambiguity in favor of the trial *de novo*.[53]

### B.

■ The legislative history of the 1972 amendments to Title VII, although somewhat sketchy and at times internally inconsistent on the issue *sub judice,* basically reinforces the proposition that Congress intended to accord aggrieved federal employees the right to a trial *de novo* on their discrimination claims in District Court. Since the 1972 amendments underwent substantial transformation during the congressional proceed-

ings, we will first describe the salient changes and relevant debate chronologically, and then proceed to a fuller development of our views concerning the import of this history in ascertaining congressional intent.[54]

1.

On June 2, 1971 the House Committee on Education and Labor reported out H.R. 1746, 92d Cong., 1st Sess. (1971),[55] known as the "Hawkins Bill" after its chief sponsor, Representative Hawkins. The basic purpose of the Hawkins Bill was the conferral of judicially enforceable cease and desist authority on the Equal Employment Opportunity Commission (EEOC),[56] which had no enforcement powers whatever under the original Title VII of the Civil Rights Act of 1964.[57] Detailed provisions of the bill

---

**52.** It should also be remembered that, except for the phrase "as applicable," there is absolutely nothing in the language or structure of Title VII which would indicate that federal employee civil actions, unlike private sector employee civil actions, are not to be trials *de novo.*

**53.** Moreover, a broad interpretation of § 717 is particularly appropriate in light of the remedial character of the 1974 amendments and the constitutional overtones of the rights protected through Title VII. And although it is sometimes asserted that waivers of sovereign immunity are to be strictly construed, this principle generally relates to the circumstances under which a court may entertain a case rather than the essential characteristics of the case once it is properly entertained. No one asserts that Title VII cases are not judicially cognizable because of sovereign immunity; the controversy instead rages over the issue of what rights Congress intended to accord a federal litigant who is properly before the District Court.

**54.** The Subcommittee on Labor of the Senate Committee on Labor and Public Welfare has prepared an excellent compendium of the bills, committee reports, and congressional debate which resulted in passage of the Equal Employment Opportunity Act of 1972. *See Legislative History of the Equal. Employment Opportunity Act of 1972,* 92d Cong., 2d Sess. (Comm. Print 1972) (hereinafter cited as *Legislative History*).

**55.** *See id.* at 32–60.

**56.** *See* H.R.Rep.No.238, 92d Cong., 1st Sess., 1 (1971) (hereinafter cited as *House Report*); *Legislative History* at 61.

**57.** Prior to 1972 the EEOC acted essentially as a conciliatory agency in seeking voluntary and informal methods of dispute resolution. Compulsory enforcement of the dictates of Title VII was committed exclusively to the courts, which could only act if an aggrieved employee filed a "civil action" within certain time limits after the EEOC failed to obtain voluntary compliance or after the EEOC had determined that there was "no reasonable cause to believe" the discrimination charge was true. There was fairly unanimous agreement among members of Congress that this enforcement scheme was ineffective, and that the EEOC had to assume a more active role in enforcement of Title VII rights; the factions diverged, however, in their views as to whether cease and desist authority in the EEOC, with limited court review, or EEOC power to institute civil actions in the District Courts was the preferable route for putting teeth in the EEOC procedures. *Compare, e. g., Legislative History* at 70–71 (*House Report* at 10–11), 238 (remarks of Rep. Drinan), 426–428 (*Senate Report* at 17–19), 798 (remarks of Sen. Mondale), 811–815 (remarks of Sen. Williams), 835–837 (remarks of Sen. Humphrey) (arguing, *inter alia,* that cease and desist powers are preferable because administrative tribunals are better equipped to handle complicated discrimination issues; complex discrimination cases result in enormous expenditures of judicial resources; administrative tribunals are more suited to rapid resolution of these issues than are the overcrowded federal courts; administrative experts in a single agency can produce more efficient, uniform, and predictable results; informal rules of evidence in administrative hearings provide less opportunity for dilatory tactics and lengthy and costly process of proof; and the

specified the procedures under which the EEOC could issue cease and desist orders, which were subject to a limited "substantial evidence on the record considered as a whole" review in the United States Courts of Appeals.[58] Nevertheless, the right of private sector employees to file a "civil action" in certain circumscribed situations was explicitly re-

tained under Section 8(j) of the bill;[59] such actions, as noted above, had been held to be trials *de novo* under the unamended Civil Rights Act of 1964. Moreover, in extending Title VII coverage to federal employees, Section 11 of the Hawkins Bill invested the EEOC with enforcement responsibility and provided that an aggrieved federal em-

existence of administrative sanctions will encourage settlements), *with, e. g., Legislative History* at 118–123 (Minority views on Hawkins Bill in *House Report* at 58–62), 219 (remarks of Reps. Erlenborn and Railsback), 221 (remarks of Rep. Railsback), 493–496 (individual views of Sen. Dominick in *Senate Report* at 85–88), 692–697 (remarks of Sen. Dominick), 837–839 (remarks of Sens. Talmadge and Chiles), 1013 (remarks of Sen. Gambrell), 1446–1447 (remarks of Sen. Hruska), 1485 (remarks of Sen. Dominick) (arguing, *inter alia*, that judicial trials are preferable because relief may be more expeditiously and effectively granted by District Courts, which are not in fact overburdened; a court is a more appropriate forum in which to resolve civil rights questions, in Title VII cases as well as those involving public accommodations, school desegregation, fair housing, and voting rights, since it provides procedural safeguards, federal judges enjoy tremendous respect, the forum is convenient for the litigants and the judge is impartial, the proceedings are public, and the judge can fashion a complete remedy; the Federal Rules of Civil Procedure, with respect to discovery, greatly facilitate collection of evidence for trial; hearing examiners tend to be inadequate factfinders; administrative tribunals are less impartial, legal arguments are not always effectively brought forth, and procedural rules are virtually nonexistent; administrative tribunals are too sensitive to political winds rather than *stare decisis,* while courts possess not only greater independence, but also greater expertise; and judicial precedents encourage out-of-court settlements). Ultimately, the proponents of judicial enforcement rather than cease and desist powers in the EEOC prevailed in both Houses of Congress. *See* 171 U.S.App. D.C. pp. ——–——, ——, 520 F.2d pp. 125–126, 128 *infra.*

**58.** Relevant provisions of the Hawkins Bill are set out as Appendix A to this opinion. It should be evident that the bill was extremely careful in delineating the procedures to be followed when the EEOC's orders were reviewed. For example, the bill would have amended § 706(k) of Title VII to provide that the EEOC could "petition" the appropriate United States Court of Appeals for enforcement of its cease and desist orders. Objections not urged before the EEOC were not to be heard by the

appellate court "unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." The standard of review of factual determinations was unequivocally spelled out: "The findings of the Commission with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." Moreover, if any party sought leave of the court to adduce additional evidence and could show both that the evidence was material and that reasonable grounds existed for not adducing it at the original EEOC hearing, the court could remand the case to the EEOC for the taking of such additional evidence. Amended § 706(*l*) of Title VII made the same provisions applicable when an aggrieved party sought "review" of a final EEOC order.

With respect to the hearing before the EEOC under the Hawkins Bill, amended § 706(g) would have made the respondent a party, given him the right to answer the complaint, granted him the right to counsel, and ensured that all testimony was taken under oath and reduced to writing. Moreover, all hearings would be conducted pursuant to 29 U.S.C. § 161 (1970), thereby effectively according the right to conduct discovery and compel attendance of witnesses, *see* Hawkins Bill § 7, and hearing examiners had to be selected pursuant to the criteria of 5 U.S.C. §§ 556(b)(2), (3) (1970), *see* Hawkins Bill § 8(*l*).

**59.** Section 8(j) of the Hawkins Bill, reproduced in Appendix A, sought to amend § 715 of Title VII so as to retain a private sector employee's right to institute a "civil action" if the EEOC dismissed the discrimination complaint based on findings of no probable EEOC jurisdiction or "no reasonable cause to believe" the charge was true, or if the EEOC failed to act within 180 days after the filing of the complaint. The provisions of § 715, as proposed after the amendments, would have effectively reaffirmed the procedures governing the private sector employee civil suit as it was constituted prior to the amendments; such a suit, as noted previously, was to be a trial *de novo* rather than a review of the EEOC's "no reasonable cause" determination. *See also House Report* at 11–13, *Legislative History* at 71–73.

ployee could file a "civil action" within 30 days after receipt of notice of final agency action on his discrimination complaint. The provisions of Section 8(j) of the Hawkins Bill, which specified the procedures governing the "civil action" of an aggrieved private sector employee, and not the provisions of Section 4, which governed the substantial evidence review of EEOC cease and desist orders, were to govern the federal employee's "civil action." [60]

The House Report on the Hawkins Bill noted the "paramount" [61] importance of eradicating employment discrimination by the federal government; it emphatically declared that "there can exist no justification for anything but a vigorous effort to accord Federal employees the same rights and impartial treatment which the law seeks to afford employees in the private sector." [62] After sketching the Government's abysmal record in minority employment,[63] the Report laid much of the blame at the doorstep of the Civil Service Commission, which had been charged with enforcing federal employees' constitutional rights to be free from discrimination, as embodied in Executive Orders 11246 and 11478.[64] The Report attacked the CSC's newly revised complaint process, a "critical defect of the Federal equal employment program," for having "impeded rather than advanced" the goal of equal employment opportunity:[65] the whole structure of the system was found to create an inherent conflict of interest, and employee confidence in the effectiveness of the procedures was found to be generally lacking.[66] To overcome these structural

**60.** *See* Appendix A. The "civil action" would thus be a trial *de novo* even if the agency had accorded the federal employee a full evidentiary hearing; the Hawkins Bill *only* allowed institution of a federal employee "civil action" after the agency had taken *final* action, yet specified that the *de novo* procedures of the private sector employee "civil action," not the procedures for reviewing EEOC final determinations of the merits of a private sector complaint, would always govern those actions. Thus, although the private sector employee and the federal employee would have the same rights in any District Court proceeding, the federal employee would be able to activate those *de novo* procedures in more instances than would the private sector employee. This might have been due to the inherent bias that could be perceived in any proceeding in which an agency judged its own employment practices; for although the EEOC was given power to promulgate and enforce rules governing federal equal employment practices, the Hawkins Bill neither detailed what procedures the EEOC would have to follow in federal sector cases (it did so with respect to private sector cases), nor required the federal employee to exhaust any procedures which might be established by the EEOC for review or *de novo* determination after a final decision by the employing agency. This scheme, allowing a federal employee to bypass any post-agency remedies and proceed immediately in the District Court, also prevailed under the 1972 amendments as finally enacted, *see* 171 U.S.App.D.C. p. ——, 520 F.2d p. 126 & note 72 *infra*; —— U.S.App.D.C. p. ——, 520 F.2d p. 116 *supra*.

**61.** *House Report* at 22, *Legislative History* at 82 ("imperative that equal opportunity be the touchstone of the Federal system"); *Legislative History* at 199 ("equal employment opportunity is of critical importance in the Federal service") (remarks of Rep. Perkins).

**62.** *House Report* at 23, *Legislative History* at 83.

**63.** *Id.* The Report found substantial statistical evidence of discrimination against both women and minority groups in the Federal employ, particularly at higher grade levels. *See id. See also Legislative History* at 269–271 (remarks of Rep. Fauntroy); *id.* at 288–291 (remarks of Rep. Badillo); *id.* at 297–299 (remarks of Rep. Mink).

**64.** *See* note 21 *supra.*

**65.** *House Report* at 23, *Legislative History* at 83.

**66.** *The defect, which existed under the old complaint procedures, was not corrected by the new complaint process.* The new procedure, intended to provide for the informal resolution of complaints, has, in practice, denied employees adequate opportunity for impartial investigation and resolution of complaints.

*Under the revised procedure,* effective July 1, 1969, *the agency is still responsible for investigating and judging itself.* Although the procedure provides for the appointment of a hearing examiner from an outside agency, *the examiner does not have the authority to conduct an independent investigation.* Further, *the conclusions and findings of the*

defects so that the entrenched discrimination in federal employment could be effectively combatted, the House Report recommended the transfer of enforcement power to the EEOC, which was considered an impartial tribunal.[67] Despite this proposed improvement in the complaint process, aggrieved employees were to be authorized to "file a civil action in the same manner as in Section 715," the section of the bill retaining the

private civil action of private sector employees, after final agency action on the discrimination charge.[68]

On the floor of the House, considerable opposition was expressed to the cease and desist powers embodied in the Hawkins Bill, and by a narrow vote on September 16, 1971 the Erlenborn Bill, H.R. 9247, 92d Cong., 1st Sess. (1971), was adopted as a complete substitute for H.R. 1746.[69] Denying the EEOC any

> examiner are in the nature of recommendations to the agency head who makes the final agency determination as to whether discrimination exists. Although the complaint procedure provides for an appeal to the Board of Appeals and Review of the Civil Service Commission, *the record shows that the Board rarely reverses the agency decision.*
>
> *The system, which permits the Civil Service Commission to sit in judgment over its own practices and procedures which themselves may raise questions of systematic discrimination, creates a built-in conflict-of-interest.*
>
> Testimony reflected a general lack of confidence in the effectiveness of the complaint procedure on the part of Federal employees. Complainants were skeptical of the Civil Service Commission's record in obtaining just resolutions of complaints and adequate remedies. This has discouraged persons from filing complaints with the Commission for fear that it will only result in antagonizing their supervisors and impairing any hope of future advancement.
>
> Aside from the inherent structural defects the Civil Service Commission has been plagued by a general lack of expertise in recognizing and isolating the various forms of discrimination which exist in the system. *The revised directives to Federal agencies which the Civil Service Commission has issued are inadequate to meet the challenge of eliminating systemic discrimination.* \* \*

House Report at 24, *Legislative History* at 84 (emphasis added). For a discussion of the CSC employment discrimination complaint procedures, the modifications they have undergone, and their relevance to our decision on the issue of *de novo* federal employee proceedings, *see* 171 U.S.App.D.C. pp. ————, 520 F.2d pp. 136–142 & notes 117, 123–137 *infra*.

**67.** To correct this entrenched discrimination in the Federal service, it is necessary to insure the effective application of uniform, fair and strongly enforced policies. *The present law and the proposed statute do not permit industry and labor organizations to be the judges of their own conduct in the area of*

> employment discrimination. There is no reason why government agencies should not be treated similarly. Indeed, the government itself should set the example by permitting its conduct to be reviewed by an impartial tribunal. Because the Equal Employment Opportunity Commission is the expert agency in the field of employment discrimination and because it is an independent agency removed from the administration of Federal employment, it is the most logical place for the enforcement power to be vested.

*House Report* at 24–25, *Legislative History* at 84–85 (emphasis added). The Report also stressed the need to obviate the then current obstacles to meaningful remedies for federal employment discrimination: absence of "court review," inability to obtain back pay or retroactive promotion, and lack of access to government information and files. *Id.* at 25, *Legislative History* at 85. Finally, although recommending the transfer of *enforcement* functions from the CSC to the EEOC, the Report reiterated that the CSC would still retain "primary responsibility" in such affirmative areas as recruiting and training, the appointment of EEO officers, and the creation of specialized hiring programs. *Id. See also House Report* at 32, *Legislative History* at 92 (section-by-section analysis); *Legislative History* at 199 (remarks of Rep. Perkins).

**68.** *Persons aggrieved by the final disposition of complaints may,* within thirty days of receipt of notice, *file a civil action in the same manner as in Section 715,* in which action the head of the executive department or agency, or the District of Columbia, as appropriate, shall be the respondent.

*House Report* at 32, *Legislative History* at 92 (emphasis added). *See also id.* at 26, *Legislative History* at 86 (federal employee "may have recourse to a civil action, as provided in section 715 \* \* \* if he is not satisfied with the disposition of his complaint"); Appendix A; note 59 *supra* (describing section 715).

**69.** The Erlenborn Bill is reproduced in the *Legislative History* at 141–147.

cease and desist powers, the Erlenborn Bill instead granted the EEOC the right to file a civil action in the District Courts, which would be charged with Title VII's enforcement responsibilities. Although the private sector employee's right to file a civil action in the absence of EEOC success in obtaining voluntary compliance or the failure of the EEOC to file a civil action was preserved, the Erlenborn Bill did not extend the protections of Title VII to federal employees.

Meanwhile, on September 14, 1971 Senator Williams had introduced S. 2515, 92d Cong., 1st Sess. (1971), which substantially paralleled the Hawkins Bill, granting the EEOC cease and desist powers, bringing federal employees within the ambit of Title VII with enforcement powers in the EEOC, and according aggrieved federal employees recourse to the District Courts.[70]

The amended version of S. 2515 which eventually emerged from the Senate Committee on Labor and Public Welfare (the "Committee Bill") retained cease and desist authority over private sector discrimination in the EEOC, with substantial evidence review in the Courts of Appeals.[71] The Committee hammered out a compromise, however, on the provisions relating to federal employment: enforcement responsibility with respect to federal employees was returned to the Civil Service Commission, although an aggrieved employee was granted the option of filing a "civil action" after either final action by the agency or by the CSC on appeal, or after inaction by either the agency or the CSC for 180 days from the filing of the original charge or the taking of an appeal.[72] This compromise es-

70. The Williams Bill is reproduced in the *Legislative History* at 157–187.

71. The Committee Bill is reproduced in the *Legislative History* at 375–409, and relevant portions are included as Appendix B to this opinion. The Committee Bill, like the Hawkins Bill, *see* note 58 *supra,* spelled out the procedures to be followed by the EEOC in considerable detail. For example, respondents were made parties to the proceedings and granted the right to appear at any stage, with or without counsel; all testimony before the EEOC was to be taken under oath and reduced to writing; and the rules of evidence applicable in the United States District Courts were, so far as practicable, to govern the proceedings. Committee Bill § 4(a) (proposed § 706(g) of Title VII). Similarly, the Committee Bill, like the Hawkins Bill, gave tremendous attention to the review provisions. Any aggrieved party could obtain "review" of the EEOC's final orders. Committee Bill § 4(a) (proposed § 706(k) of Title VII). The EEOC was to file its record in the Courts of Appeals in which review was sought, and EEOC factual findings, if supported by substantial evidence on the record considered as a whole, were to be conclusive. Objections not urged before the EEOC could not be made before the appellate court unless the previous failure to urge those objections was excused because of extraordinary circumstances, and additional testimony could be taken on remand before the EEOC if it could be demonstrated to the appellate court that the testimony would be material and there were reasonable grounds for failure to adduce it at the original EEOC hearing. *Id.*

Identical provisions governed the appellate process when the EEOC sought to "petition" a Court of Appeals for enforcement of its order. *Id.* (proposed § 706(*l*) of Title VII).

72. Both the language of the Committee Bill's proposed section 717(c) of Title VII and the Report's commentary make it clear that there are four situations in which a federal employee may enter the District Court; exhaustion of available CSC remedies and procedures *after final agency action* is thus not a prerequisite to a Title VII suit:

The bill (section 717(c)) enables the aggrieved Federal employee (or applicant for employment) to file an action in the appropriate U.S. district court after either a final order by his agency *or* a final order of the Civil Service Commission on an appeal from an agency decision or order in any personnel action in which the issue of discrimination on the basis of race, color, religion, sex or national origin has been raised by the aggrieved person. *It is intended that the employee have the option to go to the appropriate district court* or the District Court for the District of Columbia *after either the final decision within his agency* on his appeal from the personnel action complained of *or after an appropriate appeal to the Civil Service Commission or after the elapse of 180 days from the filing of the initial complaint or appeal with the Civil Service Commission.* S.Rep.No.415, 92d Cong., 1st Sess. 16–17 (1971) (hereinafter cited as *Senate Report*), *Legislative History* at 425–426 (emphasis added). *See also, e. g., Legislative History* at 1819 (*Conference Report* at 21); *id.* at 1744 (re-

tablished the structure of Section 717 which the Congress ultimately enacted, and even the language of the Committee Bill remained essentially unchanged throughout the remainder of the Act's consideration. The Committee Bill also specified that under certain circumstances private sector employees could still bring civil actions in the District Court,[73] and these civil actions would presumably be trials *de novo*.[74] Like the Hawkins Bill in the House, the Committee Bill specified that these provisions governing private sector employee civil actions, and not the section of the Committee Bill governing review proceedings of final EEOC action, would govern federal employee civil actions.[75]

After repeating the concerns expressed in the House Report with respect to the high priority of rooting out all discrimination in federal employment, and reiterating the failure of the federal government to even begin to adequately redress its serious shortcomings in this area,[76] the Senate Report on the Committee Bill zeroed in on the CSC's complaint procedures. Like the House Report, the Senate Report recited the litany of inadequacies in the CSC complaint process and bemoaned the lack of employee confidence in that process.[77]

---

marks of Sen. Cranston); *id.* at 1851 (remarks of Sen. Williams); 5 C.F.R. §§ 713.281 (1974). *See also* 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 154–155 *infra.*

**73.** *See* Appendix B, Committee Bill § 4(a) (proposed § 706(q) of Title VII). A private sector employee could file his own civil action if the EEOC dismissed his charge or if, after 180 days from the filing of the charge, the EEOC (or the Attorney General in cases involving state or local government employees) had not issued a complaint or achieved a satisfactory voluntary conciliation of the dispute.

**74.** The *Senate Report* specified that proposed subsection 706(q) of Title VII was intended to preserve the preexisting private right of action in designated instances, *see, e. g., Senate Report* at 40, *Legislative History* at 449, and those actions had been held to be trials *de novo* under the unamended Act.

**75.** The innocuous character of the "as applicable" language of the Committee Bill's proposed subsection 717(d) (which eventually became the final version of subsection 717(d) except for technical amendments, *see Legislative History* at 1562) is readily apparent from an analysis of the structure of the Committee Bill. As indicated above, the Committee Bill's proposed subsections 706(k) and (*l*) set forth the appellate review procedures that would govern judicial proceedings after final EEOC action, while proposed subsections 706(q)–(w) set forth the trial *de novo* procedures for a private sector employee's individual cause of action. Proposed subsection 717(d) stated that "[t]he provisions of *section 706(q) through (w),* as applicable, shall govern [the federal employee] civil actions." (Emphasis added.) There was no indication that the review provisions of subsections 706(k) and (*l*) would *ever* be "applicable" to such actions; Congress did, however, specify their applicability to other types of actions. *See* note 139

*infra. See also* 171 U.S.App.D.C. pp. ——, —— ——, 520 F.2d pp. 144, 145–146 *infra.*

**76.** *See generally Senate Report* at 12–13, *Legislative History* at 421–422. In particular, the Senate Report reiterated the paramount importance of taking every effort to root out discriminatory practices of the Federal government:

The Federal government, with 2.6 million employees, is the single largest employer in the Nation. It also comprises the central policymaking and administrative network for the Nation. Consequently, its policies, actions, and programs strongly influence the activities of all other enterprises, organizations and groups. *In no area is government action more important than in the area of civil rights.*

*Id.* at 12, *Legislative History* at 421 (emphasis added). *See also, e. g., Legislative History* at 673–674 (remarks of Sen. Humphrey); *id.* at 1768 (remarks of Sen. Williams).

**77.** One feature of the present equal employment opportunity program which deserves special scrutiny by the Civil Service Commission is the complaint process. *The procedure under the present system, [see* 171 U.S.App.D.C. pp. —— —— ——, 520 F.2d pp. 136–142 *infra* ] *intended to provide for the informal disposition of complaints, may have denied employees adequate opportunity for impartial investigation and resolution of complaints.*

*Under present procedures, in most cases, each agency is still responsible for investigating and judging itself. Although provision is made for the appointment of an outside examiner, the examiner does not have the authority to conduct an independent investigation, and his conclusions and findings are in the nature of recommendations to the agency head who makes the final agency determination on whether there is, in fact, discrimination in that particular case. The*

Nevertheless, although echoing the House recognition that the system created a built-in conflict of interest, the Senate Report related the CSC's sincere desire to overcome that apparent conflict and the Committee's belief that the CSC possessed "the will and desire to overcome any such conflict of interest." [78]

The Senate Report also elaborated on the importance of the employee's right to file a civil action in certain situations:

> An important adjunct to the strengthened Civil Service Commission responsibilities is the statutory provision of a private right of action in the courts by Federal employees who are not satisfied with the agency or Commission decision.
>
> The testimony of the Civil Service Commission notwithstanding, the committee found that an aggrieved Federal employee does not have access to the courts. In many cases, the employee must overcome a U. S. Government defense of sovereign immunity or failure to exhaust administrative remedies with no certainty as to the steps required to exhaust such reme-

dies. Moreover, the remedial authority of the Commission and the courts has also been in doubt. The provisions adopted by the committee will enable the Commission to grant full relief to aggrieved employees, or applicants, including back pay and immediate advancement as appropriate. *Aggrieved employees or applicants will also have the full rights available in the courts as are granted to individuals in the private sector under title VII.*[79]

As did the House Report, the Senate Report unequivocally asserted that the provisions governing private sector suits brought by individual litigants, and *not* the provisions for substantial evidence review of EEOC cease and desist orders, would govern the federal employee's "civil action" in the District Court:

> The provisions of section 706(q) through (w) concerning private civil actions by aggrieved persons are made applicable to aggrieved Federal employees or applicants. They could file a civil action within 30 days of notice of final action on a complaint made pursuant to section 717(b), or after 180

only appeal is to the Board of Appeals and Review of the Civil Service Commission.

The *testimony* before the Labor Subcommittee *reflected a general lack of confidence in the effectiveness of the complaint procedure* on the part of Federal employees. *Complaints have indicated skepticism regarding the Commission's record* in obtaining just resolutions of complaints and adequate remedies. *This has, in turn, discouraged persons from filing complaints* with the Commission for fear that doing so will only result in antagonizing their supervisors and impairing any future hope of advancement. *The new authority given to the Civil Service Commission in the bill is intended to enable the Commission to reconsider its entire complaint structure and the relationships between the employee, agency and Commission in these cases.*

Senate Report at 14, *Legislative History* at 423 (emphasis added). *See also* Supplemental Brief for NAACP Legal Defense and Educational Fund, Inc. as Amicus Curiae at n. 2 (listing relevant portions of Hearings in which criticism of CSC procedures was expressed).

**78.** *The Civil Service Commission's primary responsibility over all personnel matters in*

the Government does create a *built-in conflict of interest* for examining the Government's equal employment opportunity program for structural defects which may result in a lack of true equal employment opportunity. *Yet, the Committee was persuaded that the Civil Service Commission is sincere in its dedication to the principles of equal employment opportunity* enunciated in Executive Order 11478 *and that the Commission has the will and desire to overcome any such conflict of interest.* In order to assist the Commission in accomplishing its goals and to make clear the Congressional expectation that the Commission will take those further steps which are necessary in order to satisfy the goals of Executive Order 11478, the Committee adopted in Section 707(b) [717(b)?] of the bill specific requirements under which the Commission is to function in developing a comprehensive equal employment opportunity program.

*Senate Report* at 15, *Legislative History* at 424.

**79.** *Id.* at 16, *Legislative History* at 425 (emphasis added).

days from the filing of an initial charge, or an appeal with the Commission. *The authority given to the Commission or the limitations placed upon the Commission under sections 706(q) through (w) would apply* to the Civil Service Commission or the agencies, as appropriate, *in connection with a civil action brought under section 717(c).* So, for example, if the Civil Service Commission or agency does not issue an order within 180 days after a complaint or appeal is filed, the aggrieved person may also institute a civil action. If such action is instituted within one year of the filing of the complaint or appeal, the Civil Service Commission or agency may request that the action be stayed or dismissed upon a showing that it has been acting with due diligence, that it anticipates issuance of an order within a reasonable time on the complaint or appeal, that the case or proceeding is exceptional and that extension of exclusive jurisdiction of the Civil Service Commission or agency is warranted.[80]

Like the Hawkins Bill in the House, the Committee Bill encountered stiff opposition on the floor of the Senate to its grant of cease and desist powers to the EEOC. Although a proposed amendment by Senator Dominick to delete those provisions in favor of EEOC authority to institute civil actions against private sector employers which the EEOC believed were violating the statute was twice defeated by a two-vote margin, a threatened filibuster eventually resulted in a compromise effecting Senator Dominick's desired change.

During the course of the Senate debate on the cease and desist issue, Senator Dominick, who was one of the Committee on Labor and Public Welfare members who formulated the compromise [81] which provided for continued CSC supervision of Title VII aspects of federal employment, with the concomitant right of an aggrieved employee to file a civil action in certain enumerated circumstances, made several references to the sections of the Committee Bill pertaining to federal employment discrimination. These references reflected his understanding that the federal employee "civil action" would be a trial *de novo,* since he continually contrasted the District Court proceedings which could be instituted by federal and state and local government [82] employees with the "substantial evidence" Court of Appeals re-

**80.** *Id.* at 45–46, *Legislative History* at 454–455 (emphasis added). In his detailed comparison of existing Title VII law and the provisions of the Erlenborn Bill passed by the House and the Committee Bill in the Senate, Senator Williams reinforced the notion that identical procedures were to govern all civil actions in the District Courts, whether instituted by private sector or federal employees:

> Provisions of 706(q) through (w) applicable to private actions by aggrieved persons are made applicable to U. S. government workers and applicants for Federal employment.

*Legislative History* at 620. *See also* 171 U.S. App.D.C. pp. ——–——, 520 F.2d pp. 146–147 *infra.*

**81.** *See Legislative History* at 589 (remarks of Sen. Williams); *id.* at 1725 (remarks of Sen. Cranston who, together with Sens. Dominick and Kennedy, cosponsored the federal employee provisions); *id.* at 1749; *id.* at 1768. Indeed Sen. Williams, who introduced the Committee Bill and acted as its floor manager, acknowledged Sen. Dominick's greater authority as interpreter of the federal employee provisions:

> I shall not dwell on [the federal employee provisions], because I was not the author of the provision that strengthened the opportunity of Federal employees. The Senator from Colorado was the author of that significant advance in the bill.

*Legislative History* at 1539.

**82.** That state and local employees would have a right to bring a trial *de novo* (even after being accorded a hearing at the local level) is indicated not only by the language regulating those actions, *see* note 45 *supra,* and Sen. Dominick's remarks quoted in text and note 85 *infra,* but also by other statements in the legislative history of the 1972 amendments which appear to accord such employees the right to bring an unrestricted "civil action." *See, e. g., Legislative History* at 418–420, 434, 446 (*Senate Report* at 9–11, 25, 37), 588 (remarks of Sen. Williams), 680 (remarks of Sen. Dominick), 895–896 (remarks of Sen. Williams), 1772 (remarks of Sen. Williams), 1814–1816 (Conference Report at 16–18), 1846–1847 (remarks of Sen. Williams). *Cf. also Love* v. *Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972).

view of final EEOC orders; to establish equality of treatment he wanted all private sector actions to similarly entail plenary proceedings in the District Courts:

> [In the committee process] we were able to work out an agreement whereby a Federal employee who feels he is discriminated against can go through his agency, and if he is still dissatisfied, he is empowered to bring suit in Federal court or through the existing Civil Service Board of Appeals and Reviews to Federal court. So on two of the major groups of employees covered by this legislation; namely, State and local employees on the one hand, and Federal employees on the other, *the committee itself agreed to grievance remedy procedures through the Federal district courts; yet with the private employee they say, "No, you cannot have that. We will have an agency that can do it all by itself." That is discrimination in and of itself, right within the bill*; and it strikes me that *one of the first things we have to do is at least to put employees holding their jobs, be they government or private employees, on the same plane so that they have the same rights, so that they have the same opportunities, and so that they have the same equality within their jobs, to make sure they are not being discriminated against*

and have the enforcement, investigatory procedure . carried out the same way.[83]

> [W]e have already provided in the existing bill for State and local employees and Federal employees to seek redress of their grievances to Federal District Courts. We are not doing so for private employees or private employers. It seems to me that is discrimination in and of itself.[84]

This [Dominick] amendment does not change a committee-adopted amendment authored by Senator Cranston and me creating machinery suggested by Clarence Mitchell, director, Washington Bureau, NAACP. The machinery provides a remedy procedure for the approximately 2.6 million civil service and postal employees whereby an aggrieved employee has the option, after exhausting his agency remedies, of either instituting a civil suit in Federal district court or continuing through the Civil Service Board of Appeals and Reviews to district court, if necessary. *Curiously enough, the majority members of the committee seem pleased with ultimate court enforcement procedures for 2.6 million Federal employees and 10.1 State and local government employees, but continue to urge cease-and-desist. procedures for private employees.*[85]

---

83. *Legislative History* at 680–681 (remarks of Sen. Dominick) (emphasis added).

84. *Id.* at 683 (emphasis added).

85. *Id.* at 695 (emphasis added). *See also Senate Report* at 85–86, *Legislative History* at 493–494 (individual views of Mr. Dominick) (emphasis added):

> [S]implistic reasoning has classified proponents of court enforcement as being pro-respondent or anti-employees' rights. Nothing could be less correct. Both procedures seek to achieve the same end—the fair redress of employees' grievances. Although I opposed the cease and desist provisions, I voted to report S. 2515, as amended, out of committee favorably as I was most encouraged by the potential relief its compromise amendments offered federal employees. As the report indicates, these employees are the most frustrated in achieving equal employment

opportunity. *I authored an amendment with Senator Cranston which was adopted that provided the approximately 2.6 million civil service and postal workers with court redress of their employment discrimination grievances.* * * * [A]n aggrieved civil service or postal employee has the option after exhausting his agency remedies, of either instituting a civil suit in Federal district court or continuing through the Civil Service Board of Appeals and Reviews to district court, if necessary.

> Curiously enough, *the majority seems pleased with court enforcement procedures for 2.6 million federal employees, but continues to urge cease and desist procedures for private employees.*

*See also Legislative History* at 833 (remarks of Sen. Dominick) (emphasis added):

> [I]n the discussion of this bill in committee, we considered what should be done about State and local employees, and we gave

After the Dominick amendment was agreed to, thereby deleting the EEOC's cease and desist powers and all of the Committee Bill's references to review proceedings, and instead according the EEOC the power to file a civil action in District Court, the Senate turned its attention to other proposed amendments to S. 2515. One such amendment, introduced by Senator Cranston, brought Library of Congress employees within the ambit of the federal employment discrimination provisions of Section 717.[86]

them a right to proceed through the Attorney General into the court system and not be subject to cease-and-desist orders. We gave the Federal employees the right to go through their agency and then go either to the Civil Service Commission Board of Appeals and Reviews or to the court. But in the case of private employees, this bill says that they cannot use the court system; *they cannot be like the other people covered under this bill. They will have to redress their grievances through the cease-and-desist machinery without ever getting to the district court.*

*See also id.* at 835:
We are additionally treating private employees and private employers differently than we treat Federal, State, and local employees—we should give them a right to redress their grievances in the Federal district court.

*See also id.* at 1440–1441 (emphasis added):
I cannot, for the life of me, understand why the proponents of the [Committee] bill are taking such an adamant position on the particular point of cease and desist. They have already agreed in committee that, in the case of Federal employees, after proceeding through their agency remedies, they can go * * * into the Federal court system or to the Civil Service Commission Board of Appeals and Reviews, at their option. The proponents have already agreed that State, county, and local government employees, instead of relying on cease-and-desist orders before the Commission, could go to the Attorney General, who would decide whether or not he is going to file, a civil action on the employees' behalf. In pattern and practice suits, they agreed to leave enforcement of grievances with the Attorney General for a period of 2 years, with some concurrent jurisdiction in the EEOC, contingent upon subsequent reorganization provision, or to leave it entirely in the hands of the Attorney General, which then can go into the district courts.

*Under what conceivable type of logic can the proponents of cease-and-desist orders say it is best to go to the court system for the Federal employees, and best to go there for the State and local government employees, and it is probably best to go there in practice and pattern procedure; but in the case of private employees, we are going to force them to agency determinations.*

*See also id.* at 1482 (emphasis added):
[W]e have already provided in the bill that with reference to disputes involving State or local governmental employees, the dispute would go to the Attorney General for the filing of a case in U. S. district court. *Federal employees would exhaust their respective agency remedies and then the employee would have a right either to go to the Civil Service Commission Board of Appeal and Review or to * * * [go] through the U. S. district courts.*

*So the bill provides governmental employees and the governmental agencies with rights to redress their grievances in court. The only ones who are not subject to such court relief are the private employers and private employees; this, in my own humble opinion, is discrimination in and of itself.* I do not see why we should arbitrarily carve out one sector.

*See also id.* at 1526–1527 (emphasis added):
A Federal employee, under the [Dominick] amendment, would still have a right to go through the agency and determine whether or not he wants to go to the Civil Service Commission for final determination or whether he wants to go into court himself in order to get a solution to his problem. This was worked out in committee; * * *.

*The point is, however, that every governmental agency and every employee of a governmental agency, State, local, or Federal, has his rights, in the Federal courts. Under the bill as reported and under the Williams-Javits amendment, you do not have that right if you are a private employee or a private employer. I, for the life of me, cannot see why we should discriminate against that one group. It seems to me that where we are dealing with job discrimination, it makes no difference what type of job you have, you should be entitled to the same remedies anyone else in that situation has, and this is a right to have the Federal court determine whether or not you have been discriminated against.*

*See also, e. g., id.* at 549, 681–682, 690, 693.

**86.** Appellees insist that Congress intended that "the CSC play a prominent and almost exclusive role in implementing this newly legislated commitment [to equal employment opportunity]." Brief for Appellee at 22. In support of this claim, appellees cite the fact that subsection 717(b) of Title VII proclaims that

In the course of introducing and discussing that proposed amendment, Senators Cranston and Williams made several statements concerning Section 717 generally. Initially, Senator Cranston adumbrated the rationale and purposes behind the new section and expanded Title VII coverage:

> [S]ection 11 of the bill inserts of [*sic*] new section 717 in Title VII of the Civil Rights Act of 1964 to provide, for the first time, a clear statutory mandate with respect to equal employment opportunity in the Federal Government. \* \* \*

This bipartisan provision has three basic purposes:

First. Subsection (a) of the new section 717 provides a statutory mandate that all personnel actions affecting employees or applicants for employment in the Federal Government, "Shall be made free from any discrimi-

nation based on race, color, religion, sex or national origin."

Second. Subsection (b) in the new section 717 empowers the Civil Service Commission to enforce the mandate in subsection (a) and to be responsible for review of evaluation of Federal agency equal employment opportunity plans and programs. The subsection also requires that certain provisions be included in each agency's plans.

Third. *Subsection (c) of the new section 717 creates a remedy in district court—comparable to private employment actions—for any employee who has exhausted the equal employment opportunity complaint procedure within his Federal agency.*[87]

Senator Williams then addressed the poor record of the federal government in its attempts to make equal employment opportunity a reality,[88] and concluded that significant changes in the CSC complaint process were therefore necessary.[89]

---

"[e]xcept as otherwise provided," the CSC has the authority to enforce the non-discrimination commitment of subsection 717(a). However, even if we were to ignore the fact that the purported congressional intent is rather unlikely in view of the general skepticism with which the CSC was viewed and the structure of section 717, *see, e. g.,* 171 U.S.App.D.C. pp. ———–———, 520 F.2d pp. 154–156 *infra,* we would still depreciate the value appellees attempt to give the quoted phrase. The phrase actually reads, "[e]xcept as otherwise provided *in this subsection* [706(b)]" (emphasis added); it was added when section 717 was amended to encompass Library of Congress employees so that there would be no doubt that the Librarian of Congress would continue to exclusively possess all of his preexisting authority to regulate the Library's personnel program. *See Legislative History* at 1723–1725 (remarks of Sen. Cranston in offering amendment and elucidating its intent); 42 U.S.C. § 2000e–16(b) (Supp. III 1973). From this perspective, it is difficult to construe the phrase as indicative of any congressional intent to denigrate the judicial role in the enforcement of Title VII rights.

**87.** *Legislative History* at 1723 (emphasis added).

**88.** *See id.* at 1725–1726. Senator Williams also acknowledged that the bill "contains significant new procedures and directives to the Civil Service Commission regarding Federal equal employment programs. It also provides, for the first time, to my knowledge, for the

right of an individual to take his complaint to court." *Id.* at 1725.

**89.** There are, perhaps, many reasons for this unforunate record. One of them must be presumed to be the fact that the complaint process, in effect, calls upon the complaining party's agency to investigate and judge itself. *Although the informal nature of the complaint process provides for the appointment of an outside examiner, the examiner does not have the authority to conduct an independent investigation, and his conclusions and findings are in the nature of recommendations to the agency head who makes the final determination on whether there is discrimination in that particular case.* The only appeal possible is to the Civil Service Commission's Board of Appeals and Review.

*Id.* at 1726 (emphasis added).

Senator Williams also referred to the substantial testimony which various hearings had generated concerning the inadequacy of the CSC complaint process and federal employee resignation to the reality that "it will be a rare instance where an agency admits to its own shortcomings." *Id.* More particularly, Senator Williams quoted testimony of Mr. Fauntroy, the Delegate in Congress from the District of Columbia:

> It seems anomalous to have the [Civil Service] Commission both establish policies for rooting out discrimination and at the same time have the basic responsibility for

After describing the obligations of the CSC under the proposed Section 717, Senator Williams made the statement relied on by Judge Gesell as support for the proposition that Congress intended the "civil action" of Section 717 to be a mere review of the agency record:

> Finally, written expressly into the law is a provision enabling an aggrieved Federal employee to file an action in U.S. District Court for *a review of the administrative proceeding record* after a final order by his agency or by the Civil Service Commission, if he is dissatisfied with that decision. Previously, there have been unrealistically high barriers which prevented or discouraged a Federal employe[e] from taking a case to court. This will no longer be the case. *There is no reason why a Federal employee should not have the same private right of action enjoyed by individuals in the private sector*; and I believe that the committee acted wisely in this regard.[90]

Senator Williams also received unanimous consent to insert a "more detailed analysis" of Section 717 into the Congressional Record.[91] After relating the historical background of the problem and the failings of the CSC's complaint procedures,[92] the analysis noted the "private right of action" added by Section 717:

> An important adjunct to the strengthened Civil Service Commission responsibilities is the statutory provision of *a private right of action of review of the agency proceedings* in the courts by Federal employees who are not satisfied with the Agency or Commission decision.
>
> The testimony of the Civil Service Commission notwithstanding, the Com-

mittee found that an aggrieved Federal employee does not have access to the courts. In many cases, the employee must overcome a U.S. Government defense of sovereign immunity or failure to exhaust administrative remedies with no certainty as to the steps required to exhaust such remedies. Moreover, the remedial authority of the Commission and the courts has also been in doubt. The provisions adopted by the Committee will enable the Commission to grant full relief to aggrieved employees, or applicants, including back pay and immediate advancement as appropriate. Aggrieved employees or applicants *will also have the full rights of review available in the courts.*[93]

Following brief debate on some other issues relating to EEOC activities, Senator Cranston again took the floor to discuss Section 717:

> My Federal Government EEO amendment included in the committee bill would:
>
> \* \* \* \* \* \*
>
> Fifth. For the first time, permit Federal employees to sue the Federal Government in discrimination cases— under the theory of Federal sovereign immunity, courts have not generally allowed such suits—and to bring suit either prior to or after CSC review of the agency EEO decision in the case. *As with other cases brought under Title VII of the Civil Rights Act of 1964, Federal district court review would be based on the agency and/or CSC record and would not be a trial de novo.*

measuring the effectiveness of its personnel policies against the demands of the law. S. 2515 will remedy this inequity and provide for objective review of Federal discrimination policies.

**90.** *Legislative History* at 1727 (emphasis added).

**91.** *Id.*

**92.** *See generally id.* at 1727–1730. The analysis was essentially the same as the original Senate Report on section 717. However, there were a few crucial and subtle changes, which are critically evaluated in *Sperling v. United States, supra* note 4, at 482–483.

**93.** *Legislative History* at 1730 (emphasis added).

Mr. President, the Federal Government must be a model, of equal employment opportunity.[94]

However, several months after enactment of the 1972 amendments, Senator Cranston asserted that the "not" had been misplaced in the printed version of his remarks, and that he had actually stated on the Senate Floor that "Federal district court review would *not* be based on the agency and/or CSC record and would be a trial *de novo*."[95]

Immediately prior to the Senate's passage of its version of the Act, Senator Williams intromitted another section-by-section analysis into the Congressional Record. He observed:

*Sections 717(c) and (d)—The provisions of sections 706(f) through (k) as applicable, concerning private civil actions by aggrieved persons, are made applicable to aggrieved Federal employees or applicants.* * * * The authority given to the Commission or the limitations placed upon the Commission under sections 706(f) through (k) *would apply* to the Civil Service

Commission or the agencies, as appropriate, in connection with a civil action brought under section 707 [*sic*] (c).[96]

When the House and Senate versions of H.R. 1746 were sent to conference, the conferees agreed to adopt the Senate version with respect to bringing federal employees under Title VII's umbrella:

The Senate amendment. provided that all personnel actions involving Federal employees be free from discrimination. This policy was to be enforced by the United States Civil Service Commission. Each agency of the Federal Government would be responsible for establishing an internal grievance procedure and progams to train personnel so as to enable them to advance under the supervision of the Civil Service Commission. If final action had been taken by an agency or the Civil Service Commission, an aggrieved party *could bring a civil action under the provisions of section 706.* * * * In providing the statutory basis for such appeal or court access, it is not the intent of the Committee to

---

**94.** *Id.* at 1744 (emphasis added).

**95.** Chagrined by the *Congressional Record's* error in reporting his statement, Senator Cranston went on record, 10 months after section 717 was enacted into law, to correct it:

Mr. President, it has been brought to my attention that the Congressional Record report of my February 22, 1972, floor statement on S. 2515, the "Equal Employment Opportunities Act of 1972," contains an error on S. 2287. In describing the provisions of the committee bill dealing with equal employment opportunity in the Federal Government, which I authored, the Record states as follows.

[the above paragraph beginning "Fifth" was then quoted.]

Unfortunately, Mr. President, the word "not" was misplaced in the last sentence of the material I just quoted. I have called this to the attention of the appropriate officers, and the bound volume of the CONGRESSIONAL RECORD, which I understand will not be available for almost a year, will set forth this sentence in the correct manner as follows:

As with other cases brought under title VII of the Civil Rights Act of 1964, Federal

district court review would not be based on the agency and/or CSC record and would be a trial de novo.

I hope that this correction will set the RECORD straight and that my calling attention to it today will avoid any misplaced reliance on the incorrect version as originally printed in the CONGRESSIONAL RECORD of February 22, 1972.

119 *Cong.Rec.* S. 1219 (daily ed. Jan. 23, 1973). *See also* 171 U.S.App.D.C. pp. ————, 520 F.2d pp. 147–148 *infra.*

Senator Cranston also added his voice to the chorus condemning the federal government's record in failing to provide equal opportunity to minority groups and women. *See Legislative History* at 1745–1748. More specifically, he chastised the CSC for itself exemplifying "this shocking pattern of exclusion;" of the CSC's top 53 jobs, only two were held by blacks, one of whom was a civil rights officer. *Id.* at 1745. *See also id.* at 1752–1753 (remarks of Sen. Cranston); *id.* at 425 (*Senate Report* at 16) (need for CSC revision of its personnel policies).

**96.** *Legislative History* at 1777 (emphasis added).

subordinate any discretionary authority or final judgment now reposed in agency heads by, or under, statute for national security reasons in the interests of the United States.[97]

In submitting the Conference Report to the Senate, Senator Williams again introduced a section-by-section analysis for printing in the Congressional Record. The analysis was prefaced by the statement that

> [i]n any area where the new law does not address itself, or in any areas where a specific contrary intention is not indicated, it was assumed that the present case law as developed by the courts would continue to govern the applicability and construction of Title VII.[98]

As already noted, private sector employees had the right to a trial *de novo* under pre-1972 judicial interpretation of Section 706 of Title VII,[99] and the inclusion of language in amended Section 706 which refers to "hearings" and "trial"[100] merely reinforces that interpretation. For the final time, Senator Williams' analysis stressed the equality of treatment which should be accorded private sector and federal employee civil actions:

> *Section 717(c) and (d)—The provisions of sections 706(f) through (k), concerning private civil actions by aggrieved persons, are made applicable to aggrieved Federal employees or applicants for employment.* \* \* \*[101]

### 2.

Although many courts have followed the District Court opinion in this case in holding that the 1972 amendments do not accord aggrieved federal employees the right to a trial *de novo*, they have generally done so on the basis of that court's "comprehensive" analysis of the amendments and their legislative history.[102] Yet the District Court's scant two-page analysis[103] dealt only with a few parts of the legislative history, and relied almost exclusively on two statements of Senator Williams. In searching the legislative history, the District Court isolated two dominant themes which it believed embodied the congressional intent in 1972.

First, the District Court asserted that Congress was cognizant of the ineffectiveness of the then current CSC and agency complaint processes, but was satisfied that they could be remedied by strengthening the CSC's enforcement machinery in various ways.[104] The District Court, without comparing the criticized procedures and the ones now in effect, simply averred that

> [t]he Commission has lived up to these obligations by putting into effect comprehensive new regulations to meet the concerns of Congress. Clear-cut complaint procedures protect individuals as well as groups and broad classes of complainants, and new obligations are imposed on the agencies. 5 C.F.R. Part 713 (1973).[105]

Second, the District Court perceived that Congress was disaffected because of the lack of effective judicial control over the agency complaint processes; the doctrines of sovereign immunity and failure to exhaust administrative remedies had

---

**97.** S.Rep.No.681, 92d Cong., 2d Sess. 20–21 (1972), *Legislative History* at 1818–1819 (emphasis added).

**98.** *Legislative History* at 1844.

**99.** *See* 171 U.S.App.D.C. pp. ——–——, 520 F.2d pp. 118–119 *supra*.

**100.** *See* 171 U.S.App.D.C. pp. ——, ——–——, 520 F.2d pp. 118, 121–122 & note 40 *supra*.

**101.** *Legislative History* at 1851.

**102.** *See, e. g., Thompson v. United States Department of Justice, Bureau of Narcotics &*

*Dangerous Drugs*, 372 F.Supp. 762, 763 (N.D. Cal.1974). *See also, e. g., Handy v. Gayler*, 364 F.Supp. 676, 678–679 (D.Md.1973) (*Hackley* court undertook "definitive review of the legislative history of the Act"). Every case denying federal employees the right to a trial *de novo* has relied to some extent on the holding of the District Court in this case, and most have done so with no further analysis.

**103.** *See* 360 F.Supp. at 1250–1252.

**104.** *See id.* at 1250–1251.

**105.** *Id.* at 1251.

barricaded agency action from "meaningful court review."[106] Viewing Section 717 of Title VII as the congressional response to this problem, the District Court concluded:

Congress clearly left primary responsibility for enforcement of these rights within the Civil Service Commission. A fair reading of the statute shows that the courts and the Commission are to work together and complement one another's weaknesses and strengths. Neither can ignore the role the other plays. Viewing the Act and its history broadly, Congress intended to guarantee *access* to the courts—"a civil action"—to eliminate previous barriers but not to start the process anew.[107]

Our impression of the legislative history convinces us that the District Court's opinion of the amended Civil Service Commission procedures is unduly optimistic, and that its conception of the purpose of Section 717 is unduly narrow. More generally, we believe the District Court, in its "fair reading" of the statute and "broad" view of the legislative history, actually manifested an unfortunately constricted attitude toward the congressional intent in passage of the sweeping 1972 reform legislation.

██ We take as our starting point the basic purpose of Section 717: the rooting out of every vestige of employment discrimination within the federal government. Both the House and Senate Reports and a chorus of congressmen decried the federal government's poor record in achieving real equality of employment opportunity.[108] This was the critical defect which necessitated congressional action, and remedying this in-

justice was the "paramount" purpose which motivated inclusion of Section 717 in Title VII.[109] Equality is the touchstone of a democratic government, and Congress in 1972 finally perceived the injustice and hypocrisy of a system that demanded more from private employers than it was willing to give itself, that sought to establish a regime of equality for the private sector of the economy while leaving its own house in disarray, rife with discrimination.

Nor was the actuality of equal opportunity alone sufficient. The federal government plays a vital role in all aspects of our society; it is a model for all and exercises a significant educative force by its example. As the Senate Report opined, because the "policies, actions, and programs [of the federal government] strongly influence the activities of all other enterprises, organizations and groups, [i]n no area is government action more important than in the area of civil rights."[110] Thus, assuring the appearance of fair and equal treatment of federal employees and applicants for employment, as much as achieving the actuality of fair and equal treatment, was a primary congressional objective.[111] It is from this perspective that congressional action in 1972, and congressional intent in enacting Section 717 of Title VII, must be judged.

██ Turning our attention to the more specific congressional objectives addressed by Section 717, we first note that we concur in the District Court's observation that Congress intended to strengthen the CSC's remedial authority and the federal government's internal procedures for assuring equal employ-

---

106. *Id.*

107. *Id.*

108. *See, e. g.*, sources cited notes 63, 67, 76, 88 *supra*, & n. 119 *infra*.

109. *See, e. g.*, sources cited notes 61, 62, 76 *supra*.

110. *See* note 76 *supra*. *See also, e. g., Legislative History* at 82 (*House Report* at 22) (Amer-

icans "traditionally measure the quality of their democracy by the opportunity they have to participate in governmental processes. It is therefore imperative that equal opportunity be the touchstone of the Federal system."); note 67 *supra*.

111. *See, e. g.*, 171 U.S.App.D.C. pp. ————, ————, ————, 520 F.2d pp. 124–125, 127–129, 129–130 & notes 66, 67, 77, 78, 85, 89 *supra*.

ment opportunity through the 1972 amendments. Such an intent is evident in the language of the statute itself,[112] and permeates much of the commentary in the Senate Report.[113] However, we disagree with the District Court that this mandate to the CSC indicates a congressional belief that formal judicial fact-finding procedures are therefore unnecessary.

There is also serious question whether the District Court was on sound ground in concluding that the CSC's revised procedures effectively rectify the defects identified by Congress in 1972. As to this point, as indicated in their concurring opinions, Judges Leventhal and Davis are of the view that it is not necessary to address the recent course of the Civil Service Commission and consequently do not join in its discussion in this opinion. However, it seems to the writer worthy of note that both the House and Senate Reports found critical infirmities in the CSC's complaint procedures, even as revised in 1969. The informal procedures were found to have impeded rather than enhanced the quest for equal employment opportunity.[114] The fact that the hearing examiner was to be appointed from outside the agency was not considered curative of the defect that the examiner was without actual authority to conduct an independent investigation, since his conclusions and findings were "in the nature of recommendations to the agency head who makes the final agency determination as to whether discrimination exists." [115] Moreover, the CSC's Board of Appeals and Review was found to rarely reverse an agency determination, and the whole federal complaint process was considered to create a "built-in conflict-of-interest." [116]

It is evident from a comparison of 5 C.F.R. Part 713 as it existed before and after the 1972 amendments that no substantial reform was effectuated to meet these congressional concerns.[117] To be sure, the regulations were expanded to include, *inter alia,* provisions governing third-party allegations,[118] the aggrieved employee's right to file a civil action in District Court,[119] allegations of reprisal or coercion,[120] and the necessity for various remedial actions where discrimination is found.[121] However, no substantial changes were effectuated to meet many of the specific objections expressed in the House and Senate Reports. For example, although those Reports suggested that informal procedures may have impeded anti-discrimination efforts, the mandatory precomplaint processing procedures have not been altered.[122] Despite congressional criticism that an agency's responsibility for investigating and judging complaints lodged against it produces, at a minimum, an appearance

112. *See* 42 U.S.C. § 2000e–16(b) (Supp. III 1973).

113. *See, e. g., Legislative History* at 423–425 (*Senate Report* at 14–16).

114. *See, e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 124 & notes 66, 77 *supra.*

115. *See, e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 124 & notes 66, 77, 89 *supra.*

116. *See, e. g.,* 171 U.S.App.D.C. pp. ——–——, ——–——, 520 F.2d pp. 124–126, 127–128 & notes 66, 67, 77, 78, 89 *supra.*

117. *Compare* 5 C.F.R. Part 713 (1974) *with* 5 C.F.R. Part 713 (1972). For a graphic portrayal of the relatively minor changes wrought in the CSC procedures after passage of the 1972 Amendments, *see* Attachment 1 to Federal Personnel Manual Letter 713–17 (Nov. 3, 1972), *reproduced in* Supplemental Brief for NAACP Legal Defense and Educational Fund as Amicus Curiae (CSC letter addressed to heads of all departments and independent establishments), which sets out the then current regulations and the material added for the purpose of bringing the regulations into compliance with the requirements of the new legislation.

118. 5 C.F.R. § 713.251 (1974).

119. *Id.* §§ 713.281–.283.

120. *Id.* §§ 713.261–.262.

121. *Id.* § 713.271.

122. *See id.* § 713.213. The regulations do, however, caution the agency's EEO counselor "not [to] attempt in any way to restrain the aggrieved person from filing a complaint." *Id.* § 713.213(a).

of unfairness, and that the system creates a built-in conflict of interest, the head of an agency may still reject a complaint under certain circumstances or cancel a complaint for "failure of the complainant to prosecute,"[123] and the provisions under which the defendant agency preliminarily investigates the charges are not modified in any relevant way.[124]

Furthermore, the hearing procedures are only cosmetically altered, with the "hearing examiner" now denominated a "complaints examiner" but with the practical limitations on his independence and the fact that ultimate decision-making authority rests with the agency head persisting under the "revised" procedures.[125] The examiner need have no legal training,[126] and no rules of evidence govern the hearing;[127] hearsay is explicitly rendered admissible[128] and examiners are informed that the concept of "burden [of proof]" has *no applicability* to the hearing process.[129] Moreover, the

---

**123.** *Id.* § 713.215. *See also id.* § 713.220(b) (head of agency may cancel complaint if failure to prosecute "without undue delay"). Besides authorizing dismissals for failure to prosecute, the regulations allow the agency to dismiss a complaint for being untimely filed and require dismissals for complaints which are not within the purview of the regulations or which duplicate material in pending or decided complaints filed by the same individual.

**124.** *Id.* §§ 713.216–.217. The investigator is an agency employee, although from a division of the agency other than the one in which the complaint arose; the possibility that such agency personnel cannot be completely impartial and the image of impartiality created by this aspect of the complaint process have been noted by the *United States Commission on Civil Rights, The Federal Civil Rights Enforcement Effort—A Reassessment* 55 (1973). No rules of evidence or similar restrictions govern the investigator's compilation of an investigative file, which is made a part of the record and which the complaints examiner can utilize in arriving at his findings of fact. *See Office of Federal Equal Employment Opportunity of the Civil Service Commission, Discrimination Complaints Examiners Handbook* 38, 40 (Apr. 1973) [hereinafter cited as *Complaints Examiners Handbook*].

**125.** 5 C.F.R. §§ 713.218, 713.221 (1974).

**126.** *See id.* § 713.218(a). *See generally Complaints Examiners Handbook.* Moreover, it is remarkable that the CSC finds it necessary to caution complaints examiners that they "should maintain absolute impartiality in the conduct of the hearing. The fact that the Examiner is assigned to the case by the Civil Service Commission and paid for hearing work by the requesting agency does not alter the Examiner's independent status." *Id.* at 7.

Nevertheless, there are subtle biases in the complaints examiner's instructions. For example, examiners are told that "[f]ailure of the complainant to move forward on the case is often reason for delays in case completion," *id.* at 14, and that a remand to the agency (which

can then cancel the complaint) may be appropriate in such situations. No warning is given concerning the possibility of agency delay. Similarly, examiners are informed that "[i]f the complainant or his representative becomes contumacious, threatening, or belligerent toward the Examiner, the Examiner may close the hearing and return the case to the agency," *id.* at 15, which can then cancel the complaint. No suggestion is made that the agency representative might not accord the examiner normal courtesy, and no analogous sanctions are enumerated. Instead, the agency representative is cast as a "friend" of the examiner:

> The role of the agency representative is to help the Examiner determine whether there is a basis for the complaint. *The representative does not "defend" the agency or its officials but rather aids in the process of obtaining the truth* by bringing forth any information, whether helpful to the agency's position or not, which will assist the Examiner in fairly deciding the issues.

*Id.* at 25 (emphasis added).

**127.** *See, e. g.,* 5 C.F.R. § 713.218(c)(2) (1974); *Complaints Examiners Handbook* at 43 (test for admissibility is whether evidence is "both relevant and material and not unduly repetitious"; "wide latitude in the introduction of evidence"); *id.* at 46–47 ("[o]rdinarily, technical objections to testimony or evidence are not entertained"); *id.* at 47–48 (explaining meaning of "material" and "relevant"); *id.* at 95.

**128.** *See, e. g., id.* at 43, 60 ("Hearsay testimony is admissible and must be evaluated").

**129.** Indeed, the law of burden of proof which is appropriate to such Title VII cases, *see, e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 157 *infra,* is expressly rejected:

> The burden of proof in adversary proceedings is the obligation imposed on a party to persuade the trier of fact of the existence of the facts alleged in his pleadings. The trier of fact must be persuaded by a fair preponderance or greater weight of the evidence. The burden of proof never shifts[.] * * *

issues are delineated by the complaints examiner, and he rather than the com- plainant molds the agency record.[130] And particularly important in evaluating

On the other hand, the burden of going forward with the evidence may shift several times during [an adversarial] proceeding. For example, if the party having the burden of proof makes out a *prima facie* case * * * the burden of going forward shifts to the other party who must come forth with sufficient evidence to overcome the *prima facie* case. If such evidence is presented, the burden of going forward shifts back to the party having the ultimate burden of proof to overcome the evidence presented.

In adversary proceedings the party who has the burden of proof is first in the order of presentation of evidence.

\* \* \* \* \* \*

*The concept of burden of proof does not apply to discrimination complaint cases because hearings in these cases are not adversary but are investigatory.* Consequently, *rules applied under the burden of proof concept as in adversary proceedings, and the procedures based on this concept which have been developed in court trials and in some quasi-judicial administrative proceedings, are not to be rigidly applied.*

In discrimination complaint cases it is more appropriate to consider burden of proof as the burden of complying with the obligations imposed on agencies by the Equal Employment Opportunity Act of 1972, Executive Order 11478, and the Commission's regulations implementing the Act and Executive Order.

*Complaints Examiners Handbook* at 53–54 · (emphasis added). The examiner is then told that the "[a]gencies have primary responsibility to eliminate discrimination," *id.* at 54, and that the agencies have presumably made a complete investigation of the complaint before the hearing was to be held, *id.* at 55. "The Examiner's role in a discrimination complaint proceeding is to open all relevant lines of inquiry to ensure that all necessary facts are developed[.]" *Id.* He is to reach a "fair" decision, *id.* at 56; he must reach "a just and expeditious resolution of the complaint." *Id.* See also *id.* at 59 (must "fairly and justly" resolve the issues in the case).

In sum, the Examiner's role is to inquire into the facts. He must evaluate the evidence contained in the investigative file and in the transcript of the hearing in light of the agency's responsibility under the Act and the Executive Order. Thus, *if on the record* (including any evidence or argument presented by the complainant) *it appears that there was disparate treatment, the agency has the burden of presenting whatever credible evidence it may have so as to persuade the Examiner that the matter complained of was not the result of discrimina-* tion. *The agency's evidence must be of sufficient substance to persuade a reasonable man that any disparate treatment of the complainant was not based on his race, color, sex, religion, or national origin. Otherwise, the Examiner may justifiably make a finding of discrimination.* Id. at 56–57 (emphasis added). Thus, it is evident that the hearing does not assure that controlling principles of constitutional and statutory law will be properly applied.

Indeed, the complaints examiners are even told that in situations in which "the record shows disparate treatment," they must evaluate the evidence tending to show there was no discrimination and decide whether a "reasonable and unprejudiced mind could not infer from the facts so assembled that the agency was free from discrimination." *Id.* at 62. Moreover, despite the extensive congressional concern that the CSC had concentrated too much attention on discovering actual malice on the part of government officials rather than on isolating and eradicating systemic and institutional modes of discrimination, *see, e. g., Legislative History* at 84 (*House Report* at 24); *id.* at 423 (*Senate Report* at 14), the examiners are only reminded in a single matter-of-fact comment that "Disparate treatment can be systemic or institutional rather than individually motivated. A pattern of past discriminatory practice may be developed by the evidence." *Id.* However, they are given no instruction as to what factors might indicate such systemic practices, and they are never instructed concerning the central place statistics may play in such a demonstration. Indeed, although appellant claimed a pattern of prior discrimination at I&S, statistics on other I&S personnel were not introduced or evaluated until the case reached the BAR, at which point they were not subject to rebuttal. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 114, *supra.* Moreover, even those statistics were not very detailed. *See* brief and appendix for appellant at App. 48.

An additional problem with the agency hearings, especially in cases in which a general climate of discrimination is alleged, is that the hearing is not public, *see, e. g.,* 5 C.F.R. § 713.- 218(c) (1974); *Complaints Examiners Handbook* at 36–37, 95, even if the complainant seeks to open the hearing to others whose rights might be affected by the ultimate decision.

130. *See, e. g., Complaints Examiners Handbook* at 19 (examiner "must initially define the issues in the complaint" and determine the adequacy of the investigative file with respect to these issues; may remand case to agency if insufficient investigation on those issues); *id.*

the credibility of the agency proceedings as adequate factfinding mechanisms, the examiner has no subpoena power and thus neither the complainant nor the examiner has the right to conduct discovery or secure compulsory process.[131] Indeed, the CSC has frankly recognized that

> [t]he hearing is an adjunct to the investigation. *It is not an adversary proceeding but is an administrative*

proceeding *designed to provide additional evidence.*

Office of Federal Equal Employment Opportunity of the Civil Service Commission, Discrimination Complaints Examiners Handbook 5 (April 1973) (emphasis in original).[132] Furthermore, the head of the employing agency still makes the final agency decision on the complaint,[133] and although the employee may appeal that decision to the CSC's

at 27 (parties must furnish witness list before hearing, and examiner must determine whether it is "necessary" for each witness to testify); *id.* at 39 (parties merely "advise" examiner concerning issues they believe are involved in case). *See also id.* at 41, 67, 96. *Compare id.* at 41 (prevent complainant from engaging in "fishing expedition," particularly with respect to agency environment in which complaint arose; restrict testimony to issue stated in complaint) *with id.* at 63 (examiner may find discrimination on grounds other than those alleged in complaint). Moreover, the record is molded without considering the needs of a court and the proper legal standards and data for assessing and demonstrating the existence of discrimination. And although nothing precludes a complainant from selecting an attorney as his representative during agency proceedings, Congress was cognizant of the fact that Federal employees often needed counsel in these complicated areas, but seldom could afford such expenses. *See, e. g., Legislative History* at 85 (*House Report* at 25); note 139 *infra.* It therefore provided for discretionary appointment of counsel once a Title VII case reaches a court. *See* 171 U.S.App. D.C. pp. –– ––, 520 F.2d pp. 118–119 *supra.* Thus, it may be particularly oppressive to bind legally unsophisticated employees to complex and difficult choices made without adequate assistance at the agency level; indeed, the fact that the complaints examiner and EEO counselors need have no legal training exacerbates these problems since they are not therefore sensitive to the problem of preventing an unintentional or uninformed waiver of rights by complainants. Of course, the agency representative (whose primary loyalty is to the agency) will more than likely be an attorney, thereby aggravating the differential between the resources of the agency and those of the complainant.

131. *See, e. g., Complaints Examiners Handbook* at 101 (noting lack of subpoena powers and fact that complainant must make own arrangements for attendance of witnesses not in federal employ). Indeed, there are explicit limitations on the right to obtain CSC job ele-

ment examining guides and crediting plans, *see id.* at 46, and comparative personnel data, *see id.* at 44. When the examiner requests that federal employees attend as witnesses, they are to do so unless the employing agency states reasons why that would be "administratively impracticable." 5 C.F.R. § 713.218(e) (1974). However, as in this case, *see* notes 13 & 15 *supra,* former employees cannot be forced to testify or to supply affidavits.

132. *See also Complaints Examiners Handbook* at 39 ("The hearing is an extension of the investigative process and is not an adversary proceeding."); *id.* at 54 ("[H]earings in these cases are not adversary but are investigatory. Consequently, rules applied under the burden of proof concept as in adversary proceedings, and the procedures based on this concept which have been developed in court trials and in some quasi-judicial administrative proceedings, are not to be rigidly applied."); *id.* at 69 ("hearing process is not an adversary procedure"); Letter from Robert E. Hampton, Chairman, CSC, to Arthur F. Sampson, Acting Administrator, GSA, June 18, 1973, *reprinted in* Supplemental Brief for NAACP Legal Defense and Educational Fund, Inc. as Amicus Curiae at 41a:

> It is important to stress that it [the complaint procedure] is from beginning to end (at least until appeal) basically an investigative process. Thus, although the complainant is accorded the right to a hearing, the hearing is not adversary but is an extension of the initial investigation into the complaint. The hearing is for the same purpose as the initial investigation, that is to develop the facts on which a decision of the agency can be made.

133. *See* 5 C.F.R. § 713.221 (1974). In fact, the complainant does not see the complaints examiner's recommended decision until the time the agency has either accepted, modified, or rejected it. *See id.* at § 713.221(b)(2); *Complaints Examiners Handbook* at 49–50.

Board of Appeals and Review,[134] there is no right to a hearing of any type before the BAR.[135]

■ Thus, contrary to Judge Gesell's pronouncement that the CSC has lived up to its obligations under Section 717 and has implemented procedures that meet congressional concerns, the CSC's nonadversarial fact-finding procedures [136]

and inherent structural defects persist essentially unchanged, and do not guarantee federal employees a full and fair hearing on their claims of employment discrimination; these persisting inadequacies at the least present an aura of unfairness and an appearance of conflict of interest which will continue to discourage federal employees from seeking to vindicate their rights before the CSC with any prospect of success.[137]

**134.** *See* 5 C.F.R. § 713.231 (1974). Of course, the 1972 amendments offer the complainant the option of immediately proceeding in district court rather than appealing the final agency action to the CSC. *See* 171 U.S.App. D.C. p. ——, 520 F.2d p. 116 & note 72 *supra*. *See also* 5 C.F.R. §§ 713.221(d), 713.281 (1974).

**135.** 5 C.F.R. § 713.234 (1974). The failure of the CSC's procedures as an enforcement mechanism for the government's non-discrimination policies was itself the principal motivation for enactment of section 717. *Morton v. Mancari,* 417 U.S. 535, 546–547 & nn. 21–22, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

**136.** In holding that private sector employees have the right to a trial *de novo* despite prior decisions in non-judicial forums, the Supreme Court has stressed the inadequacies in the factfinding processes in those forums. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798–799, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973), which held that the EEOC's failure to find reasonable cause to believe a private sector complainant's charge is valid does not preclude a *de novo* court action, emphasized "the nonadversary character of many of [the EEOC's] proceedings[.]" Even more relevant is the analysis of *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which held that a private sector employee's right to a trial *de novo* is not foreclosed by his prior submission of the discrimination claim to final arbitration under the non-discrimination clause of a collective bargaining agreement.

The *Alexander* Court held not only that a prior arbitral decision does not preclude a trial *de novo,* but also that, despite the strong labor policy favoring arbitration, courts cannot defer to arbitration even if the claim is before the arbitrator, the bargaining agreement prohibits the discrimination charged, and the arbitrator has authority to rule on the claim and fashion an appropriate remedy. Although in reaching this result the Supreme Court partially relied on the special role of the arbitrator and his limited expertise in public policy matters, *id.* at 56–57, 94 S.Ct. 1011, it also emphasized the

importance of strict factfinding procedures in protecting the substantive rights guaranteed under Title VII:

> [T]he factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. * * * Indeed, it is the informality of arbitral procedure that enables it to function as an efficient, inexpensive, and expeditious means for dispute resolution. This same characteristic, however, makes arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts.[19]
> [19] A further concern is the union's exclusive control over the manner and extent to which an individual grievance is presented. * * *

415 U.S. at 57–58, 94 S.Ct. at 1024. As the discussion in text should make evident, the agency and CSC factfinding procedures under 5 C.F.R. Part 713 are similarly deficient, thereby accentuating the wisdom of the congressional decision that judicial factfinding rather than judicial decisionmaking on the basis of the compiled agency record would be most conducive to safeguarding Title VII rights.

**137.** Of course, if Congress had intended that the federal employee "civil action" be a review of the agency proceedings rather than a trial *de novo,* the failure of the CSC to substantially ameliorate the complaint process would not provide a basis for determining that we should judicially establish the right to a trial *de novo.* But as we have already noted, we do not believe that the congressional directive to the CSC under subsection 717(b) in any way detracts from the congressional intent to establish the right to a trial *de novo* under subsections 717(c) and (d). It was probably partially out of fear that the CSC's procedures would not (or inherently could not) be substantially improved that Congress guaranteed that federal employees would have the same right to a fair and comprehensive judicial hearing and

Turning our attention to the more specific congressional objectives addressed by subsections 717(c) and (d), we cannot agree with Judge Gesell that the mere conferral upon federal employees of the right of "access" to the courts was intended. To be sure, Congress discounted CSC testimony that federal employees already had the right to prosecute discrimination claims in the District Courts; it found that the Government defenses of sovereign immunity and failure to exhaust administrative remedies often effectively precluded meaningful judicial consideration of those claims.[138] However, by ensuring federal employees that they would have the unequivocal right to a day in court, Congress did not thereby dictate that that day in court would only consist of a review of the administrative record in those cases in which such a record has been compiled. Indeed, by enacting subsection 717(c) Congress had assured federal employees of their day in court; but Congress also enacted subsection 717(d), specifying that the provisions of Title VII governing private sector employee actions would also govern federal employee civil actions. We believe that

this broader congressional objective—the equalization of the rights and remedies in the courts of private sector and federal employees—is manifest in the legislative history of the 1972 amendments.

Both the Hawkins Bill in the House and the Committee Bill in the Senate sought to accord the EEOC cease and desist authority, and to limit judicial action on final EEOC orders in the private sector to substantial evidence review in the appropriate Courts of Appeals. However, both bills preserved the preexisting private sector employee "civil action" in the District Courts in certain enumerated situations; these actions, like those under the unamended Act, would of necessity be trials *de novo.* Despite the fact that each bill, with respect to private sector employees, contained provisions requiring substantial evidence review in the Courts of Appeals in some situations but trials *de novo* in the District Courts in other situations, the section of the bills pertaining to federal employee civil actions *always* referenced the private sector provisions requiring trial *de novo* as the provisions

---

the same utilization of the discovery provisions and other procedural tools of the Federal Rules of Civil Procedure which are accorded private sector litigants in their "civil actions." At a minimum, it can be said with certainty that Congress had sufficient doubts about CSC procedures, even if revised, that it specifically provided in subsection 717(c) that a federal employee could file a civil action after final agency action *without* exhausting any review or hearing rights that might be afforded by the CSC. Indeed, it would appear from the legislative history that the very essence of the Senate Committee's "compromise" was that such a trial *de novo* was absolutely essential if the CSC retained jurisidiction over Title VII aspects of federal employment.

138. *See, e. g.,* 171 U.S.App.D.C. pp. ——,·—— ——, ——, 520 F.2d pp. 128, 133–134, 135–136 *supra.* Appellants argue that if Congress only intended to provide access to the courts, the 1972 amendments were superfluous, since federal employees already had access to the District Courts on discrimination matters. *See* Brief and appendix for appellant at 29–31. However, during the congressional consideration of Section 717, the CSC had made the

same argument, which Congress declined to accept. It is not our task to decide whether Congress was right or wrong in its assessment of the law relating to federal employment as of 1972; we are bound, in analyzing congressional intent, to accept Congress' impression of the legal status of these employees. However, merely because one congressional purpose in enacting Section 717 was to ensure that there would be meaningful court access for federal employees (in particular, sovereign immunity could no longer be interposed as a defense) does not mean that Congress intended no more than this; it is clear from other segments of the legislative history that Congress had the broader purpose of equalizing the essential characteristics of private sector and federal employee Title VII suits, with the ultimate objective being the total eradication of discrimination from federal personnel practices. Needless to say, the fact that Congress has one objective (the grant of court access) does not obviate any other objectives (such as the grant of a day in court comprised of a trial *de novo* governed by the Federal Rules of Civil Procedure) which it intends to achieve through major reform legislation.

which would govern a federal employee's civil action.[139] The Senate Report, in its

analysis of the provisions which, without relevant modification, became Section

139. *See generally* 171 U.S.App.D.C. pp. ——— ——, 520 F.2d pp. 122–129 *supra.* Moreover, when it so intended, Congress was certainly capable of indicating that the review provisions governing final EEOC action rather than the trial *de novo* provisions governing certain private sector "civil actions" would govern various suits under Title VII. The Committee Bill, in transferring "pattern and practice" cases from the Attorney General's Office to the EEOC, stated that "such actions shall be conducted in accordance with the procedures set forth in section 706, *including the provisions for enforcement and appellate review contained in subsections* (*k*), (*l*), (m), and (n) thereof." *See* Appendix B *infra,* Committee Bill § 5 (proposed § 707(e) of Title VII) (emphasis added). By contrast, the provisions establishing the right of the Attorney General to institute *de novo* actions against state and local governments employed the same language as that in subsection 717(d):

In the case of a respondent which is a government, governmental agency, or political subdivision, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. * * * *The provisions of section 706(q) through (w), as applicable, shall govern actions brought hereunder.*

*See* Appendix B, Committee Bill § 4(a) (proposed § 706(f) of Title VII). · Indeed, the Senate's final version of subsection 706(f), after authorizing EEOC, Attorney General, and personally initiated private sector "civil actions," specified in subsection 706(f)(6) that the "provisions of section 706(f) through (k), *as applicable,* shall govern civil actions brought hereunder." *Legislative History* at 1782 (emphasis added). This merely reinforces the notion that Congress, when using the phrase "as applicable," was simply taking cognizance of the fact that the more specific language of those subsections referred to a variety of plaintiffs and agencies. *See, e. g.,* 171 U.S.App.D.C. pp. —— ——, 520 F.2d pp. 121–122 & note 45 *supra.* However, all plaintiffs were to be accorded trials *de novo* in the District Courts.

Moreover, there was some indication that the grant of jurisdiction under subsection 717(c) was itself considered sufficient to accord federal employees the same right to a trial *de novo* which is possessed by private sector employees. Under the initial Dominick Amendment which the Senate rejected, *see* 171 U.S.App.D.C. p. ——, 520 F.2d p. 129 *supra,* the proposed subsection 717(d) was to be eliminated, although the reference to filing a "civil action" under the procedures of subsec-

tion 706 was to be retained in subsection 717(c). *See Legislative History* at 557 (text of Dominick Amendment). Senator Javits sought to amend the Dominick proposal by striking that part which sought to eliminate subsection 717(d):

If Senators will refer to that particular section [717(d)], they will find that [it] *applies the provisions of another section of the Equal Employment Opportunities Act, to wit, 706(q) through (w), to civil actions brought by Federal Government employees* under the equal employment opportunity protections of the law. The Senator from Colorado (Mr. Dominick) proposes to strike that out. Sections 706(q) through (w) will no longer apply if the amendment should pass unamended.

If you refer to those provisions, insofar as they are applicable, you find that the main point is that where the complainant is suing in court, you have arrived at the stage of the proceeding where he has that remedy, and in such circumstances as the court may deem just, the court may appoint an attorney for the complainant and authorize the commencement of the action without the payment of fees, costs, or security.

Mr. President, that is a very important right for the individual, just as it is a very important right for a Government employee, for the individuals involved are not, in the main, high-salaried, in that those who would be likely to sue in these equal employment opportunity cases are fairly modest people.

So I see no reason, Mr. President, why in the one case, to wit, that of the normal complainant who is not a Government employee with a remedy in court, that complainant shall be the beneficiary of a court-appointed lawyer, and not have to pay these costs and securities and why this provision should be stricken out when it comes to a Federal Government employee who has to sue and is also a person * * * of modest means.
 * * * I do not see how we can very well make that distinction.

 * * * * *

 * * * [L]et us at least do· our utmost to lay on with an even hand as far as the complainant who is a Government employee is concerned.

*Legislative History* at 868–869. Senator Dominick, who thought that federal employees had the right to a trial *de novo* under the compromise which he had co-authored in committee, *see* 171 U.S.App.D.C. pp. ——— – ——, 520 F.2d pp. 122–128 & notes 81, 85 *infra,* responded:

Mr. President, I want to say for the record that this particular amendment language was included, as the specific provisions of

717, made this equality of federal employee "civil actions" and the *de novo* private sector "civil actions" unmistakable:

> Aggrieved [Federal] employees or applicants will [in addition to rights before the CSC] also have *the full rights available in the courts as are granted to individuals in the private sector* under title VII.

\*　\*　\*　\*　\*　\*

> *The provisions of sections 706(q) through (w) concerning private civil actions by aggrieved employees are made applicable to aggrieved Federal employees or applicants.*[140]

Never was there any hint that provisions pertaining to substantial evidence review of final EEOC orders should apply to federal employees; nor was there any suggestion, as contended by appellees, that the various provisions of those bills dealing with the standard of review or judicial remand of the case to the agency for further fact-finding were intended to govern federal employee civil actions (although in the District Courts rather than in the Courts of Appeals).[141] Indeed, the very fact that Congress, when considering review provisions for EEOC cease and desist orders for over 40 million private sector employees that were to be covered, placed jurisdiction in the Courts of Appeals, indicates the absurdity of suggesting that it intended to create analogous "review" provisions for the mere 2.6 million covered federal employees in the District Courts.

In addition to the evidence of congressional intent derived from the structure of the progenitors of Section 717, considerable support for the federal employee's right to have a *de novo* determination of his discrimination claims in the District Courts is manifest in the plethora of statements delivered by Senator Dominick (who had co-authored the Committee compromise embodied in Section 717) during the Senate debate on the Committee Bill. As indicated by the passages already quoted in the chronological description of the legislative history,[142] Senator Dominick spoke forcefully against the bill's provisions which accorded the EEOC cease and desist powers and which limited judicial oversight of its final orders to substantial evidence review in the Courts of Appeals. With rhetorical flourishes, Senator Dominick castigated the Senate for the discrimination which this allegedly wrought, since it denied most private sector em-

---

the bill deal only with Federal employees for whom we had a different procedure. They go through their own agencies and then they have the right as a Federal employee to go to the civil service board or to go through the Federal court system. *The amendment to strike the language was included because the language to be struck was thought to be inappropriate to the specialized grievance procedures adopted in committee for Federal employees. A closer reading of sec. 706(q) through (w) does indicate that language for providing attorney's fees and waiving court costs are applicable.*

*Legislative History* at 872. Thus Senator Dominick believed that the grant of jurisdiction under 717(c) provided for an unrestricted trial *de novo*, and that additional references to subsections 706(f) through (k) were unnecessary, since the language in those subsections basically referred to EEOC activities. Nevertheless, when he formulated the amendment that was finally adopted, he did not seek to delete the language of 717(d) since it provided an additional guarantee that *all* the safeguards accorded private sector litigants would also apply to federal employees, and that there would be no doubt that Congress was treating all litigants "with an even hand." Moreover, once he appreciated this fact, there was no reason to refrain from adding specific safeguards only in section 706. Thus, the amendment incorporating the clause of 706(f)(5) allowing the appointment of a master if the case is not set *for trial* after 120 days, *see* 171 U.S.App.D.C. pp. ——, ——, 520 F.2d pp. 118, 121 *supra,* was passed *after* this discussion concerning attorneys and court costs. *See also* note 181 *infra.*

**140.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 128 *supra* (emphasis added).

**141.** *See also* 171 U.S.App.D.C. pp. ——–——, 520 F.2d pp. 145–146 *infra.*

**142.** *See* 171 U.S.App.D.C. pp. ——–——, 520 F.2d pp. 129–130 & note 85 *supra.*

ployees[143] the right to *de novo* judicial proceedings and the beneficial concomitants[144] of such trials which the Committee Bill accorded to federal litigants and state and local government employees. These statements of Senator Dominick were essentially aimed at persuading his colleagues that *all* covered employees should enjoy the *same* rights to a court trial and judicial procedures which, in his understanding, the Committee had already deemed appropriate for federal and state and local government employees; eventual adoption of his proposed amendment to the Committee Bill accomplished this result by eliminating all references in the bill to cease and desist power and to "review," and subjecting all Title VII suits—whether brought by the Attorney General, the EEOC, or private litigants—to the same governing sections of the bill which had originally been intended to cover only some private litigant discrimination claims.[145] Federal employee suits, under the Committee Bill's proposed subsection 717(d) of Title VII, had already been subjected to these same procedural criteria. Thus, after adoption of the Dominick amendment, all Title VII suits would have the same essential characteristics— granting litigants the right to a trial *de novo* and access to the discovery mechanisms of the federal rules—although the party acting as plaintiff would vary according to the type of suit involved. The Committee Bill, as thus amended, for all relevant purposes became the 1972 amendments to Title VII. Indeed, the Conference Report on the bill as enacted simply reiterated the equality of private sector and federal employee "civil actions" under the amendments; a federal employee "could bring a civil action *under the provisions of section 706*,"[146] the section of Title VII according the EEOC or aggrieved private sector litigants the right to bring a discrimination complaint to District Court for a trial *de novo*.[147]

Furthermore, substantial support for our holding may be derived from what Congress did *not* do in the 1972 amendments and the issues which were not debated in either House. Before the Dominick amendment was adopted, the EEOC was to be granted cease and desist powers in the private sector, with substantial evidence review in the Courts of Appeals. The procedures under which an appellate court was to conduct its review were elaborated in considerable detail.[148] In particular, there was extended debate on whether the proper standard of review should be "substantial evidence" or "preponderance of the evidence."[149] The difference in the two standards was considered significant, and proponents of cease and desist authority warded off attempts, primarily sponsored by Senator Ervin, to increase the intrusiveness of judicial review through substitution of a preponderance test for the Committee Bill's substantial evidence test. Appellees would have us believe that Congress, despite the fact that similar debate was not initiated with respect to federal employees, intended implicitly to establish procedures *in the District Court* for review of final federal agency or CSC orders analogous to the detailed procedures which it had explicitly estab-

---

143. That is, all private sector litigants except those in the narrow category where individual lawsuits could be brought in district court. *See* 171 U.S.App.D.C. pp. ——-——, 520 F.2d pp. 125–127 & note 73 *supra*. *supra*.

144. *See* note 57 *supra*.

145. *See, e. g., Legislative History* at 1499–1504 (text of Dominick Amendment), 1557 (adoption of Dominick Amendment).

146. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 134 *supra* (emphasis added). *See also Confer-*

*ence Report* at 17–18, *Legislative History* at 1815–1816.

147. *See* 171 U.S.App.D.C. pp. ——-——, 520 F.2d pp. 118–119 *supra*.

148. *See, e. g.,* notes 58, 71 *supra*.

149. *See, e. g., Legislative History* at 219–221, 229–230 (debate on Hawkins Bill in House), 542 (proposed Ervin amendment to Committee Bill in Senate), 798–799 (debate on Committee Bill in Senate), 875 (proposed Ervin amendment), 1026–1038 (debate and vote rejecting Ervin amendment to Committee Bill).

lished *in the Courts of Appeals* for review of final EEOC orders. As already indicated, there is no support for this proposition in the structure of the Committee Bill before the Dominick amendment, since the procedures governing individual private sector actions *in the District Courts,* which were trials *de novo,* were referred to as governing federal employee "civil actions." [150] But even if we were to assume *arguendo* that Congress conceivably wanted those provisions regulating appellate review to govern federal employee civil actions in the District Court (and only in the situations in which an agency record had been compiled), it would be difficult indeed to assert that although Congress wanted to limit federal employee "civil actions" to review of the administrative record, it did not say anything about the "review" procedures, especially the standard of review, even when the Dominick amendment purged all references to review from the Committee Bill and Congress thereby accepted Senator Dominick's goal of equal court treatment for all employees. Given the significance that Congress attached to the standard of review, and the detail with which Congress specified procedures governing such "review" problems as inadequate administrative records and failure to present evidence before the agency,[151] we believe

Congress would have addressed these issues if a "review" proceeding rather than a trial *de novo* in the District Court was intended.[152]

Against the press of this legislative history and subsequent statements applauding the comparability of the federal employee and private sector "civil actions" authorized by the 1972 amendments,[153] the District Court (which did not allude to the legislative history discussed above) quoted only two statements by Senator Williams and cited another statement by Senator Cranston to indicate that Congress intended to limit the federal employee's "civil action" to a review of the administrative record when such a record has been compiled.[154] These statements, however, cannot shunt the primary thrust of the legislative history.

Admittedly, Senator Williams, in a discussion focusing on the proposed Section 717, proclaimed that a federal employee would henceforth be able to file an action "for a review of the administrative proceeding record," [155] and in amplifying remarks contemporaneously inserted into the Congressional Record he asserted that the federal employee would have "a private right of action of review of the agency proceedings * * * the full rights of review available in the

---

**150.** *See, e. g.,* 171 U.S.App.D.C. pp. ——-——, 520 F.2d pp. 128–129 & note 80 *supra.*

**151.** *See, e. g.,* note 71 *supra.*

**152.** Indeed, even those courts which have held that Congress only intended that federal employees would be able to obtain judicial review of the agency or CSC record have been unable to agree on what standard of review was intended. *Compare, e. g., Tomlin v. United States Air Force Medical Center,* 369 F.Supp. 353 (S.D.Ohio 1974), *Handy v. Gayler,* 364 F.Supp. 676 (D.Md.1973), *Ficklin v. Sabatini,* 383 F.Supp. 1147 (E.D.Pa.1974), *Roney v. Saxbe,* 380 F.Supp. 1191 (D.D.C.1974) ("substantial evidence" or "rational basis" standard), *with, e. g., Hackley v. Johnson,* 360 F.Supp. 1247 (D.D.C.1973), *Pointer v. Sampson,* 62 F.R.D. 689 (D.D.C.1974), *Warren v. Veterans Hospital,* 382 F.Supp. 303 (E.D.Pa. 1974), *Abrams v. Johnson,* 383 F.Supp. 450

(N.D.Ohio 1974) ("preponderance of the evidence" standard). Thus, even if we were satisfied that a searching review of the record under the "preponderance of the evidence" standard could satisfactorily protect complainants' Title VII rights (and in light of congressional intent and the inadequacies of CSC and agency factfinding mechanisms we are not in fact satisfied that such an approach is acceptable), the ease with which courts have slipped into a "mere rationality" standard of review counsels against following that path.

**153.** *See, e. g.,* 171 U.S.App.D.C. pp. ——, ——-——, 520 F.2d pp. 132, 133–135 & note 95 *supra.*

**154.** *See* 360 F.Supp. at 1251–1252 & n.7.

**155.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 133 *supra.*

courts." [156] However, with the same breath Senator Williams, in apparent contradiction since adoption of the Dominick amendment had accorded all private sector employees the right to a trial *de novo* in District Court, asserted that "[t]here is no reason why a Federal employee should not have the *same* private right of action enjoyed by individuals in the private sector." [157] Moreover, on at least three other occasions Senator Williams noted the equality of treatment that was to be accorded private sector and federal government employees when they file suit in District Court.[158] Furthermore, Senator Williams' statement could not accurately depict congressional intent in establishing a federal employee "civil action," since some such actions— where suit is instituted after agency delay for 180 days—could under no circumstances constitute a simple review of the agency record, for no such record would be extant.[159] Particularly when it is recalled that Senator Williams acknowledged that Senator Dominick was more qualified to speak authoritatively on the meaning of the federal employee provisions,[160] and that the statement inserted into the Congressional Record appears to be no more than a personal interpretation (which altered the meaning) of the Senate Committee's more definitive interpretation of Section 717,[161] we do not believe that we should lend much weight to Senator Williams' remarks quoted above. This is especially true in light of the clear direction of the remainder of the legislative history.

The cited statement of Senator Cranston [162] provides even less support for the District Court's determination that Congress only intended to accord federal employees the right of access to federal court and not the right to a trial *de novo* possessed by all other employees under Title VII. First, even if Senator Cranston's statement is taken at face value as originally printed in the daily edition of the Congressional Record, it incorrectly portrayed the law. Beginning "[a]s with other cases brought under Title VII of the Civil Rights Act of 1964," the statement could not reasonably have been relied upon by other congressmen as indicating an intent that the District Court proceedings would "not be a trial de novo," since all other Title VII cases, both before the 1972 amendments and under the 1972 Act as it then stood, were trials *de novo* and not mere review of EEOC action.[163] Moreover, Senator Cranston had previously stated that one of the purposes of subsection 717(c) was to "create[ ] a remedy in district court— *comparable to private employment actions* —for any [federal] employee who has exhausted the equal employment opportunity complaint procedure within his Federal agency." [164] Finally, Senator Cranston went on record to correct the misquotation in the Congressional Record so that the bound volume would

**156.** *See* 171 U.S.App.D.C. pp. ————, 520 F.2d p. 133 *supra*.

**157.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 133 *supra* (emphasis added).

**158.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 134 *supra* (emphasis added) ("[S]ections 706(f) through (k) as applicable, concerning private civil actions by aggrieved persons, *are made applicable* to aggrieved Federal employees or applicants."); 171 U.S.App.D.C. p. ——, 520 F.2d 465 at 483–484. *Compare* 171 U.S.App. visions of sections 706 (f) through (k), *concerning private civil actions* by aggrieved persons, *are made applicable* to aggrieved Federal employees or applicants for employment"); note 80 *supra* (emphasis added) ("Provisions * * * applicable to *private* actions by aggrieved persons *are made applicable* to U. S.

government workers and applicants for Federal employment.").

**159.** *See* note 28 *supra*.

**160.** *See* note 81 *supra*.

**161.** *See Sperling v. United States, supra,* 515 F.2d 465 at 483–484. *Compare* —— U.S.App. D.C. pp. ————, 520 F.2d pp. 128–129 *supra,* —— U.S.App.D.C. pp. ————, 520 F.2d pp. 133–134 *supra*.

**162.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 133 *supra*.

**163.** *See, e. g.,* 171 U.S.App.D.C. pp. ————, ————, 520 F.2d pp. 118–119, 144–145 & notes 45, 85 *supra*.

**164.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 132 *supra* (emphasis added).

reflect his actual remarks, which emphasized that "Federal district court review would *not* be based on the agency and/or CSC record and *would be a trial de novo*." [165] Since this correction was made several months after passage of the 1972 amendments,[166] and although no one challenged Senator Cranston's correction or protested that his original vote was cast in reliance on the version which appeared in the daily edition,[167] we do not base our holding on this piece of legislative history; other evidence is sufficiently compelling to support our conclusion that Congress intended to create for federal employees a "civil action" with the same essential attributes as the "civil action" brought by private sector and state and local government employees. Nevertheless, the fact that the correction went unchallenged and the fact that, as originally reported, the statement was internally inconsistent, undercut any attempt to premise a holding limiting judicial action to review of the administrative record on Senator Cranston's comment.

Thus we cannot accept the view that Congress did not intend to accord federal employees the same right to a trial *de novo* that it had previously accorded private sector employees and that it reaffirmed through passage of the 1972 amendments to Title VII.

### C.

We are also unable to isolate any substantial policy justifications for denying federal employees a trial *de novo* on their claims of discrimination under Section 717 of Title VII. As we have already indicated, we believe the pertinent language of Section 717 and its legislative history, although not absolutely devoid of inconsistencies, basically support the thesis that Congress intended in passing the 1972 amendments to accord federal employees the right to such *de novo* trials in the District Courts.

As noted above, to the extent various policy considerations inform our analysis of congressional intent, we believe this interpretation is also supported by those policy considerations which motivated the 1972 amendments to Title VII: Congress wanted every trace of employment discrimination within the federal government obliterated. Subsection 717(a) trumpeted the purpose of the amendments: "*All personnel actions* affecting [federal government] employees or applicants for employment * * * *shall be made free from any discrimination* based on race, color, religion, sex, or national origin," and the right to plenary judicial proceedings was provided to insure that the trumpet did not sound a hollow note. Since the federal Government was the model for all other groups in society, Congress considered the goal of real equal employment opportunity to be of paramount importance and decided that federal employees were to be granted the same rights as private sector employees for achieving that equality. An essential prerequisite for achieving equality was the guarantee of fair and effective machinery for resolving discrimination disputes; indeed, Congress appreciated the fact that even if the CSC could provide that fairness, the appearance of conflict of interest and bias and the need to reassure federal employees that they possessed the same rights as private sector employees counseled strongly that there be *de novo* judicial proceedings rather than judicial deferral to agency or Civil Service Commission decisions.

Nevertheless, the District Court in this case urged a variety of other policy considerations as counseling a contrary result. But even if we were to ignore the fact that if Congress did not consider these factors sufficient for denying federal employees the right to a trial *de novo,* we could not rely on them to frustrate that congressional intent, we would still find them unpersuasive as compel-

---

**165.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 134 & note 95 *supra* (emphasis added).

**166.** *Id.*

**167.** *Cf. Erlenbaugh v. United States,* 409 U.S. 239, 243–245, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972).

ling reasons for adopting the District Court's approach in this case. Especially when compared with the substantial interests served by a fair and complete judicial fact-finding process, replete with the tools of discovery and compulsory process, these interests pale into insignificance.

In holding that there is no automatic right to a trial *de novo,* the District Court was obviously concerned with several factors that could be generally characterized as judicial efficiency: the fact that a trial *de novo* would be "a wholly new trial [that] will perforce duplicate much of the administrative record," [168] the prediction that the number of federal employee cases that might be filed in this district "would impose an especially heavy burden on the federal trial courts in this jurisdiction," [169] and the impact of the comparative expertise of federal judges and the CSC in the ability to isolate instances of "real" discrimination:

> it is difficult, as the present cases illustrate, to differentiate between pure discrimination claims and the underlying intricacies of civil service regulations governing job qualification selection for promotion, training and the like. The Commission's growing expertise in civil rights matters, coupled with its pre-eminent expertise in these latter areas, emphasize that an automatic trial *de novo* will not serve the laudable purpose of the Act.[170]

Furthermore, the District Court noted the fact that

> Congress wanted prompt and consistent decisions in these discrimination matters. A trial *de novo* does not accomplish this but rather works in the opposite direction for a wholly new record must be made and opportunity for reasonable discovery provided.[171]

The District Court summarized these arguments with the conclusion that "an interpretation that embraces an automatic requirement of trial *de novo* in all instances with all its inherent uncertainties and substantial delays will defeat rather than advance the Act's objectives." [172] We find little, if any, force behind these factors.

168. 360 F.Supp. at 1249.

169. *Id.*

170. *Id.* at 1252.

171. *Id.*

172. *Id.* Although not incorporated as a rationale by the District Court in this case, another rationale suggested by several courts is grounded in the notion that a trial *de novo* for federal employees would be unfair because it would accord those employees greater rights than are possessed by private sector employees in the total remedial structure of Title VII. *See, e. g., Baca v. Butz,* 376 F.Supp. 1005, 1008–1009 (D.N.M.1974); *Pointer v. Sampson,* 62 F.R.D. 689, 691, 693–694 (D.D.C.1974); *Guilday v. United States Department of Justice,* 385 F.Supp. 1096, 1098 & n.4, 1099 (D.Del.1974). This argument proceeds on the theory that the EEOC is basically designed to serve a conciliatory function, while the CSC is adjudicatory, providing the complainant with an evidentiary hearing and substantial procedural safeguards. Several factors, however, belie the argument that this asserted inequality justifies denying federal employees the right to a trial *de novo.* Most important, the argument is irrelevant. When Congress referred to according private sector and federal employees equal treatment, it did so in the context of according them equal treatment in the courts. *See, e. g.,* 171 U.S.App.D.C. pp. ——–——, ————, ——, ——, ————, ——, ————, 520 F.2d pp. 118–119, 123–124, 127, 128, 129–130, 132, 133–135 & notes 60, 68, 80, 85 *supra.* Indeed, subsection 717(d) refers to those private sector provisions governing the private sector employee "civil action," and the earlier Committee Bill referred to the *de novo* private sector actions brought in the District Courts, not to those reviewed in the appellate courts. Senator Dominick's proposed amendment was designed to equalize the rights of all employees to District Court determinations of their discrimination claims, even though it was clear that private sector and federal employees, who were governed by different agencies and different procedures, did not have identical rights *before* the institution of court proceedings. *See, e. g.,* note 139 *supra.* Moreover, the factual predicate for the "inequality" argument is erroneous. The CSC does not in fact provide the equivalent of court-room adjudication and factfinding mechanisms, and procedural safeguards such as discovery, compulsory process, strict evidentiary rules and a clear allocation of the burden of proof are conspicuously absent. *See generally* 171 U.S.App.D.C. pp. ——————, 520 F.2d pp. 139–142 & notes 117–137 *supra.* Congress recognized the conflict of in-

First, there is no reason why the *de novo* proceedings need duplicate the administrative record. As we elaborate in more detail below,[173] the administrative record should be admissible for whatever weight the trial judge wishes to accord it, and most *de novo* testimony would be in the nature of *supplementation* to that record.[174] As counsel for *amicus* NAACP Legal Defense and Edu-

terest problems of allowing the CSC to retain jurisdiction over Title VII aspects of federal employment, but in effect accorded federal agencies and the CSC—like an employer in the private sector—the first opportunity to set their house in order. When that fails, rights to full judicial process become applicable. Furthermore, the instruments in the private sector employee's armamentarium are actually considerably more numerous and varied than those available to the federal employee; for example, the former can proceed in District Court under the Civil Rights Act of 1866 without even going to the EEOC, while it is as yet unclear whether a federal employee can employ such statutes as an alternative procedure to Title VII. *See, e. g., Brown v. General Services Administration,* 507 F.2d 1300 (2 Cir. 1974), *cert. granted,* 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476 (1975) presenting question whether Section 717 repeals, *pro tanto,* 1866 Civil Rights Act, Tucker Act, Mandamus Act, and APA). Moreover, many of the individuals who clearly have the right to a trial *de novo*—private sector and state and local government employees—may have had a full adversarial hearing at the state level, replete with more safeguards than are provided by the CSC. Indeed, such avenues of redress must be exhausted before the EEOC can consider their complaints. *See* note 45 *supra.* Yet because the "civil action" which the Attorney General or the EEOC may file on their behalf or which they may file (if they are dissatisfied with action taken by the state agency and by the Attorney General or the EEOC) is explicitly accorded under subsections 706(f)-(k), there can be no doubt that they have the right to a "hearing" and "trial" in the District Court. In addition, it is certainly true that when the EEOC determines there is "reasonable cause to believe" a private sector employee's discrimination complaint is valid, it may only attempt conciliation and possesses no remedial authority. But the EEOC, unlike the CSC, has subpoena power to compel testimony and to obtain docments, and must conduct a full investigation of the complaint. *See, e. g.,* 29 C.F.R. §§ 1601.15–.16 (1974). Yet if that investigation results in a determination that there is "no reasonable cause to believe" the complaint is valid, the private sector employee can still obtain a *de novo* trial in the district court, *see* 171 U.S.App.D.C. pp. ——— ——, 520 F.2d pp. 118–119 *supra,* even though it could have been argued that since the "reasonable cause" standard is considerably lower than the "preponderance of the evidence" standard to be applied in court, an individual who cannot establish the former before the EEOC should be precluded from coming into court to attempt to prove the latter. Finally, although the *Pointer* court, *see* 62 F.R.D. at 694, and appellees, *see* brief for appellees at n.50, 41–42 & n.52, quote language indicating that, before the adoption of the Dominick Amendment, Congress did not intend to let private sector employees "retry" their cases once the EEOC had issued a final ruling on the merits, and that the purpose of the Congress was to avoid "duplication of proceedings," that legislative hitory is inapposite to the situation of the federal employee. *See Legislative History* at 73 (*House Report* at 13), 196 (remarks of Rep. Perkins); 433 (*Senate Report* at 24), 587 (remarks of Sen. Williams), 1404 (same), 1772 (same). The relevant bills at that time included provisions that explicitly prescribed EEOC procedures designed to assure private sector employees and employers a fair and complete evidentiary hearing under trial-type procedural safeguards. *See e. g.,* notes 58, 71 *supra.* As indicated previously, *see* 171 U.S.App.D.C. pp. ——— ——, 520 F.2d pp. 136–142 *supra,* the CSC does not accord such a quasi-judicial hearing and similar adversarial safeguards, and was not compelled by statute to provide federal employees with any particular procedural rights. Congress desired a multiplicity of remedies for resolving discrimination claims, *see Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47–49 & nn.8, 9, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and the Supreme Court has specifically recognized that factfinding procedures that are less efficacious than those accorded by a court should not abridge an employee's right to have a *de novo* judicial determination of his discrimination claim. *See* note 136 *supra.*

173. *See* 171 U.S.App.D.C. pp. ——— ——, 520 F.2d pp. 155–158 *infra.*

174. *See, e. g., Jackson v. United States Civil Service Commission,* 379 F.Supp. 589, 594 (S.D.Tex.1973). This problem is also evident in the trial *de novo* following EEOC action in private sector litigation. As the court sagaciously observed in *Smith v. Universal Services, Inc.,* 454 F.2d 154, 157 (5th Cir. 1972):

A trial de novo is not to be considered a trial in a vacuum. To the contrary, the district court is obligated to hear evidence of whatever nature which tends to throw factual light on the controversy and ease its factfinding burden.

The [Equal Employment Opportunity] Commission's decision contains findings of fact made from accounts by different witnesses, subjective comment on the credibili-

cational Fund forcefully emphasized at oral argument, aggrieved federal employees do not desire unnecessary delay in questing after the right to a trial *de novo;* they merely want assurance that in these complex cases they will have the irrevocable right (rather than a right contingent upon the discretion of a particular judge) to compile a complete factual record and to conduct all necessary discovery.[175] For example, in the case *sub judice,* the testimony of Holland, the black former head of the I&S, and that of Haycraft, the former employee who related Maiers' references to blacks as "burr heads," [176] would have been relevant to the issue of whether discrimination in fact impeded appellant's opportunity for promotion; and documentation concerning the agency's past employment practices and promotion records might have illuminated the controversy as to whether a pattern or climate of discrimination existed at I&S. Appellant had no right to obtain this testimo-

ny or these records during the agency hearings, but the right to conduct this discovery would be a normal concomitant of a trial *de novo* under the Federal Rules of Civil Procedure. In effect, there would be a shift in emphasis and presumptions from the procedure followed by the District Court. Rather than presuming that the record is properly the sole basis for decision, and that the plaintiff must affirmatively establish his need for supplementation, courts should focus on the employee's complaint. The administrative record should be admissible as one piece of evidence concerning the issues raised in the complaint, but the employee should have the right to conduct discovery and compel the attendance of witnesses to furnish additional evidence. The Federal Rules accord the trial judge sufficient control over the conduct of discovery and the trial that duplication of proceedings—which serves no party's interest—should be minimal.[177]

ty of these witnesses, and reaches the conclusion that there is reasonable cause to believe that a violation of the Civil Rights Act has occurred. Certainly these are determinations that are to be made by the district court in a de novo proceeding. We think, however, that to ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices would be wasteful and unnecessary.

175. For example, although the court in *Warren v. Veterans Hospital,* 382 F.Supp. 303 (E.D.Pa. 1974), ostensibly accepted the holding of the District Court in this case, it declined to hold a trial *de novo* in part because "Ms. Warren, [the plaintiff] was asked if she wished to present additional evidence. She replied that she did not. She * * * had presented all her evidence at her hearing before the Equal Employment Opportunity Examiner." *Id.* at 306. *See also, e. g., Leinster v. Engman,* 10 FEP Cas. 614 (D.D.C., Nov. 11, 1974). Indeed, the only witnesses whose testimony might need *repeating* in court (as opposed to those whose tesimony could not even be obtained at the agency hearing) would be those on whose credibility a case is likely to turn; in such situations, live testimony will facilitate the judge's task of weighing the probative value of competing testimony, and duplication will subserve the underlying purpose of Title VII of

ensuring that discrimination is, to the fullest extent possible, eradicated. Nor does there appear to be any substantial likelihood that there will be "duplication" in the production of agency records or statistical data. However, such data, often unobtainable at the agency level, are frequently essential for establishing a case of systemic discrimination.

176. *See* note 15 *supra.*

177. Indeed, there is no reason to suppose that any duplication of effort would be more extensive than that which results when a private sector employee has a trial *de novo* after an extensive EEOC investigation or that which results when a private sector or a state or local government employee has a trial *de novo* following *both* an EEOC investigation and a prior evidentiary hearing before a state or local agency. Yet Congress considered this duplication worth the cost in light of the fact that fairer and more acceptable decisions could be achieved through the courts. Moreover, if Congress thought that the elimination of duplicative effort was so crucial, it is curious that it chose to place jurisdiction in the District Courts rather than in the Courts of Appeals, unless, of course, it intended that the District Court would have a greater role than mere review of a previously compiled agency factual record. *See, e. g., Sylvester v. United States Postal Service,* 393 F.Supp. 1334 (S.D. Tex.1975). Finally, any duplication is consistent with the purposes of the 1972 amend-

ments. As the CSC has conceded, *see* 171 U.S.App.D.C. p. ——, 520 F.2d p. 140 & note 132 *supra*, the agency hearing is designed to provide information that will enable the agency to put its house in order and to improve agency practices which, even though not discriminatory, have deleterious effects on federal personnel policies; the factual record, compiled and tailored to meet the issues as perceived by the complaints examiner, is not fashioned for the purpose of supplying a formal record for a court. The trial in District Court, however, guarantees that proper statutory and constitutional standards are applied and all relevant factual matters explored in such cases.

Moreover, it is strange that the District Court, which was concerned with court congestion, suggested that a class action could not be brought (even if the plaintiff's claims were typical of those of many individuals in the agency and he was an adequate representative of their interests) unless the class problem was expressly pursued before the agency. *See* 360 F.Supp. at 1254 n.11. More generally, a number of courts have held that the conclusion that a federal employee is entitled to no trial *de novo* "necessarily carries with it a denial of class action certification. Where there is review on the record and no trial *de novo*, there is no class action." *Spencer v. Schlesinger*, 374 F.Supp. 840, 844 n.6 (D.D.C.1974). *See also, e. g., Pointer v. Sampson*, 62 F.R.D. 689, 691, 695–696 & n.33 (D.D.C.1974) ("a class action cannot be maintained if there is not an administrative record for each prospective member of the class"); *Handy v. Gayler*, 364 F.Supp. 676, 679 (D.Md.1973) (remanding case to agency for investigation of class complaints). *But see, e. g., Richerson v. Fargo*, 61 F.R.D. 641 (E.D.Pa.1974). If it were true that the denial of a trial *de novo* automatically precludes a class action, that fact would merely add additional weight to our conclusion that federal employees have the same right to a trial *de novo* as do private sector employees. Congress was aware of the importance of class actions in Title VII litigation, *see, e. g., Legislative History* at 1589–1590 (statements of Senator Javits), 1773 (statements of Senator Williams), and Senator Williams, in his section-by-section analysis of the final version of the 1972 Amendments, observed:

In establishing the enforcement provisions under this subsection [706(f)(1)] and subsection 706(f) generally, it is not intended that any of the provisions contained therein shall affect the present use of class action lawsuits under Title VII in conjunction with Rule 23 of the Federal Rules of Civil Procedure. The *courts have been particularly cognizant of the fact that claims under Title VII involve the vindication of a major public interest, and that any action under the Act involves considerations beyond those raised by the individual claimant.* As a consequence, the leading cases in this area to date have recognized that *many Title VII claims are necessarily class action complaints* and that, accordingly, *it is not necessary that each individual entitled to relief be named in the original charge* or in the claim for relief. A provision limiting class actions was contained in the House bill and specifically rejected by the Conference Committee.

*Legislative History* at 1847 (emphasis added). There is a strong federal policy of encouraging class action litigation in situations of pervasive discrimination, *cf., e. g., Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401–402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), and private sector litigants may bring class actions even if only a single party has proceeded through the EEOC. *See, e. g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 44 L.Ed.2d 280 (June 24, 1975); *Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496 (5th Cir. 1968); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). Congress gave no hint that a federal employee's Title VII claims do not also "involve[] considerations beyond those raised by the individual complainant" which can be adjudicated most efficiently through the class action device. Of course, given our holding that the federal employee "civil action" is a trial *de novo* with the same concomitants of the private sector "civil action," there will be no barrier to such salutary class proceedings in situations where a plaintiff otherwise satisfies the criteria of Rule 23. However, even if the District Courts were limited to review of the administrative record, it would appear that class action treatment after a single individual had exhausted his administrative remedies would be proper; as Senator Williams had argued, discrimination—particularly when it is systemic—is almost inherently appropriate for class treatment, and the CSC's regulations in effect require that agencies treat each individual's complaint broadly enough to encompass discrimination that may be practiced against others similarly situated:

The [agency] investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, the treatment of members of the complainant's group identified by his complaint as compared with the treatment of other employees in the organizational segment in which the alleged discrimination occurred, and any policies and practices related to the work situation which may constitute, or appear to constitute, discrimination even though they have not been expressly cited by the complainant.

5 C.F.R. § 713.216(a) (1974). Thus, in situations in which a complainant satisfies the cri-

■ Nor is the District Court's concern that a trial *de novo* will unduly burden the federal courts within this jurisdiction persuasive. Even if the District Court's approach were followed, the same number of federal employee Title VII cases would presumably be filed,[178] and the District Judge would be forced to scrutinize the full administrative record not only to determine whether it is complete enough so as to preclude the necessity for supplementation,[179] but also to evaluate where the preponderance of the evidence lies. On the other hand, if an irrevocable right to a trial *de novo* is accorded federal employees, the trial judge would not be required to estimate whether the record is complete; discovery could be conducted without substantial judicial oversight, as contemplated by the Federal Rules of Civil Procedure,[180] and the taking of live testimony [181] from the few individuals on whose credibility a case might turn

---

teria of Rule 23, the agency record should provide a sufficient foundation for class relief even if review of that record is all that is required of the courts.

**178.** To the extent denying federal employees a trial *de novo* discourages the filing of claims in the district court, the congressional intent of overcoming the skepticism and resignation of those employees, *see, e. g.,* 171 U.S.App.D.C. pp. ———— ——, 520 F.2d pp. 135–137 & notes 66, 77 *supra,* is being defeated. Of course, it could be argued that more frivolous claims will be filed if federal employees are accorded a trial *de novo,* but this seems unlikely in face of the fact that the summary judgment procedure is likely to screen off those cases under either procedure, *see* 171 U.S.App.D.C. pp. ——— ——, 520 F.2d pp. 156–158 *infra;* meritorious complaints, however, would appear to stand less chance of success on the merits where the District Court essentially defers to the agency or the CSC. Moreover, although private sector employee cases in which the EEOC finds "no reasonable cause" to believe discrimination exists are arguably unlikely to be meritorious and could be said to cause an unnecessary burden on the District Courts, it is clear that such actions are nevertheless full trials *de novo.*

**179.** *See* 171 U.S.App.D.C. pp. ——— ——— ——, 520 F.2d pp. 116–118 *supra.*

**180.** *See generally* Rules 26–37 of the Federal .Rules of Civil Procedure. As Senator Dominick observed, the discovery rules are "the most important federal rules of procedure" in such cases. *See Legislative History* at 1444.

**181.** There is a misconception concerning the taking of live testimony that should be rectified. The District Court stated that

[s]ince under the Act the Court can appoint a master to hold a hearing and make a report, a requirement that there be a trial *de novo* would be contradictory because the administrative record is in fact a master's report.

360 F.Supp. at 1252 n.10. *See also* brief for appellees at 55–56:

[W]e do not think that that imprimatur [of a federal court], to be effective, must be rendered on the basis of a firsthand view of the testimony; a conscientious review of agency action will serve that purpose as well. Congress apparently thought as much; section 706 permits the judge to whom a complaint is assigned to appoint a master under Rule 53, Fed.R.Civ.P.

To the extent these statements imply that a federal employee should be denied a trial *de novo* because it is possible that a master would be assigned to the case, they are clearly erroneous. The discretionary authority to assign a master to a case *after 120 days* also applies to private sector employee civil actions which are, all agree, trials *de novo;* indeed, the power of the court to appoint a master is included in the same clause of subsection 706(f)(5) that refers to setting Title VII cases for "trial." *See* 171 U.S.App.D.C. pp. ——, ——, 520 F.2d pp. 118, 121 *supra.* These same provisions are made applicable to federal employee civil actions through subsection 717(d).

The statements might, on the other hand, be taken as equating the agency's final decision with the report of a master; since a master could be appointed in any event *after 120 days,* the administrative record is to be adopted by the court *immediately* when federal employees are involved. This fundamentally misconstrues the provision allowing masters to be appointed in Title VII cases. That provision was merely included so that the test of Rule 53, which only permits masters to be appointed in exceptional circumstances, would be somewhat relaxed in the area of Title VII, "where justice delayed is very often justice denied." *Legislative History* at 1731 (remarks of Senator Javits). *See also id.* at 1675–1676, 1683, 1839, 1848. But the fact that the appointment of a master after substantial delay in the trial court is acceptable to Congress (and as. Senator Javits had indicated, the acceptable period of delay had been considered fully before arriving at the 120-day figure, *see*

should not expend excessive judicial resources or courtroom time. Finally, it should be remembered that the parts of the 1972 amendments involved in this case extended coverage to only approximately 2.6 million federal employees. They also extended coverage to an estimated 10.1 million state and local government employees and millions of additional private sector employees.[182] Congress explicitly decided that the time and expense of *de novo* judicial fact-finding procedures for the latter were clearly worth the expected increase in fairness and accuracy of such fact-finding over administrative fact-finding, and the increase in respect which such decisions would be accorded. There is no indication that Congress believed that any burden created by federal employee litigation would, to the contrary, be undesirable in light of the similar laudable purposes which it serves.[183]

Moreover, the argument advanced by the District Court that the CSC has developed substantial expertise with respect to discrimination charges and possesses a unique ability to separate such charges from the intricacies of civil service regulations does not furnish even the slightest policy justification for denying federal employees trials *de novo*. Congress through Section 717(c) expressly accorded federal employees the right to

*id.* at 1675–1676) does not mean that Congress thereby sought to supplant the trial judge's role through his routine adoption of a record compiled by the CSC or agency complaints examiner. Expedition is merely a *subsidiary* goal of Title VII, because it may affect the *primary substantive goal* of eliminating discrimination. Congress determined that trials before judges are most appropriate for detecting and eliminating discrimination, and therefore made this the presumptively proper procedure in all Title VII civil actions. The fact that when a trial judge is unable to comply with Title VII's mandate to expedite discrimination cases, he may appoint a master, does not justify converting this special procedure into the rule by categorizing the agency record as a master's report. *See also Legislative History* at 1441. This is particularly true when it is recalled that masters, unlike the agencies, are neutral parties who are required to apply the same evidentiary rules and legal standards as are applied by the courts, in a full adversarial context; that in proceedings before masters, unlike in those before agencies, the parties may procure witnesses and documents by compulsory process; and that cases referred to masters, unlike those before the agencies, are still subject to the Federal Rules of Civil Procedure, including such aspects as discovery and class action certification.

**182.** *See* notes 22, 76, 84 *supra.*

**183.** Appendix C, which lists the Title VII cases filed in each judicial district over the past five fiscal years, reveals the impact of the 1972 amendments on the case load of the District Courts. (The figures reflect the impact of *all* expanded coverage, *see* note 22 *supra,* not just that due to federal employees. All such non-federal cases, however, are also trials *de novo*). The statistics indicate that by any measure, the increase in this District from fis-

cal 1972 (the last fiscal year before the 1972 amendments became effective) until fiscal 1974 (the last year for which data are available) was exceeded by that in several other Districts. For example, the Southern District of Texas, the Eastern District of Michigan, the Northern District of Ohio, and the Northern District of Illinois all had a greater absolute increase in the number of Title VII cases filed. Five Districts now have a greater absolute Title VII case load. Moreover, over 25 Districts exhibited a greater percentage increase than that in this District. Furthermore, when these figures are computed on the basis of cases (or increase in number of cases) per authorized judgeship, a considerable number of additional Districts may be seen to have been affected by the amendments to a greater extent than was this District. *Compare, e. g.,* figures in Appendix C for Massachusetts (six authorized judgeships), E.D.Louisiana (nine authorized judgeships), E.D.Michigan (ten authorized judgeships), N.D.Texas (six judgeships), S.D.Ohio (five judgeships), *with* those for D.D.C. (15 judgeships). It should also be remembered that the initial jump in filings in this District, with its substantial number of federal employees, was to be expected; Congress' purpose in enacting the 1972 amendments as they related to federal employees was, after all, to allow them to remedy what were perceived to be patently discriminatory practices, in federal employment, for which previous remedies were inadequate. Finally, it should be noted that the employment discrimination filings in this District during fiscal 1974 constituted less than five per cent of the total filings on the civil docket. *See also* Annual Report of the Director of the Administrative Office of the United States Courts, 1974, at 210–215; Annual Report of the Director of the Administrative Office of the United States Courts, 1972, at 122–127.

file a civil action within 30 days after *final agency action,* thereby *totally bypassing* the CSC's appeals machinery.[184] Seen from this perspective,[185] it is clear that there need be no exercise of CSC expertise, either in identifying discrimination or in isolating it from legitimate civil service personnel requirements.[186] Thus the relevant comparison is not between federal judges and the members of the CSC, but between federal judges and the complaints examiners who conduct agency hearings or the self-interested agency heads who are vested with the power of making the final agency determination on their employees' complaints. The experience of federal judges in other areas of anti-discrimination law and in private sector and state and local government employees' Title VII actions has been extensive, and renders them particularly sensitive and adept at analyzing and deciding discrimination claims of federal employees under Title VII. Indeed, Congress was satisfied not only that federal judges were attuned to the problems of discrimination, but also that they were particularly qualified for fairly deciding the merits of such claims.[187] Moreover, to whatever extent the CSC does possess unique expertise in federal personnel matters, a District Judge would have the benefit of that expertise by way of any opinion issued by the CSC in the case (if the complainant has ap-

pealed to the CSC before filing suit in District Court)[188] or by way of an *amicus* brief should illumination be required in a case brought directly from the employing agency to the District Court. Indeed, the CSC recognizes that complaints examiners may be baffled by civil service requirements and provides for clarifying instructions should they be necessary.[189]

With respect to the District Court's argument that Congress simply wanted "prompt and consistent" decisions, and that the trial *de novo* works *contra* this purpose since a "wholly new record" must be developed and "opportunity for reasonable discovery provided,"[190] little need be said. Surely Congress intended that Title VII cases be expedited both in the agencies and in the courts. But more important, it wanted all vestiges of discrimination eradicated. To tell an aggrieved federal employee whose discrimination claim was rejected in an administrative proceeding that, since Congress wanted his claim expeditiously processed, he should be expeditiously denied the opportunity to present all relevant evidence pertaining to that claim is, to say the least, incongruous. Indeed, it is particularly incongruous to suggest that "reasonable" discovery—especially when it is intended to obtain information unobtainable at the agency level or be-

**184.** *See e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 116 & note 72 *supra.*

**185.** The question whether the district court is limited to review of the compiled agency record is analytically the same whether or not the complainant appeals to the CSC. *See also* brief for appellees at 59 & n.74. Indeed, there is no right to a hearing or to the introduction of additional evidence before the CSC should the complainant decide to appeal within the administrative system rather than proceed directly to District Court. *See* 171 U.S.App.D.C. p. ——, 520 F.2d pp. 140–141 *supra.*

**186.** Thus, the CSC is not necessarily the "focal point of *complaint adjudication*" as alleged by appellees, *see* brief for appellees at 23 (emphasis added); *see also* note 86 *supra,* even though it is clearly the focal point for achieving the goal of equal opportunity in federal employment through the promulgation of neutral personnel standards, the implementation

of rules governing agency practices, and the oversight of agency affirmative action programs.

**187.** *See, e. g.,* sources cited at note 57 *supra.*

**188.** *But see, e. g., Salone v. United States,* 511 F.2d 902, 903 (10th Cir. 1975) (noting that agency decision was "affirmed without comment" by CSC's Board of Appeals and Review).

**189.** *See, e. g., Complaints Examiners Handbook* at 12 ("The Examiner should utilize the expertise and resources of the Commission for assistance in understanding technical problems, for example, questions relating to merit promotion, classification, etc.").

**190.** *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 149 *supra.*

yond the reach of the complaints examiner's powers—is actually an evil to be avoided. Moreover, given the fact that decisions on these complaints are made by countless agency heads upon the recommendations of complaints examiners without legal training who are not even properly instructed as to the applicable legal principles,[191] agency decisions are unlikely to be "consistent," unless by that term we mean consistently self-serving.[192]

Concerning the District Court's summation,[193] we simply fail to perceive what substantive policies of the Act, from the perspective of the federal employee who is aggrieved by his agency's or the CSC's treatment of his complaint,[194] are defeated rather than advanced through a trial *de novo.* Avoidance of "substantial delays" is no panacea if the product of speed is a hasty denial of justice, and "inherent uncertainties," whatever they might be, are surely preferable to the certainty that a potentially erroneous administrative decision is perpetuated in the courts.

### III

■ To hold, as we have, that federal employees have the right to a trial *de novo* under Section 717 of Title VII is not, we must stress, to say that the administrative hearing record and agency findings have no role to play in that trial. Nor is it to say that summary judgment cannot be granted in appropriate circumstances.

■ The Supreme Court's recent unanimous decision in *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), is particularly instructive with respect to the question of the admissibility of the administrative record. In *Alexander* the Court held that a private sector employee's right to a trial *de novo* under Title VII is not foreclosed by the prior submission of his discrimination claim to final arbitration under the nondiscrimination clause of a collective bargaining agreement. Nevertheless, the Court indicated that the "arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." [195] We believe that the compiled

191. *See* 171 U.S.App.D.C. pp. ———, 520 F.2d pp. 138–141 & notes 126, 129–137 *supra.*

192. It is certainly not rare to find an agency reversing an examiner's determination that discrimination was indeed present. *See, e. g., Chandler v. Johnson,* 7 EPD ¶ 9139 (C.D.Cal., Dec. 31, 1973), *aff'd.,* 515 F.2d 251 (9th Cir. 1975); *Robinson v. Warner,* 8 EPD ¶ 9452 (D.D.C., June 24, 1974).

193. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 149 *supra.*

194. And this is surely the proper perspective since federal agencies have no right to file a Title VII suit to protest a decision in the employee's favor.

195. 415 U.S. at 60, 94 S.Ct. [1011] at 1025. In a footnote, the Court added:

We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of

the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. *But courts should ever be mindful that Congress, in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory employment claims. It is the duty of courts to assure the full availability of this forum.*
*Id.* at n.21, 94 S.Ct. at 1025 (emphasis added). The Court did not discuss the problem of admitting hearsay testimony that might form the basis of an arbitrator's decision; such hearsay testimony is explicitly admissible before a Title VII complaints examiner. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 138 & notes 127, 128 *supra.* With respect to findings of the examiner, Rule 803(8)(C) of the Federal Rules of Evidence would render them admissible. With respect to the underlying testimony, however, there will often be a double or triple hearsay problem, *see* Rule 805, even though the transcript itself may be admissible under

administrative record, though not the focus of the court's attention in a *de novo* action under Title VII, will nevertheless also shed evidentiary light on the issues raised in the complaint, and should thus be accorded similar treatment. This is particularly true because rendering the record admissible may obviate the necessity for taking extensive testimony at trial.

■ With respect to a motion for summary judgment, Rule 56 of the Federal Rules of Civil Procedure specifies that such a motion is to be granted only when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." In some situations the administrative record may itself provide a sufficient basis for granting such a motion. For example, both parties may have presented all evidence before the complaints examiner and may agree that no further factual presentations are necessary; the only dispute may concern the legal conclusions to be drawn from the undisputed facts. Another situation might be one in which a complainant argues that a supervisor is racially prejudiced, but the record conclusively shows that the complainant has not met a non-discretionary and valid criterion for promotion.[196] In such a situation, even if the agency determination of the supervisor's racial predilections were controverted, there might be no necessity for taking additional testimony on the point; since the undisputed facts would still be dispositive of the legal issue in the case, the racial question would not be "material" under Rule 56. However, in many promotional situations—particularly at higher GS levels where the ultimate decision is committed to managerial discretion with few or no objective criteria— the crucial factual issue of whether the supervisor's actual motives had racial overtones will be material, and if disputed will preclude grant of summary judgment; instead, the District Judge would have to hear testimony to enable him to evaluate the credibility of the supervisors involved.

■ Moreover, in analyzing whether a case is one meet for summary judgment treatment, the relevant legal standards under Title VII must be recalled; such standards will affect whether a disputed fact is indeed "material" with respect to resolving the case. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court discussed the order and allocation of proof appropriate in private, non-class Title VII actions. The unanimous Court held that the burden of proof in such cases does shift once the complainant has established a *prima facie* case, but that even a seemingly valid defense may be overcome by a showing that it is merely a subterfuge:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. * * *

> The burden [of proof] then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. * * *

> \* \* \* \* \* \*

> * * * [B]ut the inquiry does not end here. * * * [The complainant

---

Rule 803(6) or (8)(B). It would thus appear that the parties should be able to object to the admissibility of particular portions of the administrative record on specific grounds; whether such objections should be sustained by the trial judge would, as the Supreme Court noted, obviously depend on the particular facts and circumstances of each case. *See also, e. g.,* Rules 801(d)(1), (d)(2), 804(b)(1).

**196.** Of course, if the complainant alleged that the criterion was not job-related but tended to

have a discriminatory impact, that allegation might itself raise a disputed issue of material fact. *See, e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *See also Douglas v. Hampton,* 168 U.S.App. D.C. 62, 512 F.2d 976 (1975); *Davis v. Washington,* 168 U.S.App.D.C. 42, 512 F.2d 956 (1975).

must] be afforded a fair opportunity to show that [the respondent's] stated reason for [the complainant's] rejection was in fact pretext.

*Id.* at 802, 804, 93 S.Ct. at 1824, 1825. Even if we were to ignore appellant's contention that summary judgment was inappropriate because the administrative record itself contained sufficient evidence to establish a *prima facie* case of discrimination, we would be confronted with the fact that the District Court's grant of summary judgment in this case denied appellant the right to conduct discovery that might reasonably reveal[197] disputed issues of facts material to the resolution of appellant's complaint under these standards of proof.

For example, appellant was accorded no opportunity to obtain relevant personnel data so that the comparative treatment of appellant and other I&S investigators (comparing not only the length of time until promotion, but also such factors as conditions in the agency at the time of promotion, the identity of the supervisor, the nature of the job assignments, and the job evaluations of indi-

viduals who were or were nor promoted after specific lengths of time) could be scrutinized in an adversarial context; such statistical data could establish a *prima facie* case of discrimination, and were thus not only controverted,[198] but also material. Procurement of such data was especially important in light of the climate of racial discrimination which all agreed existed at least at some point in the agency's history.[199] Nor was appellant accorded an opportunity to secure the testimony of Holland, who apparently promised to write a statement explaining why appellant would never become a part of the I&S "family" but whose testimony could not be obtained at the agency level,[200] or of Haycraft, who only submitted an affidavit on Maiers' use of the derogatory term "burr heads."[201] This information would be relevant to the factual issue of whether appellees' stated reasons for not promoting appellant were merely a pretext and a mask for actual racial discrimination.

 Furthermore, merely because an individual testified at the agency lev-

---

**197.** A concomitant of our holding that federal employees have the right to a trial *de novo* is the holding that they may conduct reasonable discovery concerning the issues raised in the complaint. If necessary, of course, a trial judge could still issue a protective order under Rule 26(c) of the Federal Rules of Civil Procedure in order to prevent or limit, *inter alia,* unduly burdensome or harassing discovery.

**198.** On the issue of disparate treatment, there was evidence that appellant was accorded substantially different treatment than a similarly situated white investigator subsequently hired but promoted before appellant. *See* 171 U.S.App.D.C. p. ——, 520 F.2d p. 113 & note 14 *supra.* On the other hand, it was asserted that since a Mexican-American was promoted by appellees after only 14 months as a GS–12, appellees were not discriminatorily motivated. *See* 360 F.Supp. at 1254. Of course, that an individual is not biased because of a person's national origin does not necessarily mean that he is not biased because of a person's race. Moreover, appellant asserts that at least five white investigators, all hired after appellant, have been promoted over him to GS–13 since he filed his formal discrimination grievance with I&S. Reply Brief for appellant at 3.

**199.** *See, e. g.,* 171 U.S.App.D.C. p. ——, 520 F.2d p. 113 & note 16 *supra.*

**200.** *See* note 13 *supra.*

**201.** *See* note 15 *supra.* We are not presented nor need we decide today whether a District Court can refuse to hear the testimony of a known individual who could have been produced at the agency level, but whom the complainant deliberately chose not to call. *Cf. De-Seversky v. Brenner,* 137 U.S.App.D.C. 369, 424 F.2d 857 (1970). The policy of according the agencies an initial opportunity to put their house in order might be substantially undermined if such an intentional bypass of the administrative process were permitted. Nor need we decide whether an individual who knowingly and intelligently chooses not to have a hearing at the agency level should be precluded from presenting witnesses who were available at the time once he files a civil action. *Cf. Fay v. Noia,* 372 U.S. 391, 438–439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The requirement, in effect incorporated in subsection 717(c), that a complainant exhaust his agency remedies, would appear to weigh heavily on the balance requiring that agency procedures be vigorously pursued. *But see* note 130 *supra.*

el does not mean that he would not be required to testify at the trial in District Court. The decision as to whether a particular witness should be called remains with counsel; although a trial judge has discretion to limit cumulative testimony, a witness' trial testimony is not cumulative merely because it repeats his testimony before the agency. Thus the fact that Maiers and Rettew testified before the complaints examiner does not preclude their being called to repeat their testimony in appellant's *de novo* "civil action"; their live testimony might have substantially illuminated their actual motivations in not promoting appellant, and it is clear that summary judgment is particularly inappropriate where credibility is an integral component of a material factual conflict.[202] Indeed, since there were no written criteria for promotion, a racially discriminatory denial of promotion could easily pass as one motivated by a desire to accord appellant greater training. And on remand the trial judge might evaluate the motivations of appellant's supervisors against the background in which the "bit further to go"[203] which appellant purportedly needed after one year without promotion has stretched to over five years, and in which appellant was personally given favorable job evaluations while negative comments were being inserted in a secret evaluation folder. In such circumstances, the necessity for delving into the motivations of appellant's supervisors before a court under adversarial safeguards is particularly compelling.[204]

On the record before us, there appear to be disputed issues of material fact which should have precluded the grant of appellees' motion for summary judgment. In any event, since the District Court improperly focused on the administrative record and therefore denied appellant the opportunity to conduct discovery that could provide evidence on these issues, we reverse the judgment of the District Court and remand this case for further proceedings not inconsistent with this opinion.

*So ordered.*

## APPENDIX A
### H.R. 1746

---

### January 22, 1971
### A BILL

To further promote equal employment opportunities for American worker.

\* \* \* \* \* \*

SEC. 4. Section 706 of the Civil Rights Act of 1964 (89 Stat. 259; 42 U.S.C. 2000e–5) is amended to read as follows:

### "PREVENTION OF UNLAWFUL EMPLOYMENT PRACTICES

"SEC. 706. (a) The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 703 or 704 of this title.

"(b) Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs has engaged in an unlawful employment practice, the Commission

---

**202.** *See, e. g., C. Wright & A. Miller, Federal Practice and Procedure* § 2726 (1973) (noting, *inter alia*, Advisory Committee comment that "[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."). *See also id.* § 2727 (evidence construed and inferences drawn in favor of party opposing motion for summary judgment).

**203.** 360 F.Supp. at 1255.

**204.** *See also Sperling v. United States, supra,* 515 F.2d at 484–485. Moreover, Congress expressed explicit dissatisfaction with the fact that discrimination appeared to be most acute at the upper GS levels, *see, e. g.,* sources cited at notes 63, 76, 95 *supra,* where objective job criteria are most likely to be nonexistent.

shall serve a copy of the charge on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the 'respondent') and shall make an investigation thereof. Charges shall be in writing and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is no reason to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

\* \* \* \* \* \*

The Commission shall make its determination on reasonable cause as promptly as possible and, as far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c) or (d), from the date upon which the Commission is authorized to take action with respect to the charge.

\* \* \* \* \* \*

"(f) If the Commission determines after attempting to secure voluntary compliance under subsection (b) that it is unable to secure from the respondent a conciliation agreement acceptable to the Commission and to the person aggrieved, which determination shall not be reviewable in any court, the Commission shall issue and cause to be served upon the respondent a complaint stating the facts upon which the allegation of the unlawful employment practice is based, together with a notice of hearing before the Commission, or a member or agent thereof, at a place therein fixed not less than five days after the serving of such complaint. Related proceedings may be consolidated for hearing. Any member of the Commission who filed a charge in any case shall not participate in a hearing on any complaint arising out of such charge, except as a witness.

"(g) A respondent shall have the right to file an answer to the complaint against him and with the leave of the Commission, which shall be granted whenever it is reasonable and fair to do so, may amend his answer at any time. Respondents and the person aggrieved shall be parties and may appear at any stage of the proceedings, with or without counsel. The Commission may grant such other persons a right to intervene or to file briefs or make oral arguments as amicus curiae or for other purposes, as it considers appropriate. All testimony shall be taken under oath and shall be reduced to writing.

"(h) If the Commission finds that the respondent has engaged in an unlawful employment practice, the Commission shall state its findings of fact and shall issue and cause to be served on the respondent and the person or persons aggrieved by such unlawful employment practice an order requiring the respondent to cease and desist from such unlawful employment practice and to take such affirmative action, including reinstatement or hiring of employees, with or without backpay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), as will effectuate the policies of this title: \* \* \* Such order may further require such respondent to make reports from time to time showing the extent to which he has complied with the order. If the Commission finds that the respondent has not engaged in any unlawful employment practice, the Commission shall state its findings of fact and shall issue and cause to be served on the respondent and the person or persons alleged in the complaint to be aggrieved an order dismissing the complaint.

"(i) After a charge has been filed and until the record has been filed in court as hereinafter provided, the proceeding may at any time be ended by agreement between the Commission and the parties for the elimination of the alleged unlawful employment practice, approved by the Commission, and the Commission may at any time, upon reasonable notice, modify or set aside, in whole or in part, any finding or order made or issued by it. An agreement approved by the Commission shall be enforceable under subsection (k) and the provisions of that subsection shall be applicable to the extent appropriate to a proceeding to enforce an agreement.

"(j) Findings of fact and orders made or issued under subsection (h) or (i) of this section shall be determined on the record.

"(k) The Commission may petition any United States court of appeals within any circuit wherein the unlawful employment practice in question occurred or wherein the respondent resides or transacts business for the enforcement of its order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings as provided in section 2112 of title 28, United States Code. Upon such filing, the court shall cause notice thereof to be served upon the parties to the proceeding before the Commission, and thereupon shall have jurisdiction of the proceeding and of the question determined therein and shall have power to grant such temporary relief, restraining order, or other order as it deems just and proper, and to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Commission. No objection that has not been urged before the Commission, its member, or agent, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Commission with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission, its member, or its agent, the court may order such additional evidence to be taken before the Commission, its member, or its agent, and to be made a part of the record. The Commission may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the Supreme Court of the United States as provided in section 1254 of title 28, United States Code. Petitions filed under this subsection shall be heard expeditiously.

"(*l*) Any party aggrieved by a final order of the Commission granting or denying, in whole or in part, the relief sought may obtain a review of such order [under provisions identical to those set out in subsection (k)].

\* \* \* \* \* \*

SEC. 7. "INVESTIGATORY POWERS

"SEC. 710. For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 11 of the National Labor Relations Act (49 Stat. 455; 28 [29] U.S.C. 161) shall apply:

\* \* \* \* \* \*

(h) Section 713 of such Act (78 Stat. 265; 42 U.S.C. 2000e-12) is amended by adding at the end thereof the following new subsections:

"(c) * * * * [T]he Commission may delegate any of its functions, duties, and powers to such person or persons as the Commission may designate by regulation, including functions, duties, and powers with respect to investigating, conciliating, hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter: *Provided,* That nothing in this subsection authorizes the Commission to provide for persons other than those referred to in clauses (2) and (3) of subsection (b) of section 556 title 5 of the United States Code to conduct any hearing to which that section applies.

\* \* \* \* \* \*

(j) Section 715 of such Act (78 Stat. 265; 42 U.S.C. 2000e–14) is amended to read as follows:

### "CIVIL ACTIONS BY PERSONS AGGRIEVED

"SEC. 715. (a) If (1) the Commission determines that there is no reasonable cause to believe the charge is true and dismisses the charge in accordance with section 706(b), (2) finds no probable jurisdiction and dismisses the charge, or (3) within one hundred and eighty days after a charge is filed with the Commission, or within one hundred and eighty days after expiration of any period of reference under section 706(c) or (d), the Commission has not either (i) issued a complaint in accordance with section 706(f), (ii) determined that there is not reasonable cause to believe the charge is true and dismissed the charge in accordance with section 706(b) or found no probable jurisdiction and dismissed the charge, or (iii) entered into a conciliation agreement acceptable to the Commission and to the person aggrieved in accordance with section 706(f) or an agreement with the parties in accordance with sec-

tion 706(i), the Commission shall so notify the person aggrieved and within sixty days after the giving of such notice a civil action may be brought against the respondent named in the charge (1) by the person claiming to be aggrieved, or (2) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission to intervene in such civil action if it certifies that the case is of general public importance. Upon the commencement of such civil action, the Commission shall be divested of jurisdiction over the proceeding and shall take no further action with respect thereto: *Provided,* That, upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending termination of State or local proceedings described in subsection (c) or (d) or the efforts of the Commission to obtain voluntary compliance.

"(b) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this section. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, or in the judicial district in which the plaintiff would have been employed but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28 of the United States Code, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the ac-

tion might have been brought. Upon the bringing of any such action, the district court shall have jurisdiction to grant such temporary or preliminary relief as it deems just and proper.

"(c) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without backpay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice).

\*　　\*　　\*　　\*　　\*　　\*

SEC. 11. Title VII of the Civil Rights Act of 1964 (78 Stat. 253; 42 U.S.C. 2000e et seq.) is amended by adding at the end thereof the following new sections:

## "NONDISCRIMINATION IN FEDERAL GOVERNMENT EMPLOYMENT

"SEC. 717. (a) All personnel actions affecting employees or applicants for employment in the competitive service (as defined in section 2102 of title 5 of the United States Code) or employees or applicants for employment in positions with the District of Columbia government covered by the Civil Service Retirement Act shall be made free from any discrimination based on race, color, religion, sex, or national origin.

"(b) The Equal Employment Opportunity Commission shall have authority to enforce the provision of subsection (a) and shall issue such rules, regulations, orders, and instructions as it deems necessary and appropriate to carry out its responsibilities hereunder, and the head of each executive department and agency and the appropriate officers of the District of Columbia shall comply with such rules, regulations, orders, and instructions: *Provided,* That such rules and regulations shall provide that an employee or applicant for employment shall be notified of any final action taken on any complaint filed by him thereunder.

"(c) Within thirty days of receipt of notice given under subsection (b), the employee or applicant for employment, if aggrieved by the final disposition of his complaint, may file a civil action as provided in section 715, in which civil action the head of the executive department or agency, or the District of Columbia, as appropriate, shall be the respondent.

"(d) The provisions of section 715 shall govern civil actions brought hereunder.

"(e) All functions of the Civil Service Commission which the Director of the Bureau of the Budget determines relate to nondiscrimination in government employment are transferred to the Equal Employment Opportunity Commission.

"(f) All authority, functions, and responsibilities vested in the Secretary of Labor pursuant to Executive Order 11246 relating to nondiscrimination in employment by Government contractors and subcontractors and nondiscrimination in federally assisted construction contracts are transferred to the Equal Employment Opportunity Commission, together with such personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available or to be made available in connection with the functions transferred to the Commission hereby as may be necessary to enable the Commission to carry out its functions pursuant to this subsection, and the Commission shall hereafter carry out all such authority, functions, and responsibilities pursuant to such order.

\*　　\*　　\*　　\*　　\*　　\*

## APPENDIX B
### S. 2515

That this Act may be cited as the "Equal Employment Opportunities Enforcement Act of 1971".

\*　　\*　　\*　　\*　　\*　　\*

Sec. 4. (a) Subsections (a) through (e) of section 706 of the Civil Rights Act of

1964 (78 Stat. 259; 42 U.S.C. 2000e–5(a)–(e)) are amended to read as follows:

"(a) The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 703 or 704 of this title.

"(b) Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by an officer or employee of the Commission upon the request of any person claiming to be aggrieved, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the 'respondent') within ten days, and shall make an investigation thereof. Charges shall be in writing and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d). If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion.

\* \* \* \* \* \*

"(f) If the Commission determines after attempting to secure voluntary compliance under subsection (b) that it is unable to secure from the respondent a conciliation agreement acceptable to the Commission, which determination shall not be reviewable in any court, the Commission shall issue and cause to be served upon any respondent not a government, governmental agency, or political subdivision a complaint stating the facts upon which the allegation of the unlawful employment practice is based, together with a notice of hearing before the Commission, or a member or agent thereof, at a place therein fixed not less than five days after the serving of such complaint. In the case of a respondent which is a government, governmental agency, or political subdivision, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in such civil action. The provisions of section 706(q) through (w), as applicable, shall govern civil actions brought hereunder. Related proceedings · may be consolidated for hearing. Any officer or employee of the Commission who filed a charge in any case shall not participate in a hearing on any complaint arising out of such charge, except as a witness.

"(g) A respondent shall have the right to file an answer to the complaint against him and with the leave of the Commission, which shall be granted whenever it is reasonable and fair to do so, may amend his answer at any time. Respondents and the person or persons aggrieved shall be parties and may appear at any stage of the proceedings, with or without counsel. The Commission may grant other persons a right to intervene or to file briefs or make oral arguments as amicus curiae or for other

purposes, as it considers appropriate. All testimony shall be taken under oath and shall be reduced to writing. Any such proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the Rules of Civil Procedure for the district courts of the United States.

"(h) If the Commission finds that the respondent has engaged in an unlawful employment practice, the Commission shall state its findings of fact and shall issue and cause to be served on the respondent and the person or persons aggrieved by such unlawful employment practice an order requiring the respondent to cease and desist from such unlawful employment practice and to take such affirmative action, including reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organizations, as the case may be, responsible for the unlawful employment practice), as will effectuate the policies of this title, * * *. If the Commission finds that the respondent has not engaged in any unlawful employment practice, the Commission shall state its findings of fact and shall issue and cause to be served on the respondent and the person or persons alleged in the complaint to be aggrieved an order dismissing the complaint.

* * * * * *

"(j) Findings of fact and orders made or issued under subsections (h) or (i) of this section shall be determined on the record. Sections 554, 555, 556, and 557 of title 5 of the United States Code shall apply to such proceedings.

"(k) Any party aggrieved by a final order of the Commission granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals for the circuit in which the unlawful employment practice in question is alleged to have occurred or in which

such party resides or transacts business, or in the Court of Appeals for the District of Columbia Circuit, by filing in such court within sixty days after the service of such order, a written petition praying that the order of the Commission be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission and to any other party to the proceeding before the Commission, and thereupon the Commission shall file in the court the record in the proceeding as provided in section 2112 of title 28, United States Code. Upon the filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant to the petitioner or any other party, including the Commission, such temporary relief or restraining order as it deems just and proper, and to make and enter upon the pleadings, testimony, and proceedings set forth in such record a decree affirming, modifying, or setting aside, in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. Any party to the proceeding before the Commission shall be permitted to intervene in the court of appeals. The commencement of proceedings under this subsection shall not, unless ordered by the court, operate as a stay of the order of the Commission. No objection that has not been urged before the Commission, its member, or agent shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Commission, its member, or its agent, the court may order

such additional evidence to be taken before the Commission, its member, or its agent, and to be made a part of the record. The Commission may modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive, and its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it, the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the Supreme Court of the United States, as provided in section 1254 of title 28, United States Code. Petitions filed under this subsection shall be heard expeditiously.

"(*l*) The Commission may petition any United States court of appeals for the circuit in which the unlawful employment practice in question occurred or in which the respondent resides or transacts business, for the enforcement of its order and [the provisions of subsection (k) shall govern those proceedings].

\* \* \* \* \* \*

"(q)(1) If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d), whichever is later, the Commission has not issued a complaint under subsection (f), the Attorney General has not filed a civil action under subsection (f), or the Commission has not entered into an agreement under subsection (f) or (i) to which the person aggrieved is a party, the Commission shall so notify the person aggrieved and within sixty days after the giving of such notice a civil action may be brought against the respondent named in the charge (1) by the person claiming to be aggrieved, or (2) if

such charge was filed by an officer or employee of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon the commencement of such civil action, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall take no further action with respect thereto, except that, upon timely application, the court in its discretion may permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action if the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, certifies that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending termination of State or local proceedings described in subsection (c) or (d) or the efforts of the Commission to obtain voluntary compliance.

"(2) The right of an aggrieved person to bring a civil action under paragraph (1) of this subsection shall terminate once the Commission has issued a complaint under subsection (f) or the Attorney General has filed a civil action under subsection (f), or the Commission has entered into an agreement under subsection (f) or (i) to which the person aggrieved is a party, except that (1) if after issuing a complaint the Commission enters into an agreement under subsection (i) without the agreement of the person aggrieved, or has not issued an order under subsection (h) within a period of one hundred and eighty days of the issuance of the complaint, the Commission shall so notify the person aggrieved and a civil action may be

brought against the respondent named in the charge at any time prior to the Commission's issuance of an order under subsection (h) or, in the case of an agreement under subsection (i) to which the person aggrieved is not a party, within sixty days after receiving notice thereof from the Commission, and (2) where there has been no agreement under subsection (i), if the person aggrieved files a civil action against the respondent during the period from one hundred and eighty days to one year after the issuance of the complaint such person shall notify the Commission of such action and the Commission may petition the court not to proceed with the suit. The court may dismiss or stay any such action upon a showing that the Commission has been acting with due diligence on the complaint, that the Commission anticipates the issuance of an order under subsection (h) within a reasonable period of time, that the case is exceptional, and that extension of the Commission's jurisdiction is warranted."

(b) Subsections (f) through (k) of section 706 of such Act and references thereto are redesignated as subsections (r) through (w), respectively.

\*　　\*　　\*　　\*　　\*　　\*

"(e) Subsequent to the date of enactment of the Equal Employment Opportunities Enforcement Act of 1971, the Commission shall have authority to investigate an act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by an officer or employee of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 706, including the provisions for enforcement and appellate review contained in subsections (k) (*1*), (m), and (n) thereof."

\*　　\*　　\*　　\*　　\*　　\*

## "INVESTIGATORY POWERS

"Sec. 710. For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 11 of the National Labor Relations Act (49 Stat. 455; 29 U.S.C. 161) shall apply. No subpoena shall be issued on the application of any party to proceedings before the Commission until after the Commission has issued and caused to be served upon the respondent a complaint and notice of hearing under subsection (f) of section 706."

\*　　\*　　\*　　\*　　\*　　\*

Sec. 11. Title VII of the Civil Rights Act of 1964 (78 Stat. 253; 42 U.S.C. 2000e et seq.) is amended by adding at the end thereof the following new section:

## "NONDISCRIMINATION IN FEDERAL GOVERNMENT EMPLOYMENT

"Sec. 717. (a) All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, United States Code, in executive agencies (other than the General Accounting Office) as defined in section 105 of title 5, United States Code (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in the legislative and judicial branches of the Federal Government having positions in the competitive service, shall be made free from any discrimination based on race, color, religion, sex, or national origin.

"(b) The Civil Service Commission shall have authority to enforce the provisions of subsection (a) through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section, and shall issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this

section. The Civil Service Commission shall—

(1) be responsible for the annual review and approval of a national and regional equal employment opportunity plan which each department and agency and each appropriate unit referred to in section 717(a) shall submit in order to maintain an affirmative program of equal employment opportunity for all such employees and applicants for employment;

(2) be responsible for the review and evaluation of the operation of all agency equal employment opportunity programs, periodically obtaining and publishing (on at least a semiannual basis) progress reports from each such department, agency, or unit; and

(3) consult with and solicit the recommendations of interested individuals, groups, and organizations relating to equal employment opportunity.

The head of each such department, agency, or unit shall comply with such rules, regulations, orders, and instructions which shall include a provision that an employee or applicant for employment shall be notified of any final action taken on any complaint of discrimination filed by him thereunder. The plan submitted by each department, agency, and unit shall include, but not be limited to—

(1) provision for the establishment of training and education programs designed to provide a maximum opportunity for employees to advance so as to perform at their highest potential; and

"(2) a description of the qualifications in terms of training and experience relating to equal employment opportunity for the principal and operating officials of each such department, agency, or unit responsible for carrying out the equal employment opportunity program and of the allocation of personnel and resources proposed by such department, agency, or unit to carry out its equal employment opportunity program.

"(c) Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection 717(a), or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 706(q), in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

"(d) The provisions of section 706(q) through (w), as applicable, shall govern civil actions brought hereunder.

"(e) Nothing contained in this Act shall relieve any Government agency or official of its or his primary responsibility to assure nondiscrimination in employment as required by the Constitution and statutes or of its or his responsibilities under Executive Order 11478 relating to equal employment opportunity in the Federal Government.

\*　　\*　　\*　　\*　　\*　　\*

Appendix C*

Civil Rights Employment FY 1970 - FY 1975

| | FY 1970 | FY 1971 | FY 1972 | FY 1973 | FY 1974 | FY 1975 |
|---|---|---|---|---|---|---|
| TOTAL | 344 | 757 | 1015 | 1787 | 2472 | |
| D. of C. | 7 | 11 | 26 | 76 | 87 | |
| Territories | | | | | | |
| 89 Districts | | | | | | |
| **1st Circuit** | | | | | | |
| Maine | 1 | — | 5 | 5 | 4 | |
| Massachusetts | 3 | 9 | 11 | 19 | 43 | |
| New Hampshire | 1 | 1 | 1 | 3 | 8 | |
| Rhode Island | — | — | 7 | 3 | 4 | |
| Puerto Rico | 3 | — | 4 | 5 | 20 | |
| **2nd Circuit** | | | | | | |
| Connecticut | 4 | — | 11 | 17 | 35 | |
| New York, N. | 1 | 1 | 3 | 7 | 10 | |
| E. | — | — | 1 | 7 | 17 | |
| S. | 3 | 1 | 11 | 20 | 33 | |
| W. | 1 | 1 | 7 | 23 | 20 | |
| Vermont | — | — | — | 3 | 3 | |
| **3rd Circuit** | | | | | | |
| Delaware | — | — | 1 | 8 | 6 | |
| New Jersey | 9 | 10 | 23 | 30 | 43 | |
| Penn., E. | 3 | 1 | 4 | 15 | 22 | |
| M. | — | — | 1 | 6 | 6 | |
| W. | 5 | 6 | 4 | 14 | 29 | |
| Virgin Islands | — | — | — | — | — | |
| **4th Circuit** | | | | | | |
| Maryland | 3 | 11 | 9 | 37 | 41 | |
| N.C., E. | 3 | 2 | 5 | 2 | 4 | |
| M. | 1 | 2 | 4 | 8 | 19 | |
| W. | 1 | 3 | 12 | 23 | 25 | |
| S.C. | 5 | 3 | 12 | 23 | 23 | |
| Virginia, E. | 5 | 11 | 21 | 32 | 50 | |
| W. | 5 | 3 | 14 | 7 | 12 | |
| West Va., N. | 1 | 3 | 1 | 2 | 1 | |
| S. | 1 | — | 4 | 6 | 9 | |
| **5th Circuit** | | | | | | |
| Alabama, N. | 13 | 53 | 31 | 57 | 70 | |
| M. | 2 | 3 | 12 | 20 | 20 | |
| S. | 2 | 8 | 10 | 19 | 22 | |
| Florida, N. | — | 2 | 1 | 8 | 6 | |
| M. | 4 | 5 | 13 | 24 | 31 | |
| S. | 4 | 20 | 20 | 20 | 23 | |
| Georgia, N. | 15 | 37 | 39 | 53 | 55 | |
| M. | 1 | 5 | 4 | 4 | 8 | |
| S. | 3 | 9 | 3 | 7 | 8 | |
| Louisiana, E. | 14 | 51 | 37 | 51 | 54 | |
| M. | — | — | 5 | 8 | 5 | |
| W. | 5 | 3 | 15 | 20 | 29 | |
| Miss., N. | 1 | 8 | 9 | 6 | 26 | |
| S. | 2 | 9 | 17 | 27 | 38 | |
| Texas, N. | 6 | 30 | 34 | 48 | 94 | |
| E. | 5 | 12 | 15 | 21 | 29 | |
| S. | 18 | 26 | 34 | 71 | 103 | |
| W. | 8 | 9 | 13 | 21 | 55 | |
| Canal Zone | — | — | — | — | — | |

| | FY 1970 | FY 1971 | FY 1972 | FY 1973 | FY 1974 | FY 1975 |
|---|---|---|---|---|---|---|
| **6th Circuit** | | | | | | |
| Kentucky, E. | — | 1 | 4 | 8 | 3 | |
| W. | 1 | 2 | 7 | 16 | 6 | |
| Michigan, E. | 7 | 9 | 22 | 28 | 85 | |
| W. | 1 | 8 | 18 | 7 | 13 | |
| Ohio, N. | 7 | 22 | 56 | 119 | 141 | |
| S. | 16 | 12 | 13 | 39 | 59 | |
| Tennessee, E. | 1 | 11 | 3 | 18 | 24 | |
| M. | 6 | 13 | 9 | 14 | 17 | |
| W. | 19 | 80 | 20 | 39 | 54 | |
| **7th Circuit** | | | | | | |
| Illinois, N. | 6 | 17 | 28 | 80 | 107 | |
| E. | 1 | 3 | 5 | 4 | 7 | |
| S. | 4 | 1 | 8 | 4 | 11 | |
| Indiana, N. | 3 | 5 | 10 | 8 | 17 | |
| S. | 6 | 9 | 3 | 26 | 21 | |
| Wisconsin, E. | 3 | 1 | 8 | 13 | 20 | |
| W. | 1 | — | 2 | 3 | 7 | |
| **8th Circuit** | | | | | | |
| Arkansas, E. | 1 | 10 | 5 | 18 | 21 | |
| W. | — | 3 | 2 | 6 | 3 | |
| Iowa, N. | — | — | 3 | 1 | 1 | |
| S. | — | 4 | 2 | 3 | 3 | |
| Minnesota | 3 | 4 | 7 | 16 | 15 | |
| Missouri, E. | 6 | 12 | 12 | 45 | 71 | |
| W. | 9 | 17 | 28 | 31 | 41 | |
| Nebraska | — | 3 | 13 | 13 | 15 | |
| N. Dakota | — | — | — | — | 5 | |
| S. Dakota | — | — | 1 | 1 | 3 | |
| **9th Circuit** | | | | | | |
| Alaska | 2 | — | 1 | 1 | — | |
| Arizona | 4 | 7 | 3 | 15 | 23 | |
| California, N. | 11 | 45 | 76 | 98 | 125 | |
| E. | 1 | 1 | 8 | 15 | 20 | |
| C. | 20 | 21 | 40 | 56 | 74 | |
| S. | — | 1 | 5 | 5 | 6 | |
| Hawaii | — | — | — | 1 | 6 | |
| Idaho | — | 1 | — | — | 3 | |
| Montana | — | 1 | 2 | 1 | 3 | |
| Nevada | — | 3 | 3 | 3 | 8 | |
| Oregon | 2 | 3 | 6 | 14 | 5 | |
| Washington, E. | 1 | 2 | — | 5 | 6 | |
| W. | 13 | 2 | 14 | 21 | 27 | |
| Guam | — | — | — | — | — | |
| **10th Circuit** | | | | | | |
| Colorado | 7 | 33 | 21 | 30 | 47 | |
| Kansas | 4 | 4 | 7 | 36 | 17 | |
| New Mexico | 3 | 15 | 12 | 21 | 42 | |
| Oklahoma, N. | 5 | 1 | — | 2 | 6 | |
| E. | — | — | — | — | 2 | |
| W. | 1 | — | 6 | 11 | 25 | |
| Utah | — | 1 | 1 | 1 | 1 | |
| Wyoming | — | — | 7 | 5 | 6 | |

* Table supplied by Administrative Office of the United States Courts.

---

LEVENTHAL, Circuit Judge (concurring):

Since I agree generally with Judge Wright's opinion, and certainly agree with its significant points, I am joining in that opinion. This is subject to a significant exception as to Judge Wright's discussion in Part II B(2) (171

U.S.App.D.C. pp. ——–——, 520 F.2d pp. 136–142) of the performance of the Civil Service Commission after the passage of the 1972 act. These, I think, are the significant aspects of the case.

1. Although the text of the statute can be argued either way, it is more natural to consider a statute providing for "an action" in the district court as one that permits a *de novo* presentation unless there is some other indication to the contrary. The "as applicable" language of the statute relied upon by the District Court and appellees is too general to constitute a significant contrary indication.

2. Here the most important indicator of meaning is legislative history. While there are some passages of this history that support the District Court's view, the predominant impact of the legislative history, set out at length in Judge Wright's opinion in order to present the full picture, seems to me to lead fairly to the conclusion that what was contemplated by the legislature was a *de novo* trial in the district court on a charge of racial discrimination in employment, for government employees as for employees in the private sector.

3. What apparently set District Judge Gesell on a contrary course was the conviction that a compulsory *de novo* trial in every case was an unnecessary and unproductive, indeed counter-productive, drain on the resources of all concerned.

For these claims of racial discrimination in employment, as for other civil rights cases, Congress has contemplated a more searching and active role of the courts than for litigation generally or for review of other kinds of governmental action. Judge Gesell recognized this when he provided a broader standard of judicial consideration (preponderance of evidence) than is normally provided for judicial review of agency action (substantial evidence standard[1]).

Moreover, Judge Gesell stated that the judge would be obligated to permit supplementation of the administrative record unless non-discrimination was established by the "clear weight of the evidence." 360 F.Supp. at 1252. This is offset, however, by his procedure for making that determination on the basis of the administrative record, without any right of discovery, and in the case at bar Judge Gesell went so far as to find that the non-discrimination was "crystal clear" and to grant defendant's motion for summary judgment without even providing for oral argument on the motion by plaintiff's counsel.

For me the path to *de novo* action for Federal employees is illuminated by *Alexander v. Gardner-Denver Co.* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which rejected the contention that in actions under Title VII district judges should defer to arbitral decisions rendered after hearings on discrimination claims.[2]

---

[1]. The only softening of Judge-participation results from the provision in § 706(f)(5), 42 U.S.C. § 2000e–5(f)(5), that relaxes the stringent requirements of Rule 53, F.R.Civ.P., to permit the appointment of a master in order that the case might be heard within 120 days after issue is joined. But even this provision does not permit routine referrals to masters, under a general rule for all Title VII cases that could not be heard within 120 days, for that would undercut the Congressional "preference to have the case heard by a judge." *See Flowers v. Crouch-Walker Corp.*, 507 F.2d 1378, 1380 (7th Cir. 1974).

[2]. The Court said, inter alia (415 U.S. at 57–59, 94 S.Ct. at 1024–1025):

"Moreover, the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable. * * * [A] standard that adequately insured effectuation of Title VII rights in the arbitral forum would tend to make arbitration a procedurally complex, expensive, and time-consuming process."

The case is not squarely in point since the complaint hearing before a Government agency is more formal than an arbitration, and is a statutory rather than a contract procedure. On the other hand, the complaint hearing falls short of a Title VII action in certain of the crucial respects stressed in *Alexander v. Gardner-Denver*—the lack of compulsory process, except as to government employees; the dispensation with usual rules of evidence; and particularly the lack of discovery procedures. Significantly, the agency complaint hearing has been structured to avoid an "adversary" quality. The nature and purpose of the hearing are described in the Examiner's Manual thus: "The hearing is an adjunct to the investigation. It is not an adversary proceeding but is an administrative procedure designed to provide additional evidence." And the Manual virtually instructs the Examiner in terms that equate a finding of discrimination with a situation in which there is no reasonable doubt to the contrary.[3]

This is not to say that the agency hearings, and appeals taken to the Civil Service Commission, must be blanked out. In contrast with the former practice of an extremely informal procedure, without a verbatim transcript, and with the employee and agency appointing representatives who agreed on a hearing officer, now the examiner is assigned to the case by the Civil Service Commission, from among a certified list; this official has no other duties before the agency; he takes testimony under oath and insures a transcript.

The informal means available to a judge to shape the course of a trial would ordinarily suffice to obviate duplication without a purpose, just as a judge routinely takes steps to avoid cumulative testimony. But that does not warrant omission of the testimony of crucial witnesses, whose demeanor is of manifest importance to the factfinding function. And the significant discovery right should not be impaired.

Finally, insofar as Judge Gesell values the benefit of the expertise of the Civil Service Commission, particularly for those cases involving the intracacies of regulations governing job qualification selection for, *e. g.,* training and promotion, it may be considered by the judge.[4] Indeed, Judge Gesell's approach is likely to undercut availability of the Commission's expertise by encouraging government employees to exercise their option to proceed to court forthwith, for immediate relief, without pursuing an appeal to the Civil Service Commission.

The approaches of this court and the district court may not differ so much in practical result, for the bulk of cases. To the extent there is a difference, it would seem to come closer to the intent of Congress if the Federal employee can proceed in court like any other litigant, subject to informal steps to avoid what is shown to be an unnecessary duplication of the administrative record, rather than be required to make an affirmative showing persuading the judge that there is a "need" before he can exercise procedures routinely accorded to civil litigants.

---

**3.** The pertinent, and somewhat involuted, language appears at p. 62.

> "If a reasonable and unprejudiced mind could not infer from the facts so assembled that the agency was free from discrimination in the matter, then the Examiner should make a finding of discrimination."

**4.** The expertise of an agency may be considered on an advisory basis even when a court has plenary jurisdiction. *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); *Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 248, 455 F.2d 1306, 1316 (1971). I do not suggest that the District Court could or should stay its

hand pending an appeal to the Commission. This would conflict with the "statute's express aim" of expedition. *Grubbs v. Butz,* 169 U.S. App.D.C. 82, 514 F.2d 1323, 1331 (1975). Congress deliberately gave the employee an option not to appeal, and to file an action in District Court either on agency denial, or on its failure to act within 180 days, and directed the court to expedite its consideration of the action.

As Judge Wright's opinion notes, the judge in a Title VII action could elicit the views of the Civil Service Commission as *amicus curiae.*

4. I do not join in Judge Wright's opinion in regard to his characterization of the recent course of the Civil Service Commission. In my view, it is not necessary to speak to that matter in this case; it is a matter that is in flux; and if it were to be raised directly in a case I should also like to have before me a complete picture of what the Commission is doing, or more likely is trying to get the several government agencies to do. This would embrace, *e. g.,* the developments in regard to affirmative action plans.

DAVIS, Judge (concurring):

I join in Judge Wright's opinion for the court except to the extent of the reservations expressed in paragraph numbered 4 of Judge Leventhal's opinion.